# Exhibit E to *Hale v. Lee* Complaint

**IN THE CHANCERY COURT OF TENNESSEE**
**FOR THE TWENTIETH JUDICIAL DISTRICT**

AKILAH MOORE, TELISE TURNER, and GARY
WYGANT,

Plaintiffs,

v.

WILLIAM LEE, as Governor of Tennessee, in his
official capacity; TRE HARGETT, as Tennessee
Secretary of State, in his official capacity; and MARK
GOINS, as Tennessee Coordinator of Elections, in his
official capacity,

Defendants.

CASE NO. 22-0287-IV
Chancellor Perkins
Chancellor Maroney
Judge Sharp

---

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
TEMPORARY INJUNCTION**

---

Defendants William Lee, as Governor of Tennessee, in his official capacity, Tre Hargett, as

Tennessee Secretary of State, in his official capacity, and Mark Goins, as Tennessee Coordinator

of Elections, in his official capacity, respond in opposition to Plaintiffs' Motion for Temporary

Injunction.

**INTRODUCTION**

Plaintiffs filed the instant motion for temporary injunction asking that this Court enjoin

Defendants "from enforcing or giving any effect to the boundaries of the House of Representatives

and Senate districts as drawn in SB 0779 and SB 0780, including an injunction barring Defendants

from conducting any further elections under the enacted maps," and "delay[] the April 7, 2022,

candidate filing deadline until May 20, 2022, or such other date as the Court deems appropriate."

*See* Pls' Mot.. for Temp. Inj., at 2).

1

But because Plaintiffs unreasonably delayed in seeking a temporary injunction, laches bars their dilatory request for relief. Moreover, even if laches did not operate to bar their motion, they cannot show a likelihood of success on the merits due to a lack of standing and because the restricting maps were designed in good faith and meet applicable constitutional requirements. And finally, changing the rules on the eve of an election would wreak chaos upon the electoral process and would unnecessarily risk voter confusion and disenfranchisement of Tennessee's military and overseas voters, causing irreparable harm to the Defendants and to the public interest. Accordingly, their motion for a temporary injunction should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     House Bill 1035, Public Chapter 598

In accordance with the requirements of Art. II § 4, the Tennessee House of Representative undertook to reapportion the districts for the Tennessee State House after the 2020 census. The initial bill, House Bill 1035, was introduced on February 10, 2011.[1] Prior to the introduction of that bill, the House established a redistricting website containing a map of the then-current House districts and a link to each specific district. *See* Ex 1-Affidavit of Doug Himes. As information became available through the House redistricting process, information was posted to the website and made available to the public. *Id.*

On August 25, 2021, the Speaker of the House of Representatives appointed the 16-member House Select Committee on Redistricting ("House Committee"), including the Chair and three Area Coordinators. *Id*. The House Committee held its first public meeting on September 8,

---

[1]The Legislative History is public record, which is accessible at Tennessee General Assembly Legislation (tn.gov).

2021. At that meeting, counsel to the House Committee made a presentation about the redistricting process. *See* Himes Ex. 3. As part of that presentation, counsel discussed the 2020 Census numbers—noting that the State's population growth was vastly uneven, with thirty (30) counties experiencing negative growth and seventeen (17) counties experiencing positive growth in excess of 10%. *Id.* Additionally, there were six counties whose growth was essentially stagnant (less than 1%), including Shelby and Sullivan Counties. *Id.*

Next, counsel discussed the House Redistricting Guidelines codified at Tenn. Code Ann. § 3-1-103(b). These guidelines were first adopted by the General Assembly in 1992 in response to the redistricting cases in the 1980s: *State ex rel. Lockert v. Crowell*, 631 S.W.2d 702 (Tenn. 1982) ("*Lockert I*"), *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836 (Tenn. 1983) ("*Lockert II*"), *Lincoln County v. Crowell*, 701 S.W.2d 602 (Tenn. 1985), and *State ex rel. Lockert v. Crowell*, 729 S.W.2d 88 (Tenn. 1987) ("*Lockert III*"). *Id.*

These guidelines reflect the legislative intent that any House redistricting plan comply with federal constitutional and statutory and state constitutional law and include the following:

> (1) Each district be represented by a single member;
>
> (2) Districts must be substantially equal in population in accordance with the constitutional requirements for "one (1) person one (1) vote" as judicially interpreted to apply to state legislative districts;
>
> (3) Geographic areas, boundaries and population counts used for redistricting shall be based on the [2020] federal decennial census;
>
> (4) Districts must be contiguous and contiguity by water is sufficient, and, toward, that end, if any voting district or other geographical entity designated as a portion of a district is found to be noncontiguous with the larger portion of such district, it shall be constitute a portion of the district smallest in population to which it is contiguous;

3

> (5) No more than thirty (30) counties may be split to attach to other counties or parts of counties to form multi-county districts; and

> (6) The redistricting plan will comply with the Voting Rights Act and the fourteenth and fifteenth amendments to the United States Constitution.

Tenn. Code Ann. § 3-1-103(b).

Finally, counsel discussed the procedures and deadline for submission of redistricting plans, as well as the redistricting timetable. As part of that timetable, counsel specifically noted the April 7 candidate qualifying deadline for the August 2022 primary election. *Id*.

There were four (4) plans that were timely submitted to the House Committee. Counsel for the House Committee conducted a standard basic evaluation of each of these plans. These evaluations, which were provided to the House Committee members and posted on the House Committee's website, evaluated the following aspects of each plan:

- Number of districts
- Number of majority-minority districts
- Overall variance (range) and the high and low
- Number of county splits
- Contiguity
- Unassigned areas
- Paired incumbents

*Id*.

The evaluations of these plans reflected that none of the plans fully complied with the statutory guidelines set forth in Tenn. Code Ann. § 3-1-103(b). Specifically, the Windrow Plan was non-contiguous, had an overall variance of 24.23% with 26 county splits, only 5 majority-minority districts (there are currently 13 majority-minority districts) and paired 46 incumbents. The Equity Alliance and Memphis A. Phillip Randolph Institute Plan—while it had a significantly lower overall variance of 9.75% and split 30 counties—was non-contiguous, had only 2 majority-minority districts and paired 51 incumbents. Similarly, the Wishart Plan had an overall variance

4

of 9.01% and split 30 counties, but it was also non-contiguous, only had 6 majority-minority districts and paired 26 incumbents.  Finally, the plan submitted by Orrin, Newton, Lichtenstein and Moore had an overall variance of 19.28%, split 58 counties, only had 10 majority-minority districts, paired 20 incumbents and was noncontiguous.  Additionally, all the plans split the four urban counties (Shelby, Davidson, Knox and Hamilton) and had multiple splits of some counties. *See* Himes Ex. 4.

The Democratic Caucus attempted to submit a plan but failed to meet the submission deadline.  And, as with the four timely-submitted plans, it did not comply with all the statutory guidelines.  For example, while the plan had an overall variance of 6.71%, it only had 8 majority-minority districts, split 35 counties, including double splits of Sullivan, Washington, Wilson, and Blount Counties, and split three of the four urban counties (Davidson, Hamilton, and Shelby).  The plan was also non-contiguous as it assigned one or more census blocks located in one district to another district approximately 18 times and it paired 24 incumbents.  *See* Himes Ex. 5.  In informing the Democratic Caucus that this plan had been rejected as untimely, counsel for the House Committee also explained the problems with their plan and, in particular, informed them that the double splits of Sullivan, Washington, Wilson and Blount Counties and the splits of Shelby, Davidson and Hamilton County appeared to be in violation of Art. II, § 5 of the Tennessee Constitution as interpreted by the Tennessee Supreme Court in *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836 (Tenn. 1983).

The House Committee scheduled another public meeting for December 17, 2021.  The day before that meeting, the House Democratic Caucus submitted a new redistricting plan ("Democratic Caucus plan").  This new plan reduced the number of split counties from 35 to 23 and eliminated the double splits in Sullivan, Washington, Wilson and Blount Counties, but it

5

continued to split Shelby County.  *Id.*  At the public meeting the next day, counsel for the House Committee noted that the plan split Shelby County and that this split appeared to violate Art. II, § 5 of the Tennessee Constitution as interpreted by the Tennessee Supreme Court in *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836 (Tenn. 1983).  *Id.*  No member of the House Committee made a motion to approve either the Democratic Caucus plan or any of the other four plans submitted. Instead, the only motion that was made was to approve the plan that counsel had prepared for the House Committee.  *Id.*

That plan contains 99 single member districts, is wholly based on 2020 Census geography and population data and establishes 99 contiguous districts in accordance with Tenn. Code Ann. § 3-1-103(b)(1), (3) and (4).  *Id.*  The plan has an overall variance of 9.90%, which is within the parameters of constitutional requirements for "one person, one vote" as interpreted to apply to state legislative districts and in accordance with Tenn. Code Ann. § 3-1-103(b)(2), and splits a total of 30 counties, consistent with the requirements of Art. II, § 5 of the Tennessee Constitution, as interpreted by the Tennessee Supreme Court in *Lockert II* to apply to House districts, and in accordance with Tenn. Code Ann. § 3-1-103(b)(5).  *Id.*  Finally, the plan maintains 13 effective majority-minority districts in compliance with the Voting Rights Act and Tenn. Code Ann. § 3-1-103(b)(6).  *Id.*

This plan was approved by the House Committee, became House Bill 1035, and was then referred to the House Public Service Committee and recommended for passage on January 12, 2022.  House Bill 1035 was then referred to the House State Government Committee and recommended for passage on January 18, 2022.  House Bill 1035 came before the full House for third and final consideration on January 24, 2022.  At that time, Representative Dixie presented the Democratic Caucus plan as an amendment (Amendment 4) to House Bill 1035.  That

amendment was tabled, and the House voted to adopt House Bill 1035. This plan was ultimately adopted by both Houses of the General Assembly and signed by the Governor as Public Chapter 598 and became effective on February 6, 2022.

## II.      Senate Bill 0780, Public Chapter 596

In accordance with the requirements of Art. II § 4, the Tennessee Senate undertook to reapportion the districts for the Tennessee State Senate after the 2020 census. The initial bill, Senate Bill 0780, was introduced on February 9, 2021.[2]  On September 17, 2021, the Lt. Governor appointed the members of the Senate Ad Hoc Committee on Redistricting ("Senate Committee"). Just as the House Committee, the Senate Committee established a website and posted information about redistricting as information became available. In particular, the Senate Committee posted Guidelines for the Submission of Senate redistricting plans and set a deadline of November 22, 2021, for submission of proposed plans. *See* Ex. 2-Senate Guidelines.

The Senate Committee ultimately received five plans for consideration. Similar to the House Committee process, counsel for the Senate Committee conducted a standard basic evaluation of each of those plans and those evaluations were provided to the Senate Committee members and posted on the Senate Committee's website. Copies of these evaluations are attached as Collective Exhibit 3. Each of these plans had issues. For example, the Hildabrand plan had an overall deviation of 6.83% and split eight (8) counties, but only had three majority-minority districts (there are four under the 2012 Senate plan) and it switched an even-numbered district with an odd-numbered district. The Lee Plan had an overall deviation of 5.49% but split 19 counties,

---

[2]The Legislative History is public record, which is accessible at Tennessee General Assembly Legislation (tn.gov).

only had three majority-minority districts and paired 12 incumbents. The Miles Plan had an overall deviation of 8.09%, split 15 counties and only had two majority-minority districts. It also paired six incumbents. The Trivette Plan also had an overall deviation of 8.09% but only split nine counties and had three majority-minority districts. The plan paired twelve incumbents and moved some incumbents from an odd-number district to an even-numbered district, and vice versa. Finally, the Puttbrese plan had an overall deviation of 7.70%, split eight counties and only had three majority-minority districts. *See* Ex. 3-Senate Plan Evaluations.

These plans were all considered by the Senate Committee at their public meeting on December 14, 2021. At that same meeting, the Senate Committee considered the plan that had been prepared for the Committee. That plan had an overall deviation of 6.17%, split ten counties and paired no incumbents. It also had four majority-minority districts—making it the only plan presented to the Senate Committee for consideration which increased the same number of majority-minority districts. The Senate Committee ultimately adopted this plan which became Senate Bill 0780.

Senate Bill 0780 was subsequently referred to the Senate Judiciary Committee and recommended for passage on January 18, 2022. Senate Bill 0780 came before the full Senate for third and final consideration on January 20, 2012. At that time, Senator Yarbro introduced Amendment 2 which presented an entirely new and different plan for reapportionment of the State Senate. The Amendment 2 plan had an overall deviation of 7.7%, and split eight counties while pairing no incumbents. It also had three majority-minority districts. That amendment was ultimately tabled, and the Senate voted to adopt Senate Bill 0780. This plan was ultimately passed by both Houses of the General Assembly and signed by the Governor as Public Chapter 596.

### III. Procedural History

Nearly two-and-half weeks after both the House and Senate redistricting plans became law, Plaintiffs filed their complaint challenging the constitutionality of each map. *See* Compl. Plaintiffs alleged that the Senate Plan violated the Tennessee Constitution by failing to consecutively number the districts in Davidson County and that the House Plan violated by the Tennessee Constitution by excessively dividing counties. *See id.* at ¶¶ 64-75. Plaintiffs did not challenge the constitutionality of the statutory provision setting forth the qualifying deadline. *Id.*

Notably, Plaintiffs did not contemporaneously seek a temporary injunction. Instead, Plaintiffs delayed another two weeks before filing the instant motion on March 11, 2022, alongside an amended verified complaint. *See* Pls' Mot. for Temp. Inj.; *see also* Amend. Compl. Defendants hereby respond in opposition to Plaintiffs' motion for temporary injunction.

### STANDARD OF REVIEW

### I. Standard of Review – Constitutional Challenge

When there is a challenge to the constitutionality of a state statute, courts must begin with the presumption that legislative acts are constitutional. *State v. Pickett*, 211 S.W.3d 696, 700 (Tenn. 2007) (citing *Gallaher v. Elam*, 104 S.W.2d 455, 459 (Tenn 2003); *State v. Robinson*, 29 S.W.3d 476, 469 (Tenn. 2000); *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997)). Thus, courts are directed to "indulge every presumption and resolve every doubt in favor of the statute's constitutionality." *Pickett*, 211 S.W.3d at 780 (quoting *State v. Taylor*, 70 S.W.3d 717, 720-21 (Tenn. 2002)). In order to be found invalid, a statute must be plainly at odds with a constitutional provision. *Perry v. Lawrence County Election Comm'n*, 411 S.W.2d 538, 539 (Tenn. 1967), and a "heavy burden" is placed on one who attacks a statute. *Bailey*, 188 S.W.3d at 547; *Tennessee ex rel. Maner v. Leech*, 588 S.W.2d 534, 540 (Tenn. 1979). Furthermore, a challenge to a statute's

constitutionality does not give a court license to second-guess the General Assembly's policy judgments, *Draper v. Westerfield*, 181 S.W.3d 283, 290 (Tenn. 2005), or to inquire into the motives of the General Assembly. *Cosmopolitan Life Ins. Co. v. Northington*, 300 S.W.3d 911, 918 (Tenn. 1957).

The Tennessee Supreme Court has recognized that there is a distinction between a facial challenge and an "as applied" challenge to a statute's constitutionality. *See Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 454-55 (Tenn. 1995). A facial challenge to a statute involves a claim that the statute fails an applicable constitutional test and should be found invalid in all applications. *United States v. Salerno,* 481 U.S. 739, 745 (1987). Thus, the courts have recognized that a facial challenge to a statute is the most difficult challenge to mount successfully, *Lynch v. City of Jellico*, 205 S.W.3d at 390, and the presumption of the statute's constitutionality applies with even greater force when a facial challenge is made. *In re Burson*, 909 S.W.2d 768, 775 (Tenn. 1995). Accordingly, the party asserting a facial challenge must establish that no set of circumstances exists under which the statute would be valid. *Lynch v. City of Jellico*, 205 S.W.3d at 390 (quoting *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 525 (Tenn. 1993)).

In general, courts defer to legislative enactments because they represent "the duly enacted and carefully considered decision of a coequal and representative branch of our government," *Walters v. Nat. Assn. of Radiation Survivors*, 473 U.S. 305, 319 (1985), and because the legislature "is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." *Turner Broadcasting Systems Inc. v. FCC*, 520 U.S. 180, 195-96 (1997) (quotations omitted).

This deference is particularly applicable within the context of redistricting. "A state legislature is the institution that is by far the best situated to identify and then reconcile traditional

10

state policies within the constitutionally mandated framework of substantial population equality." *Connor v. Finch*, 431 U.S. 407, 414-15 (1977). *See also Petition of Below*, 855 A.2d 459 (2004) (recognizing that '[u]nlike the legislature, courts have no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name."). Consequently, in the absence of a clear, direct, irrefutable constitutional violation, judicial intervention is inappropriate given the complexity in delineating state legislative district boundaries and the political nature of such endeavors. *State ex rel. Cooper v. Tennant*, 730 S.E.2d 368, 383 (W.Va. 2012). *See also Miller v. Johnson*, 515 U.S. at 915 (recognizing that judicial review of redistricting legislation represents a serious intrusion on the most vital of local functions and that States "must have the discretion to exercise the political judgment necessary to balance competing interests"); *Georgia v. Ashcroft*, 539 U.S. 461, 123 S.Ct. 2498, 2511-12 (2003); *Maryland Commission for Fair Representation v. Tawes*, 377 U.S. 656, 676 (1964). Moreover, in reviewing Plaintiffs' arguments, this Court should "consider not only the specific violations claimed, but also those claims within the context of the entire plan, keeping in mind the difficulties in satisfying the various legal requirements statewide." *In Re Reapportionment of Town of Hartland*, 624 A.2d 323, 327 (Vt. 1993).

## II. Standard of Review – Injunctive Relief

Tennessee Courts have long recognized that a temporary injunction is an "extraordinary" remedy that should be granted "with great caution." *See, e.g.*, *Hall v. Britton*, 292 S.W.2d 524, 531 (1953); *Galyon v. First Tennessee Bank Nat. Ass'n*, No. 03A01-9106CH00219, 1991 WL 259473, at *1 (Tenn. Ct. App. Dec. 11, 1991) (noting that "injunctive relief" is "an extraordinary equitable remedy"). For that reason, "the decision to grant an injunction should not be a perfunctory one." *Alexandria-Williams v. Goins*, No. W2018-01024-COA-R10-CV, 2018 WL

11

3198799, at *2 (Tenn. Ct. App. June 26, 2018). Indeed, "there is no power the exercise of which is more delicate, which requires greater caution, deliberation and sound discretion or is more dangerous in a doubtful case." *Id.* (quoting *Mabry v. Ross*, 48 Tenn. 769, 774 (1870)).

In light of these principles, the Tennessee Rules of Civil Procedure permit awards of injunctive relief only where "it is clearly shown by verified complaint, affidavit or other evidence that the movant's rights are being or will be violated by an adverse party" and that "the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual." Tenn. R. Civ. P. 65.04. When considering requests for injunctive relief under this rule, Tennessee trial courts—like their federal counterparts—consider four factors: "(1) the threat of irreparable harm to the plaintiff if the injunction is not granted; (2) the balance between this harm and the injury that granting the injunction would inflict on defendant; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest." *Moody v. Hutchison*, 247 S.W.3d 187, 199–200 (Tenn. Ct. App. 2007); *see also S. Cent. Tennessee R.R. Auth. v. Harakas*, 44 S.W.3d 912, 919 n.6 (Tenn. Ct. App. 2000) (recognizing that this "four-factor test" is "[t]he most common description of the standard for preliminary injunction in federal and state courts"). Here, all four factors weigh against granting Plaintiffs' requested relief.

## APPLICABLE LAW

### I.      Governing Federal Principles

#### A.  Equal Protection Clause of the Fourteenth Amendment

The "overriding objective" of any legislatively adopted redistricting plan for a state legislature "must be substantial equality of population among the various [legislative] districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the

12

State." *Reynolds v. Sims*, 377 U.S. 533, 579 (1964). This principle, often referred to as the "one person, one vote" principle, is grounded in the Equal Protection Clause of the Fourteenth Amendment. In *Reynolds*, the Supreme Court held that states legislatures are required to "make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Id*. at 577.

While the Supreme Court has held that absolute population equality is required for congressional districts, *Karcher v. Daggett*, 462 U.S. 725, 732-33 (1983), it requires only "substantial" population equality for state legislative seats. *See Gaffney v. Cummings*, 412 U.S. 735, 748 (1973). Thus, the Supreme Court has recognized that minor deviations from absolute population equality may be necessary to permit states to pursue other legitimate and rational state policies. *See Reynolds v. Sims*, 377 U.S. at 577-81; *see also Mahan v. Howell*, 410 U.S. 315, 321-22 (1973). State policies that have been recognized as justifying minor deviations from absolute population equality generally include "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Karcher v. Daggett*, 462 U.S. at 740; *see also Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F.Supp. 1022, 1056 (D. Md. 1994) (recognizing traditional districting principles include: maintaining equality of population, preserving the "cores" of existing districts, preventing contests between incumbents, and complying with the requirements of the Voting Rights Act).

In *Gaffney v. Cummings*, the Supreme Court observed that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." 412 U.S. at 745. Subsequently, in *Brown v. Thomson*, the Court reiterated this point holding that "an apportionment plan with a maximum population deviation under 10% falls within

13

this category of minor deviations.  A plan with larger disparities in population, however, creates a *prima facie* case of discrimination and therefore must be justified by the State."  462 U.S. 835, 842-43 (1983).

Compliance with this "ten percent rule" does not end the inquiry, however, because *Reynolds* and its progeny also require a "good faith effort" by the state to achieve "as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. at 577.  *See also Corbett v. Sullivan*, 202 F.Supp.2d 972, 987 n.7 (E.D. Mo. 2002) (citing *Karcher*, 462 U.S. at 738-40) (holding that "[e]ven deviations smaller than the census margin of error must be the result of a good faith effort to achieve population equality").  A number of courts have recognized that the 10% *de minimis* threshold identified in *Brown* does not completely insulate a state's districting plan from attack of any type.  *See e.g., Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996) (quoting *Roman v. Sincock*, 377 U.S. 695, 710 (1964)); *Larios v. Perdue*, 306 F.Supp.2d 1190, 1202-03 (N.D. Ga. 2003); *Cecere v. County of Nassau*, 258 F.Supp.3d 184, 189-90 (E.D.N.Y. 2003);  *Montiel v. Davis*, 215 F.Supp.2d 1279, 1286 (S.D. Ala. 2002); and *Hastert v. State Board of Elections*, 777 F. Supp. 634, 645 (N.D. Ill. 1991).  Consequently, "if the plaintiff can present compelling evidence that the drafters of the plan ignored all the legitimate reasons for population disparities and created the deviations solely to benefit certain regions at the expense of others," a challenge to the plan will lie even with deviations below ten percent.  *See Legislative Redistricting Cases*, 629 A.2d 646, 657 (1993).  *See also  Licht v. Quattrocchi*, 449 A.2d 887, 887 (R.I. 1982) (finding deviation of five percent to violate one-person, one-vote requirement because deviation "negate[d] the effects of reapportionment"); *Jackman v. Bodine*, 262 A.2d 389, 382-83, *cert. denied* 400 U.S. 849 (1970) (stressing that "there is no range of deviation 'within which a State may maneuver, with or without reason;' that 'the command is to achieve equality, and a limited deviation is permissible if there

14

exists an acceptable reason for the deviation'; and the 'deviation may not exceed what the purpose inevitably requires . . . In short, there must be selected the best plan the constitutional thesis will permit, and the best plan is the one with the least population deviation").

Furthermore, courts have recognized that in light of recent technological developments that allow states to manipulate districting lines with a significantly higher degree of precision, there is no reason to give a state operating within the ten-percent margin immunity from review as to whether it is acting irrationally or undertaking invidious discrimination. *See Rodriguez v. Pataki*, 308 F.Supp.2d 346, 365 (S.D.N.Y. 2004) (recognizing that the benefit of flexibility to pursue legitimate state policies that states received under the "ten percent rule" carries with it a responsibility not to use the rule to frustrate the very purpose of the decennial census); *see also Rural West Tennessee African-American Affairs Council, Inc. v. McWherter*, 836 F.Supp. 447, 450 (W.D. Tenn. 1993).

### B. Voting Rights Act, 42 U.S.C. § 1973

In addition to compliance with the "one person, one vote" principle grounded in the Equal Protection Clause of the Fourteenth Amendment, any legislatively adopted redistricting plan for a state legislature must also comply with the Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. Section 2 provides:

> (a) No voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by

15

members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Section 2 is a "flexible, fact-intensive" doctrine, the "essence" of which is triggered when "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986). A legislative plan of reapportionment is considered a voting "standard, practice or procedure" for purposes of the Voting Rights Act.

### C. Tennessee Constitutional Provisions

There are several different provisions of the Tennessee Constitution which govern the apportionment of state legislators. Art. II, § 4 contains general provisions and provides as follows:

> *The apportionment of Senators and Representatives shall be substantially according to population.* After each decennial census made by the Bureau of Census of the United States is available the General Assembly shall establish senatorial and representative districts. Nothing in this Section nor in this Article II shall deny to the General Assembly the right at any time to apportion one House of the General Assembly using geography, political subdivisions, substantially equal population and other criteria as factors; provided such apportionment when effective shall comply with the Constitution of the United States as then amended or authoritatively interpreted. If the Constitution of the United States shall required that Legislative apportionment not based entirely on population be approved by vote of the electorate, the General Assembly shall provide for such vote in the apportionment Act.

(emphasis added). Art. II, § 5 contains the more specific provisions governing the apportionment of state representatives and provides as follows:

16

> The number of Representatives shall be ninety-nine and shall be apported by the General Assembly among the several counties or districts as shall be provided by law. Counties having two or more Representatives shall be divided into separate districts. In a district composed of two or more counties, each county shall adjoin at least one other county of such district; and no county shall be divided in forming such a district.

And Art. II, § 5a requires that "[e]ach district shall be represented by a qualified voter of that district."

Art. II, § 6 contains the more specific provisions governing the apportionment of state senators and provides as follows:

> The number of Senators shall be apportioned by the General Assembly among the several counties or districts substantially according to population, and shall not exceed one-third the number of Representatives. Counties having two or more Senators shall be divided into separate districts. In a district composed of two or more counties, each county shall adjoin at least one other county of such district; and no county shall be divided in forming such a district.

Similarly, Art. II, § 6a requires that "[e]ach district shall be represented by a qualified voter of that district."

Finally, Art. II, § 3, while not part of the Constitution addressing the apportionment of legislators, does provide that in the first election after adoption of the amendment[3], "Senators elected in districts designated by even numbers shall be elected for four years and those elected in districts designated by odd numbers shall be elected for two years. In a county having more than one senatorial district, the districts shall be numbered consecutively."

---

[3] This amendment was adopted at the November 1966 General Election.

17

## ARGUMENT

### I. Plaintiffs' Motion is Barred by Laches.

Plaintiffs' request for a temporary injunction is barred by laches. Laches, the Tennessee Supreme Court has explained, is a negligent and unintentional failure to protect one's rights. *Long v. Bd. of Prof. Resp. of Sup. Ct.*, 435 S.W.3d 174, 181-82 (Tenn. 2014); s*ee also United States v. City of Loveland*, 621 F.3d 465, 473 (6th Cir. 2010) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir.1991)). A defendant asserting laches, then, must show that: (1) the plaintiff delayed unreasonably in asserting its rights, and (2) the defendant is prejudiced by this delay. *See id.* (citing *Jansen v. Clayton*, 816 S.W.2d 49, 51 (Tenn. Ct. App. 1991)). Both elements are met here.

*First*, Plaintiffs unreasonably delayed in seeking judicial intervention. Plaintiffs waited nearly three weeks before they filed their complaint. *See* Compl. And then Plaintiffs delayed another two weeks to file their instant motion for temporary injunction. *See* Plaintiffs' Mot. for Temp. Inj. Plaintiffs' delay is inexcusable given that the qualifying deadline (which is statutorily set and acknowledged by Plaintiffs) falls within a month of the date of Plaintiffs seeking temporary injunctive relief. Even if the delay in filing the complaint is excusable, the delay in filing for temporary injunction was not, especially where prompt attention could have permitted consideration of temporary injunctive relief without disturbing the qualifying deadline.

*Second*, Plaintiffs' delay will prejudice Defendants. "Prejudice," some courts have recognized, "can be inferred simply from the plaintiff's delay, or from evidence of specific harm." *Perry v. Judd*, 840 F. Supp. 2d 945, 954 (E.D. Va.), *aff'd*, 471 F. App'x 219 (4th Cir. 2012) (citing *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990)); *see also Memphis A. Phillip Randolph Inst. v. Hargett*, 473 F. Supp. 3d 789, 800 (M.D. Tenn. 2020) (recognizing that "at this late stage, a certain amount of prejudice can be presumed"). And "[t]he greater the delay, the less prejudice required to show laches." *Perry*, 840 F. Supp. 2d at 954. Given Plaintiffs' inexcusable delay here, then, Defendants need not show much

18

prejudice. *See id.* But that is not to say that Defendants cannot show prejudice. To the contrary, Plaintiffs' eleventh-hour temporary injunction is all but certain to prejudice Defendants.

For one thing, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 (recognizing that enjoining a State from enforcing its laws would "seriously and irreparably harm the State"). Here, the redistricting maps are legislative enactments entitled to presumptions of constitutionality. It follows that the State would suffer "irreparable injury" if this Court were to issue Plaintiffs' requested temporary injunction. *See Maryland*, 567 U.S. at 1303. And the timing of their motion, coupled with the precise logistical requirements for carrying out Tennessee elections— discussed *infra* at 38-44 demonstrates the chaos that their sought-after injunction would create.

In sum, both elements of laches are present here. And for that reason, this Court should exercise its discretion to conclude that laches bars Plaintiffs' eleventh-hour request for a temporary injunction. *Long v. Bd. of Prof. Resp. of Sup. Ct.*, 435 S.W.3d 174, 181-82 (Tenn. 2014); *see also Memphis A. Phillip Randolph Inst.*, 473 F. Supp. 3d at 800.

**II.      Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits.**

**A.  Plaintiffs lack standing.**

"Courts use the doctrine of standing to determine whether a litigant is entitled to pursue judicial relief as to a particular issue or cause of action." *City of Memphis v. Hargett*, 414 S.W.3d 88, 97 (Tenn. 2013). Standing "ordinarily precedes a consideration of the merits of a claim." *Fisher v. Hargett*, 604 S.W.3d 381, 396 (Tenn. 2020).

"Constitutional standing is a fundamental requirement of a justiciable controversy." *Id*. at 396. To establish constitutional standing, a plaintiff must demonstrate: (1) that the plaintiff has suffered a distinct and palpable injury, (2) that a causal connection exists between the alleged

19

injury and the challenged conduct, and (3) that the injury is capable of being redressed by a favorable decision of the court. *Id.* Injuries that are "distinct and palpable" are not "conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general citizenry." *City of Memphis*, 414 S.W.3d at 98. "A generalized grievance against allegedly illegal governmental conduct" is insufficient to establish constitutional standing. *United States v. Hays*, 515 U.S. 737, 743 (1995); *see Hamilton v. Metropolitan Government of Nashville*, No. M2016-00446-COA-R3-CV, 2016 WL 6248026, at *4 (Tenn. Ct. App. Oct. 25, 2016) ("a plaintiff's interest must be different from not only the general public, but also from any large class of citizens") (no perm. app. filed).

Plaintiffs in this case have failed to satisfy this fundamental requirement, alleging nothing more than a "generalized grievance" which they share in common with the general citizenry. Plaintiffs challenge two specific aspects of the redistricting plan as violating the Tennessee Constitution: (1) the numbering of districts in Davidson County in the 2022 Senate plan and (2) the number of counties divided by the 2022 House plan. *See* Amend. Compl., ¶¶ 64-75. The Amended Complaint does not contain any allegations of a distinct and palpable injury to Plaintiffs caused by that challenged conduct.

With respect to the numbering of Senate districts in Davidson County, none of the Plaintiffs have alleged that they have been injured by the numbering of Senate districts in Davidson County. Indeed, it is difficult to imagine that Plaintiffs Turner and Wygant ever could. In the context of redistricting challenges, federal courts have routinely held in the context of redistricting challenges that a plaintiff must reside in the challenged district to establish standing absent specific evidence of some other distinct and palpable injury. *See, e.g., Hays*, 515 U.S. at 745; *Gill v. Whitford*, 138 S. Ct. 1916, 1929-31 (2018). This residency requirement comports with Tennessee's standing

requirements. Unless a plaintiff resides in a challenged district or alleges some other distinct injury, there is nothing to differentiate that plaintiff's interest from those shared in common with the general citizenry. *City of Memphis*, 414 S.W.3d at 98. Thus, Plaintiff Turner, who resides in Shelby County, s*ee* Amend. Compl., ¶ 15, and Plaintiff Wygant, who resides in Gibson County, *id.* at ¶ 16, could never establish standing to challenge the numbering of Senate districts in Davidson County on residency alone. And neither have alleged any other injury.

While Plaintiff Moore does at least reside in Davidson County, the allegations of the Amended Complaint still fail to establish that Plaintiff Moore has suffered a distinct and palpable injury. Plaintiff Moore does not allege that she resides in a district that is not consecutively numbered. Plaintiffs admit that Senate Districts 19, 20, and 21 are numbered consecutively; they take issue only with the numbering of District 17. *Id.* at ¶¶ 57-63. Plaintiff Moore has not alleged that she resides in Senate District 17 or that the renumbering of that district would in any way impact her in a manner distinct from the general citizenry. Accordingly, none of the Plaintiffs have pled sufficient facts to establish standing to challenge the numbering of the Senate districts in Davidson County.

With respect to the division of counties by the House plan, Plaintiffs have similarly failed to plead any facts establishing a particularized injury. First, Plaintiffs Moore and Turner reside in counties that remain completely undivided by the 2022 House plan. *Id.* at ¶¶ 14-15; Ex. 1-Affidavit of Doug Himes, ¶ 30. As with Plaintiffs' challenge to the Senate map, Plaintiffs Moore and Turner have failed to establish that they reside in a district which they contest, *see Hays*, 515 U.S. at 745; *Gill*, 138 S. Ct. at 1929-31, and they have alleged no injury beyond their residence. Plaintiffs Moore and Turner therefore lack standing.

Second, while Plaintiff Wygant resides in Gibson County, which is divided in the 2022 House plan, s*ee* Amend. Compl. at ¶¶ 16, 50, he has made no allegations in the Amended Complaint which satisfy the fundamental requirement of standing. Beyond stating that he resides in Gibson County, Plaintiff Wygant has not alleged that the division of Gibson County has injured him in any way, much less in a particularized manner. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding that, to establish standing, a plaintiff bears the burden of proving the "irreducible constitutional minimum" of a concrete and particularized injury in fact). Further, Plaintiff Wygant has not demonstrated that whatever unstated injury he suffers is judicially redressable. While Plaintiffs ask the Court to order Defendants to redraw the House districts, they have not identified how the General Assembly will be able to resolve the alleged state constitutional violation while maintaining its obligations under the federal and state constitutions. In fact, the only proof in the record indicates that reducing the number of divided counties would reduce the number of majority-minority districts. Ex. 1-Affidavit of Doug Himes, ¶¶ 32-36. Furthermore, Plaintiffs have not alleged or otherwise demonstrated that Gibson County still would not be split under any redrawn map, i.e., that the population of Gibson County is so close to the ideal population for a House district such that Gibson County would comprise a single House district and should not be divided.

The Amended Complaint is complete devoid of any allegations that the challenged maps have distinctly injured Plaintiffs. Indeed, in their motion for a temporary injunction, Plaintiffs' only claim of harm is that the 2022 House and Senate plans are unconstitutional. *See* Mem. in Support of Mot. for Temp. Inj., at 21-22. Without any allegation of a distinct and palpable injury, Plaintiffs have failed to establish the fundamental requirement of standing.

**B. House Bill 1035, Public Chapter 598 is Constitutional**.

Plaintiffs have challenged House Bill 1035, Public Chapter 598 solely under the provisions of Art. II, § 5 of the Tennessee Constitution, arguing that it violates this provision by splitting too many counties. Specifically, Plaintiffs argue that House Bill 1035 should be declared unconstitutional on the basis that the Democratic Caucus plan is preferable because it splits fewer counties. Plaintiffs further argue that the General Assembly cannot demonstrate that it was "'justified in passing a reapportionment act which crossed county lines,'" citing to *Lockert I*, 631 S.W.2d. at 714. Ironically, in making this argument, Plaintiffs would have this Court accept only some of the Supreme Court's holdings in *Lockert I* and *Lockert II* and reject the rest.

The legislative reapportionment after the 1980 census resulted in a trio of cases challenging the reapportionment in state court, *Lockert I*, *II* and *III*. As discussed herein, these cases have shaped redistricting in Tennessee ever since. The first, *State ex rel. Lockert v. Crowell*, 631 S.W.2d 701 (Tenn. 1982) (*Lockert I*), challenged the constitutionality of the Senate Reapportionment Act of 1981 under several provisions of the Tennessee Constitution, including Article II, Section 6. That plan had a maximum variance of 1.65% and split sixteen counties. *Id*. at 706. The State argued that because a plan that did not divide any counties would produce a maximum variance of over 22%, there was an unavoidable conflict between the Equal Protection Clause and the provisions of Article II, Section 6, and the General Assembly was required to choose a plan that complied with the Equal Protection Clause. *Id*. The trial court rejected this argument and granted summary judgment to the plaintiffs.

On appeal, however, the Tennessee Supreme Court agreed that in adopting a reapportionment plan, both the Fourteenth Amendment to the United States Constitution and Art. II, §§ 4 and 6, of the Tennessee Constitution mandate that the Legislature must consider "first and

23

foremost . . . the requirement of equality of population among districts, insofar as is practicable."

*Id.* at 707 (citing *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d (1973); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1963); *Clements v. Valles*, 620 S.W.2d 112 (Tx. 1981); *Smith v. Craddick*, 471 S.W.2d 375 (Tex. 1971)). The Supreme Court further noted that, under United States Supreme Court precedents, a "rule of thumb" had developed whereby variances of 10% or less need not be justified by a state absent a showing of invidious discrimination. *Id*. At the same time, the Supreme Court recognized that a plan with less than 10% variance would not automatically be upheld in the face of an Equal Protection challenged, stating:

> "[T]he fact that a 10% or 15% variation from the norm is approved in one State has little bearing on the validity of a similar variation in another State." [*Mahan v. Howell*], 410 U.S. at 328, 93 S.Ct. at 987. It must be remembered that "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. at 577, 84 S.Ct. at 1390. "For a State's policy urged in justification of disparity in district population, however rational, cannot constitutionally be permitted to emasculate the goal of substantial equality." *Mahan v. Howell*, 410 U.S. at 326, 93 S.Ct. at 986.

*Id*. at 707-708.

Applying these principles to the 1981 reapportionment of the Tennessee Senate, the Supreme Court found that the 1.65% variance in the current plan could be increased in order to preserve county boundaries and still comply with other constitutional standards and, in fact, noted that plaintiffs had submitted a plan that crossed significantly fewer county lines and yet met the equal protection guidelines. *Id*. at 708-709. However, because the record failed to establish whether any of the submitted plans diluted minority voting strength, the Supreme Court concluded that the case was not a proper one for summary judgment and reversed and remanded to the trial

24

court for a full hearing on the merits.  As a guide to the trial court and the General Assembly, the

Supreme Court articulated the following applicable principles:

1. The population variance under the Act can be increased and still comply with equal protection standards. *The variance should be as low as possible, because equality of population is still the principal consideration.*  The variance certainly should not be greater than any figure which has been approved by the United States Supreme Court; nor would such maximum figure automatically be approved, because the variance for any state will be judged solely by the circumstances present in that state.[4]

2. *Primary consideration must also be given to preserving minority strength to the extent required by United States Supreme Court cases cited above.*  The Chancellor should consider whether the reapportionment Act or any other plan unconstitutionally dilutes the opportunity of minorities to participate in the political process.

3. The provisions of the Tennessee Constitution, although of secondary import to equal protection requirements, are nonetheless valid and must be enforced insofar as is possible.  If the State is correct in its insistence that there is no way to comply with the mandates of the federal and state constitutions without crossing county lines, then we hold that the plan adopted must cross as few county lines *as is necessary to comply with the federal constitutional requirements*.

4. In addition to equal protection, preserving minority voting strength, and not crossing county lines, constitutional standards which must be dealt within any plan include contiguity of territory and consecutive numbering of districts.

*Id*. at 714-715 (emphasis added).

After this decision, the General Assembly amended the Senate Reapportionment Act,

which increased the variance from 1.65% to 10.76% and decreased the number of counties split

---

[4] The one person/one vote principle is also mandated not once, but twice in the Tennessee Constitution.  *See* Tennessee Constitution, Art. II, § 4 ("The apportionment of Senators and Representatives shall be substantially according to population . . .") and Art. II, § 6 ("The number of Senators shall be apportioned . . . substantially according to population . . .").

from 16 to 4 (Washington, Knox, Davidson and Shelby Counties). This amended plan, as well as the House Reapportionment Act[5], was challenged on the grounds that it violated Art. II, § 6, of the Tennessee Constitution. *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836 (Tenn. 1983) (*Lockert II*).

With respect to the Senate plan, specific evidence was introduced at trial demonstrating that the purpose of the split of Washington County was not to comply with the one-person/one-vote principle, but instead was to avoid placing two incumbents who resided in that county in the same district. *Id*. at 839. Accordingly, the trial court ruled that this split violated Art. II, § 6, and that ruling was upheld on appeal by the Supreme Court. *Id*.

With respect to the splits in Knox and Davidson County, the 1982 Senate Reapportionment Plan contained double splits. For example, a fractional part of Knox County on the southwest side was added to Sevier and Blount Counties to form District 8 and a fractional part on the northwest side of Knox County was added to Anderson, Campbell, and Claiborne Counties to form District 5. *Id*. While the Tennessee Supreme Court held that the excess population of Knox and Davidson counties required them to be split to comply with the one-person/one-vote requirement, it also held that only one split was necessary in order to reduce the over-population deviation to limits acceptable under federal law. *Id*. at 840.

With respect to the fourth county split (Shelby County), the Court concluded that this split was unnecessary based largely on a plan that was submitted at trial (the "exhibit 4 plan") which did not split Shelby County but contained a total variance of 13.73%. The Supreme Court stated that it was "of the opinion that the exhibit 4 plan with a total variance of 13.73% would withstand all challenges on federal constitutional grounds in the federal courts." *Id*. at 841. However, the

---

[5]The 1981 House Reapportionment Act had a variance of 11.07% and split fifty-seven counties. *Id*. at 842.

Court did not foreclose the possibility that a split might be justified by either "(1) *the necessity to reduce a variance in an adjoining district or (2) to prevent the dilution of minority voting strength*." *Id.*

With respect to the 1981 House Reapportionment Plan, the trial court found that neither the one-person, one-vote principle nor the preservation of minority-voting-strength federal mandates justified the split of 53 counties. *Lockert II*, 656 S.W.2d at 838. The Supreme Court affirmed this ruling on appeal, but in doing so set "an upper limit" on dividing counties in creating House districts:

> Turning to the limitation on dividing counties in creating House districts, *we think an upper limit of dividing 30 counties in the multi-county category is appropriate*, with the caveat that none of the thirty can be divided more than once. In addition, with respect to the four urban counties, *we have left open the possibility of a small split per county only if justified by the necessity of reducing a variance in an adjoining district or to prevent the dilution of minority voting strength.*

*Id*. at 844 (emphasis added).

In *Lockert III*, the Senate redistricting plan was again challenged on the basis that it violated the state constitutional prohibition on splitting counties because a portion of Shelby County was detached and joined with Tipton and Lauderdale counties. 729 S.W.2d 88, 89 (Tenn. 1987). The Supreme Court upheld the constitutionality of the plan finding that the split of Shelby County was necessary to prevent the dilution of the minority voting strength of District 19 in Davidson County. *Id*. at 90. In doing so, the Supreme Court specifically affirmed "all the principles of law enunciated in *Lockert I* and *Lockert II*." *Id*. at 91.

It was against this backdrop and history of redistricting in Tennessee that in the next redistricting cycle, the General Assembly adopted the House Redistricting Guidelines set forth in Tenn. Code Ann. § 3-1-103(b). These guidelines reflect the legislative intent that any House

27

redistricting plan comply with federal constitutional and statutory and state constitutional law and clearly incorporates the "principles of law enunciated" in *Lockert I*, 631 S.W.3d at 714-715, and *Lockert II*, 656 S.W.2d at 844. And House Bill 1035 was the only plan submitted to the House Committee and the General Assembly that fully complied with these guidelines. *See* Ex. 1-Affidavit of Doug Himes.

Plaintiffs' proffered plan—the Democratic Caucus plan—clearly splits Shelby County. But in *Lockert II*, the Supreme Court repeatedly stated that "*none of the four urban counties [Shelby, Davidson, Knox and Hamilton] can be split even once unless justified by either (1) the necessity to reduce a variance in an adjoining district or (2) to prevent the dilution of minority voting strength*." 656 S.W.2d at 842, 844 (emphasis added). And, in *Lockert III*, the Supreme Court affirmed this "principle of law". 729 S.W.2d at 91. Moreover, the General Assembly has consistently followed this principle—only splitting the urban counties when their excess population made the split necessary to reduce the over-population deviation to limits presumptively acceptable under federal law. *See* Ex. 1-Affidavit of Doug Himes.

However, no such justification exists for splitting Shelby County in the Democratic Caucus plan. Shelby County currently has 14 House districts. The population of Shelby County per the 2020 Census is 929,744—a growth rate of only .23% since 2010. Consequently, Shelby County can be split into either 13 districts with an average ideal variance of +2.45%, or 14 districts with an average ideal variance of -4.86%. And neither of these variances would significantly increase the overall variance. Thus, because the population of Shelby County does not exceed the presumptive standard deviation of 10% (+5.0% and -5.0%), there is no need to split Shelby County. *See* Ex. 1-Affidavit of Doug Himes. Nor was splitting Shelby County necessary to reduce a variance in an adjoining district—under either a 13 or 14 district Shelby County plan—the

28

remaining House districts can be drawn within presumptively constitutional population variance. *Id.* And without splitting Shelby County, it is not possible to draw a map with 23 county splits while still complying with other state and Federal constitutional and statutory provisions—as evidenced by the fact that the no other plan submitted to the House Committee split fewer than 30 counties except for the Windrow plan and it had a presumptively unconstitutional deviation of 24.23%. *See* Himes Ex. 4.

In addition, there also is no need to split Shelby County to prevent the dilution of minority strength. Moreover, an analysis of the black voting-age populations ("BVAP") of the majority-minority districts in the Democratic Caucus plan would suggest that plan encourages dilution of minority strength rather than preventing it. *See* Ex. 1-Affidavit of Doug Himes. Over half of the plan's 13 majority-minority districts are bare majorities with a BVAP ranging from 50.02% to 50.34%. These percentages represent a significant decrease in the BVAP in those districts from the 2002 and 2010 plans—and even from House Bill 1035. Attached is a chart showing the BVAP for the majority-minority districts based on the 2000-2020 census numbers compared to the BVAP for the majority-minority districts in the Democratic Caucus plan. Himes Ex. 7.

Tenn. Code Ann. § 3-1-103(b)(6) requires that any House Redistricting Plan must comply with the Voting Rights Act ("VRA"). Section 2 of the VRA protects against the "denial or abridgement of the right of any citizen of the United States to vote on account of race or color" in any election held by a "State or a political subdivision." *Thornburg v. Gingles*, 478 U.S. 30, 42 (1986). Dilution of minority voting strength through dispersal or concentration of minority voters can constitute a violation of §. *Id*. at 46-47 & n.11. Section 2 claims are "established if, based on the totality of circumstances," it is shown that the members of a racial minority group "have less opportunity than other members of the electorate to participate in the political process and to elect

29

representatives of their choice." *Id.* To prove a Section 2 vote dilution claims, a racial group must first satisfy the three Gingles preconditions. *League of United Latin Am. Citizens v. Perry* (*LULAC*), 548 U.S. 399, 425 (2006). The first Gingles precondition requires that "the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.*

The U.S. Supreme Court has affirmatively stated that "it may be possible for a citizen voting-age majority to lack real electoral opportunity," and thereby require the protection of Section 2." LULAC, 548 U.S. at 428. Thus, a number of courts have rejected the idea that a racial minority cannot prevail on a Section 2 claim when it constitutes a bare numerical majority within the district. *See, e.g., Missouri State Conference of the N.A.A.C.P. v. Ferguson-Florissant School District*, 894 F.3d 924, 933-934 (8th Cir. 2018) (holding that minority voters do not lose VRA protection simply because they represent a bare numerical majority within the district); *Pope v. Cty. of Albany*, 687 F.3d 565, 575, n.8 (2d Cir. 2012) ("[T]he law allows plaintiffs to challenge legislatively created bare majority-minority districts on the ground that they do not present the 'real electoral opportunity' protected by Section 2."); *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964, F.2d 1542, 1547 (5th Cir. 1992) ("unimpeachable authority from our circuit has rejected any per se rule that a racial minority that is a majority of a political subdivision cannot experience vote dilution.").

The Democratic Caucus plan does not have just one majority-minority district with a bare numerical majority; seven out of the thirteen—over half—of the districts have a bare numerical majority. In Lockert I, the Supreme Court stated that "[p]rimary consideration must also be given to preserving minority strength." 631 S.W.2d at 714. The Democratic Caucus plan does not preserve minority strength but instead disperses it. As such, that plan presented a significant

30

litigation risk for vote dilution under § 2 of the Voting Rights Act—a risk that the General Assembly was justified in not taking.[6]  *See* Ex. 1-Affidavit of Doug Himes.

Finally, it must be remembered that the prohibition against splitting county lines in Art. II, § 5 "cannot be considered in isolation," *Beaubien v. Ryan*, 762 N.E.2d 501, 506 (Ill. 2001), as it is only one of several constitutional criteria that a House redistricting plan must satisfy.  In addition to the overarching criterion of population equality in both the federal and state constitutions and the requirements of the Voting Rights Act, the redistricting plan must be based upon the last federal decennial census; the number of Representatives must be ninety-nine; and the districts must be contiguous.  Tenn. Constitution, Art. II, § 4 and § 5.  Perfect compliance with these constitutional mandates is impossible, and while it is the responsibility of the Legislature to draw the redistricting plan, there is no definitive way to find the "best" such plan, because there is no single "best" way for the Legislature to determine which trade-offs between population equality, minority vote dilution, integrity of political subdivisions and territorial cohesion are most appropriate.  *See McClure v. Secretary of the Commonwealth*, 766 N.E.2d 847, 856 (Mass. 2002).  *See also State ex rel. Cooper v. Tennant*, 730 S.E.2d at 398 (recognizing that "[i]n any examination of a legislative determination, it must be acknowledged that reasonable minds may differ upon such complex issues as the designation of legislative districts and competing policy considerations may enter the fray"); *Beaubien v. Ryan*, 762 N.E.2d at 507 ("Redistricting is a difficult and often contentious process.  A balance must be drawn.  Trade-offs must be made.").

Thus, as the court in *Moore v. State* recognized

> 'the General Assembly has principal responsibility and . . . primary authority' for legislative redistricting, and in the absences of equal protection violations, bad faith or improper motives, the courts will

---

[6] Indeed, the last time the General Assembly took a "litigation risk" with respect to a redistricting plan, they were immediately sued in federal court for violations of the Fourteenth Amendment and the Voting Rights Act.  *See Rural West Tennessee African-American Affairs Council*, 836 F.Supp. 447 (W.D. Tenn. 1993).

> not 'set aside individual district lines on the ground that they theoretically might have been drawn more perfectly.' A redistricting plan will not be set aside on constitutional grounds merely because a slight 'better' plan can be devised when the plan devised by the General Assembly yields to equal protection principles and makes an honest effort to balance legitimate state objectives against those principles.

436 S.W.3d 775, 788 (Tenn. Ct. App. 2014) (internal citations omitted).

Here, there are no allegations of bad faith or improper motives, and the record otherwise reflects that the *only* plan presented to the General Assembly that complied with federal and state constitutional requirements and the VRA, as reflected in Tenn. Code Ann. § 3-1-103, was the plan ultimately adopted—House Bill 1035. And, in light of that evidence and the applicable state and federal precedent, the General Assembly's adoption of the House Redistricting Plan (Public Chapter 596) was rational and justified. Accordingly, Plaintiffs cannot demonstrate a likelihood of success on their facial challenge to the constitutionality of that plan.

### C. Senate Bill 0780, Public Chapter 596 is Constitutional

Plaintiffs challenge Senate Bill 0780, Public Chapter 596 ("Senate Redistricting Plan") on the sole grounds that it departs from Art. II, § 3 of the Tennessee Constitution, which requires senatorial districts in counties with more than one district to be consecutively numbered. In the Senate Redistricting Plan, the four senatorial districts within Davidson County are numbered 17, 19, 20, and 21, respectively. As an alternative, Plaintiffs offer the plan proposed by Amendment 2, which has a higher total population deviation than the Senate Bill 0780 plan and fewer majority-minority districts. *See* Ex. 4-Affidavit of Thomas Brunell, ¶¶ 10-11. Plaintiffs ask the Court to ignore the Supreme Court's prioritization of redistricting principles in *Lockert I*, the Equal Protection Clause, and Section 2 of the Voting Rights Act and instead consider in isolation the consecutive numbering provision. Plaintiff's logic would render the task of balancing the

32

requirements of the Equal Protection Clause of the Fourteenth Amendment and the Voting Rights Act, 42 U.S.C. § 1973 with the State constitution virtually impossible. such reasoning would produce an unworkable standard for redistricting in Tennessee.

The Senate Redistricting Plan is constitutional in part because it places paramount importance on the "overriding objective in redistricting" and the first principle from *Lockert I*— low total population variance—with a 6.17% total population deviation compared to Amendment 2's 7.7% total population deviation. *Reynolds v. Sims*, 377 U.S. 533, 579 (1964). Equal protection concerns are paramount in redistricting. *Moore*, 436 S.W.3d at 784 (*citing Larios v. Cox*, 300 F. Supp. 2d 1320, 1337 (N.D. Ga. 2004) (*aff'd Cox v. Larios*, 542 U.S. 947 (2004)). Plaintiffs attempt to obfuscate the Senate Redistricting Plan's superiority by citing only Amendment 2's "superior average variance across all districts" of 1.4% compared to the enacted plan's 2.3% average variance. For decades, the U.S. Supreme Court and Tennessee Supreme Court have examined compliance with the Equal Protection Clause and the "one person, one vote standard" through analyzing the total population deviation. *Mahan v. Howell*, 410 U.S. 315 (1973) (finding that a gross deviation of less than 10% was "de minimis"); *White v. Register*, 412 U.S. 755 (1973); *Gaffney v. Cummings*, 412 (U.S. 1973); *Lockert v. Crowell*, 631 S.W.2d 702 (Tenn. 1982); *Cox v. Larios*, 542 U.S. 947 (2004). Plaintiffs' reliance on average population variance simply carries no weight. Plaintiffs cite no authority for an analysis based on average, rather than total, population deviation.

The Senate Redistricting Plan also better complies with Section 2 of the Voting Rights and the second *Lockert I* principle, preserving minority vote strength, by having four majority-minority districts as opposed to the Amendment 2 Plan's three majority-minority districts. *See* Ex. 4- Affidavit of Thomas Brunell, ¶¶ 11. The U.S. Supreme Court has construed § 2 of the Voting

Rights Act to prohibit the distribution of minority voters into districts in a way that dilutes their voting power. *See Thornburg v. Gingles*, 478 U.S. 30, 46-51, 106 S. Ct. 2752 (1986). While failure to maximize majority-minority districts "cannot be the measure of § 2", *Johnson v. De Grandy*, 512 U.S. 997, 1017, 114 S.Ct. 2647, 2660 (1994), enacting the Amendment 2 plan with fewer majority-minority districts risks satisfying the *Gingles* framework for demonstrating a vote dilution claim. *See Gingles* at 50-41, 106 S.Ct. 2752.

The third and fourth *Lockert I* principles are require adherence to state constitutional redistricting requirements like county splitting and consecutive numbering of districts, if such adherence is possible while conforming to the Equal Protection Clause and Section 2 of the Voting Rights Act. It is well established that "the state constitutional prohibitions against the division of counties in establishing legislative districts must yield to federal constitutional requirements under the Equal Protection clause." *Lincoln County v. Crowell*, 701 S.W.2d 602, 603 (Tenn. 1985). Precedent exists for the departure from the consecutive numbering requirement. Some senatorial districts in the same county from the 2000s Senate Plan were not consecutive. *See* 2002 Pub. Ch. 466, § 1.

The consecutive numbering of senatorial districts is solely an administrative distinction. Given that even-numbered and odd-numbered senatorial districts have staggered election years, the Senate Redistricting Plan accomplishes the goal of preventing a large county from having all its senatorial elections in occur at the same time. The four (4) Davidson County senatorial districts are numbered in a manner that prevents the county from having four senatorial elections simultaneously.

The competing factors of redistricting necessarily require "trade-offs." *Moore v. State*, 436 S.W.3d 775, 780 (Tenn. Ct. App. 2014). States are required to "'make an honest and good faith

effort to construct districts . . . as nearly of equal population as is practicable.'" *Rural West Tennessee African–American Affairs Council v. McWherter*, 836 F. Supp. 447, 451 (W.D. Tenn. 1993). However, population deviation remains the "only clear limitation on improper districting practices" and the Supreme Court warned of "dilute[ing] its strength." *Cox v. Larios*, 542 U.S. at 949-50 (Stevens, J. concurring). The General Assembly chose to prioritize superior compliance with federal constitutional requirements over state constitutional prohibitions by rejecting Amendment 2 and voting for Senate Bill 0780.

The Senate Redistricting Plan's departure from the consecutive numbering requirement in Davidson County has no practical effect on the shape, size, or demographics of the senatorial districts and is necessary to satisfy the paramount concern in redistricting—minimizing total population variance in compliance with the Equal Protection Clause of the Fourteenth Amendment. The *Rural West Tennessee* court established that a redistricting plan will not be set aside on constitutional grounds merely because a slightly "better" plan can be devised when the plan when the enacted plan satisfies the Equal Protection clause. 836 F. Supp. 447 at 451. Regardless, Plaintiffs' preferred plan, Amendment 2, is not a better plan because it has a higher total population variance. Plaintiffs have not alleged the Sente Redistricting Plan does not comply with any other federal and state constitutional requirement. The Senate Redistricting Plan's minor deviation from the consecutive numbering requirement achieves the legitimate state interests of minimizing the total population variance and preserving majority-minority districts. Therefore, Plaintiffs cannot demonstrate a likelihood of success on their facial challenge to the constitutionality of the Senate Redistricting Plan.

        **D.     Plaintiffs Have not Challenged the Constitutionality of the Qualifying Deadline.**

Lastly, while Plaintiffs' instant Motion seeks a postponement of the qualifying deadline, *see*

Tenn. Code Ann. §§ 2-5-101(a)(2); 2-5-101(e), that matter is not currently present before the Panel. It is well-settled pursuant to the constitutional requirement of separation of powers, the judicial branch is prohibited from infringing upon the legislative branch's authority to make, alter, and repeal the law. *See Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446, 453 (Tenn. 1995); Tenn. Const. Art. II, § 2. The only exception to this is that the judicial branch may enjoin enforcement of a legislative enactment where it has been determined that the act violates the irreducible requirements of the Tennessee Constitution or United States Constitution. *See Dennis v. Sears, Roebuck & Co.*, 446 S.W.2d 260, 265-66 (Tenn. 1969). Thus, the Panel may only set aside the qualifying deadline if it asked to determine that statute's constitutionality and determines that it fails to meet the minimum requirements of the Tennessee or United States Constitutions.

Here, Plaintiffs only ask the Panel to declare the constitutionality of SB 0779 and SB 0780. Amend. Compl. at 15-16. Their Amended Complaint does not allege that the qualifying deadline set forth in Tenn. Code Ann. § 2-5-101 is unconstitutional as applied to the current legislative maps. *See generally,* Amend. Compl. And because Plaintiffs have not sought such a declaration of constitutionality regarding the qualifying deadline, much less requested an injunction to enjoin enforcement of the qualifying deadline, separation of powers prohibits the Court from altering the deadline as enacted by the General Assembly. Thus, Plaintiffs' request that this Court temporarily enjoin the qualifying deadline must be denied.

### III. Plaintiffs Will Not Suffer Any Irreparable Harm if the Injunction is Not Granted.

Plaintiffs' lack of standing, discussed *supra* at 19-22, also demonstrates that they will suffer no irreparable harm absent an injunction.

With respect to the numbering of Senate districts in Davidson County, none of the Plaintiffs have alleged that they have been injured by the numbering of Senate districts in Davidson County.

36

Plaintiffs Turner and Wygant certainly cannot, as they do not reside in Davidson County. Amend. Compl., ¶¶ 15-16. And neither have alleged any other injury.

While Plaintiff Moore does at least reside in Davidson County, the allegations of the Amended Complaint still fail to establish that Plaintiff Moore will suffer an irreparable injury absent injunctive relief. Plaintiff Moore does not allege that she resides in a district that is not consecutively numbered. Plaintiffs admit that Senate Districts 19, 20, and 21 are numbered consecutively; they take issue only with the numbering of District 17. Amend. Compl., ¶¶ 57-63. Plaintiff Moore has not alleged that she resides in Senate District 17 or that the renumbering of that district would in any way impact her. Accordingly, none of the Plaintiffs have pled sufficient facts to establish irreparable harm with regard to the Senate plan.

With respect to the division of counties by the House plan, Plaintiffs have similarly failed to plead any facts establishing irreparable harm. Plaintiffs Moore and Turner reside in counties that remain undivided by the 2022 House plan. Amend. Compl., ¶¶ 14-15; Ex. 1-Affidavit of Doug Himes, ¶ 30. And while Plaintiff Wygant resides in Gibson County, which is divided in the 2022 House plan, Amend. Compl., ¶¶ 16, 50, he has not alleged that the division of Gibson County will cause him irreparable harm.

In sum, the Amended Complaint and instant motion are devoid of any allegations that the challenged maps will irreparably harm Plaintiffs absent an injunction. Accordingly, as discussed here and in Defendants' standing argument *supra* at 19-22, an injunction is not warranted here due to Plaintiffs' failure to demonstrate irreparable harm should the House and Senate maps not be enjoined.

### IV. Plaintiffs' Requested Relief Will Cause Substantial Harm to the State and Will Not Further the Public Interest.

Even if the Court finds that Plaintiffs will be harmed if the requested injunctive relief is not granted, this harm still must be balanced against the harm to the State and the public interest. *See Eluhu v. HCA Health Servs. of Tenn., Inc.*, M2008-01152-COA-R3-CV, 2009 WL 3460370, at *22 (Tenn. Ct. App. Oct. 27, 2009). These two factors "merge when the Government is the opposing party." *Wilson v. Williams*, No. 20-3447, 2020 WL 3056217, at *11 (6th Cir. June 9, 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Here, the election process for members of the house of Representatives and Senate is well underway. Qualifying petitions for candidates for the general Assembly began to be issued on February 7. The qualifying deadline for candidates is April 7, the withdrawal deadline is April 14, In order to qualify for candidacy, the candidate must present a petition to the county election commission containing the signatures of twenty-five registered voters *in the district.* Candidates cannot obtain those signatures unless they know where the district boundaries are. Plaintiffs are asking the court to change the rules in the middle of the game.

Federal law underscores the harm that can befall a state when its redistricting maps are enjoined on the eve of an election. The Supreme Court has repeatedly recognized the State's compelling interest in preserving the integrity of the election process. *See Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989). In *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Supreme Court aptly noted that "[c]ourt orders affected elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4-5. The proximity of an impending election increases this risk. *Id.* at 5. Accordingly, courts are cautioned not to change the rules on the eve of an election. *See Veasey v. Perry*, 574 U.S. 951 (2014). As further discussed below, the *Purcell* principle is met

38

here—temporarily enjoining the qualifying deadline and the House and Senate maps would work exceptional harm to the State and would unduly risk voter confusion and undermine the integrity of Tennessee's elections.

Likewise, the Tennessee Supreme Court has long recognized the compelling nature of the state's interest in the integrity of the election process. *See City of Memphis v. Hargett*, 414 S.W.3d 88, 103 (Tenn. 2013) (cases cited therein). Similarly, the United States Supreme Court has confirmed that "[a] State indisputably has a compelling state interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.,* 489 U.S. 214, 231 (1989). Further recognizing that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy," the Supreme Court has required that *any* claims with respect to elections be pressed expeditiously, because as time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made. *Purcell v. Gonzalez,* 127 S.Ct. 5, 7 (2006); *see also Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968); *see also Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980); *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990); *Duenas v. Guam Election Commission*, 2008 WL 111302 at * 4 (Guam Sup. Ct. Jan. 2, 2008) (citing *Melendez v. O'Conner*, 654 N.W.2d 114, 117 (Minn. 2002); *State ex rel. Manos v. Del. County Bd. of Elections*, 701 N.E.2d 371, 372 (Ohio 1998) ("'Extreme diligence and promptness are required in election-related matters' to avoid the application of laches."); *Harris v. Purcell*, 973 P.2d 1166, 1169 (Ariz. 1998) ("In election matters, time- is of the essence because disputes concerning election and petition issues must be initiated and resolved, allowing time for the preparation and printing of absentee voting ballots."); *In re Cook*, 882 P.2d 656, 659 (Utah 1994) ("[O]ne who seeks to challenge the election process must do so at the earliest possible opportunity.")).

Here, Plaintiffs waited until less than a month before the candidate qualifying deadline to ask this Court to enjoin the State from conducting any further elections under Public Chapters 596 and 598 and to delay the candidate qualifying deadline until May 20, 2022. In doing so, Plaintiffs assert that "there is currently enough time to remedy the constitutional defects that Plaintiffs allege before the voting process begins in late June of this year." Pls' Memo. in Support of Mot. for Temp. Inj., at 22. Plaintiffs are wrong.

Indeed, contrary to Plaintiffs' assertion, the election process begins long before the June 20 deadline for mailing out military ballots. And the April 7 candidate qualifying deadline is tied directly to that deadline. Although candidates are required to qualify by noon on April 7th, county election commissions cannot begin to prepare the August ballot until April 21. That is because qualified candidates have seven days to withdraw from the ballot. Tenn. Code Ann. § 2-5-204(b)(1). During the same time period, the state executive committee for each political party may disqualify primary candidates as not being bona fide members of the party pursuant to Tenn. Code Ann. § 2-13-104. The deadline for the withdrawal and the disqualification of primary candidates is 12:00 noon on April 14. However, the appeal by the disqualified candidate and review process of the state executive committee are not finalized until seven days after the withdrawal deadline—April 21. Tenn. Code Ann. § 2-5-204(b)(2). Taking into account these statutorily mandated deadlines, there are approximately forty-one (41) business days between the time county election commissions can begin to prepare their ballots and the deadline on which ballots for military personnel and overseas citizens must be mailed out. *See* Ex. 5-Affidavit of Beth Henry-Robertson.

If, however, the qualifying deadline moves to May 20, then the withdrawal deadline moves to May 27 and the political party disqualification process deadline falls on June 3. This delayed schedule would give county election commissions only ten (10) business days to prepare, review

and send ballots to military personnel and overseas citizens.  That simply is not enough time. Indeed, as the Deputy State Election Coordinator and the Election Administrators for Shelby, Wilson and Knox Counties have testified, they need the time between the April 7 qualifying deadline and the deadline mandated by the MOVE Act to accurately prepare and timely mail out the ballots to military voters and, that if the April 7 qualifying deadline were moved, they would not be able to mail military ballots out as required by federal law.  *See* Ex. 5-Affidavit of Beth Henry-Robertson; *see also* Ex. 6-Affidavit of Linda Phillips; Ex. 7-Affidavit of Tammy Smith; and Ex. 8-Affidavit of Chris Davis.

They have further testified that moving the April 7 qualifying deadline will make it difficult for them to timely and accurately prepare for the August Election as their work preparing for that election becomes unnecessarily hasty, risking the accuracy of the election.  For example, the voting machines used in the August election must be programmed for early voting and for election day. The voting machines used for early voting must be programmed with all the ballot styles in a particular county, while the machines used on election day must be programmed with the ballot styles for each individual precinct in which they will be used.  Once the voting machines have been programmed, pursuant to Tenn. Code Ann. § 29-105(b), notice must be given to the chairs of the county executive committees of the political parties and to independent candidates stating where and when the machines will be tested, and then public testing of the voting machines must be conducted.  Once again though, the county election commissions cannot begin to program their voting machines until after the withdrawal and party certification deadlines, the Election Commission candidate certification vote, and the ballots are built and approved.  Thus, if the qualifying deadline is moved to May 20—the counties will not have enough time to adequately

program and test their voting machines prior to the start of early voting (July 15, 2022). *See* Exs. 6-8.

"[E]elections are complex and election calendars are finely calibrated processes, and significant upheaval and voter confusion can result if changes are made late in the process." *Alpha Phi Alpha Fraternity Inc.v . Raffensperger*, --- F.Supp.3d ---, 2022 WL 63312, at *74, 76 (N.D. Ga. Feb. 28, 2022) (finding that "due to the mechanics of State election requirements, there is insufficient time to effectuate remedial relief for purposes of the 2022 election cycle"). Thus, when an election is too close for the State realistically to be able to implement the necessary changes before the election, courts have found injunctive relief to be inappropriate. *See e.g., Williams v. Rhodes,* 393 U.S. at 35 ("[A]t this late date it would be extremely difficult, if not impossible, for Ohio to provide still another set of ballots. Moreover, the confusion that would attend such a last-minute change poses a risk of interference with the rights of other Ohio citizens, for example, absentee voters."). And specifically, within the context of redistricting, the Supreme Court has stated:

> [U]nder certain circumstances, *such as where an impending election is imminent and a State's election machinery is already in progress,* equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, *a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.*" (emphasis added)).

*Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

In this case, the evidence clearly demonstrates that moving the qualifying deadline risks the accuracy of the primary election because of the required timelines for building ballot combinations, proofing draft ballots, preparing ballots for printing by the deadline for overseas

and military voters and programming and testing of voting machines. Thus, an injunction delaying the candidate qualifying deadline to May 20 would significantly undermine the State's interest "in conducting an efficient election [and] maintaining order" and the public's "[c]onfidence in the integrity of [the] electoral processes." *Purcell v. Gonzalez*, 549 U.S. at 4.

It would also not serve the public interest to enjoin Public Chapters 596 and 598 and begin the process of putting new plans in their place for the 2022 election cycle. Indeed, since February 7, 2022, the first day petitions for the federal and state primary election petitions could be issued, county election commissions have reviewed and changed voting precinct lines based upon the Public Chapters 596 and 598. Relying on these new State Senate and House district lines, county election commissions have adjusted voting precinct lines and moved street names and voters into legislative districts in accordance with the new district lines. Additionally, for the district-based offices of U. S. House of Representatives, Tennessee Senate, Tennessee House of Representatives, Tennessee Republican State Executive Committeeman, Tennessee Republican State Executive Committeewoman, Tennessee Democratic State Executive Committeeman, and Tennessee Democratic State Executive Committeewoman, the county election commissions, candidates, and voters have relied upon the adoption of these lines to determine whether voter signatures are valid on nominating petitions for the offices that have already been filed. *See* Ex. 5-Affidavit of Beth Henry-Robertson.

Furthermore, once the county election commissions have established their new precincts and polling places, they are required pursuant to Tenn. Code Ann. § 2-3-105 to immediately publish the new precincts or districts in a newspaper of general circulation in the county and mail to each active voter whose polling place has changed a notice of the voter's new polling place and precinct number. Many of the county election commissions have already sent out these notices to

43

their active voters and/or published this information.  For example, the Shelby County Election Commission has already mailed out notices regarding changes in districts, precincts, and polling places to all registered voters in the county for the upcoming May County Primary Election, the August County General and Federal Primary elections, and November Federal General Election, at a cost of approximately $375,000.  *See* Ex. 6-Affidavit of Linda Phillips.  And while there is always some degree of confusion among voters during redistricting years, changing the State House and Senate district maps now would result in significant voter confusion, in addition to jeopardizing the county election commission's ability to timely and accurately prepare for the August election.  *Id; see also* Ex. 7—Affidavit of Tammy Smith and Ex. 8-Affidavit of Chris Davis.

"[E]lections are complex to administer, and the public interest would not be served by a chaotic, last-minute reordering of Senate [and House] districts.  It is best for candidates and voters to know significantly in advance of the petition period who may run where.  *Favors v. Cuomo*, 881 F.Supp.2d 356, 371 (E.D. N.Y. 2012); *see also Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 2022 WL 6333312, at *76 (finding that "with the timeline of candidate qualifying set to begin in days, it would not serve the public interest or the candidates, poll workers, and voters to enjoin use of the Enacted Plans and begin the process of putting new plans in their place for the 2022 election cycle"); *Diaz v. Silver,* 932 F.Supp. 462, 466–68 (E.D.N.Y.1996) (three-judge court) (in redistricting challenge, holding that, even assuming that plaintiffs had shown likelihood of success on the merits, the public interest weighed against an injunction because there was insufficient time before the election to create a new plan, and cases cited therein).

Accordingly, the merged balancing of the harms and public interest factors weigh against injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Temporary Injunction should be denied.

Respectfully Submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

/s/Alexander S. Rieger
ALEXANDER S. RIEGER (BPR 029362)
Senior Assistant Attorney General

JANET M. KLEINFELTER (BPR 013889)
Deputy Attorney General

PABLO A. VARELA (BPR 29436)
Assistant Attorney General
Public Interest Division
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-2408

JOHN L. RYDER #08258
2700 One Commerce Square
Memphis, TN  38103
Tel: (901) 525-1455
Fax: (901) 526-4084
jryder@harrisshelton.com

JACOB R. SWATLEY #37674
6060 Primacy Parkway, Suite 100
Memphis, TN 38119
Tel: (901) 525-1455
Fax: (901) 526-4084
jswatley@harrisshelton.com

45

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served by U.S. Mail, postage prepaid, and by electronic transmission, on the following counsel of record on this 25th day of March 2022:

David W. Garrison
Scott P. Tift
Barrett Johnston Martin & Garrison, LLC
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2202
(615) 252-3798
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

Josh Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville TN, 37203
(615) 983-8900
john@spragenslaw.com

/s/*Alexander S. Rieger*
ALEXANDER S. RIEGER

46