Exhibit I to *Hale v. Lee* Complaint

**IN THE CHANCERY COURT OF TENNESSEE
FOR THE TWENTIETH JUDICIAL DISTRICT**

| | | |
|---|---|---|
| AKILAH MOORE, | ) | |
| TELISE TURNER, and | ) | |
| GARY WYGANT, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | CASE NO. 22-0287-IV |
| | ) | |
| | ) | **THREE-JUDGE PANEL** |
| BILL LEE, Governor, | ) | CHANCELLOR PERKINS, CHIEF |
| TRE HARGETT, Secretary of State, | ) | CHANCELLOR MARONEY |
| MARK GOINS, Tennessee Coordinator | ) | CIRCUIT JUDGE SHARP |
| of Elections; all in their official | ) | |
| capacity only, | ) | |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY INJUNCTION**

Plaintiffs Akilah Moore, Telise Turner, and Gary Wygant submit this Memorandum in Support of their Motion for Temporary Injunction.

## I.   INTRODUCTION

Plaintiffs allege that the newly enacted district maps applicable to the Tennessee House of Representatives and Senate violate the express language of the Tennessee Constitution.  Plaintiffs seek a Temporary Injunction now because sufficient time remains before the August 4, 2022, primary elections to remedy these constitutional defects before those elections take place.  Entry of a temporary injunction at this point will prevent the violation of Plaintiffs' constitutional rights and of the constitutional rights of Tennesseans across the State.

Plaintiffs' claims can be proven on the legislative record. Concerning the House of Representatives, the General Assembly enacted a redistricting plan that divides 30 counties and

1

rejected a plan that divided just 23 counties. Per the evaluation of the counsel to the House Select Committee on Redistricting, the rejected plan divided seven fewer counties than the enacted plan, contained districts with a smaller total deviation from the ideal population than the enacted plan, and included the same number of majority-minority districts as the enacted plan. This side-by-side comparison illustrates that the General Assembly did not "cross as few county lines as is necessary to comply with federal constitutional requirements." *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836, 838 (Tenn. 1983).

Concerning the Senate, the General Assembly enacted a plan that numbers Davidson County's four senatorial districts 17, 19, 20, and 21, despite the Tennessee Constitution's requirement that in "a county having more than one senatorial district, the districts *shall* be numbered consecutively." Tenn. Const. art. II, Sec. 3 (emphasis added). Shortly before approving this plan, the General Assembly tabled a motion that would have numbered Davidson County's senatorial districts consecutively, while maintaining an acceptable district-to-district population deviation and ensuring that no incumbents were paired in the same district.

These facts, described more fully below, prove that the General Assembly's new House and Senate district maps violate the Tennessee Constitution. As a result, the Court should enter a temporary injunction because Plaintiffs are likely to succeed on the merits of their claim, because the balancing of harms and the public interest favor injunctive relief, and because Plaintiffs will otherwise suffer irreparable injury.

## II.    FACTUAL BACKGROUND

The Tennessee General Assembly completed its decennial reapportionment of the Tennessee House of Representatives and Senate in January of this year, with Governor Lee signing

the reapportionment legislation into law on February 6, 2022.[1] The Senate approved the House

redistricting plan by a vote margin of 23 to 6, and the Senate redistricting plan by a vote margin

of 26 to 5.[2] The House of Representatives approved the House redistricting plan by a vote margin

of 70 to 27, and the Senate redistricting plan by a vote margin of 71 to 26.[3] Governor Lee signed

both redistricting plans into law on February 6, 2022.[4]

### A. The Reapportionment of the Tennessee House of Representatives

The 2020 United States Census identified 6,910,840 people as the total population of

Tennessee.[5] Based on this total state population, each of Tennessee's 99 House districts would

have ideally contained 69,806 people following this year's decennial reapportionment.[6]

The General Assembly reapportioned the House of Representatives through its enactment

of Senate Bill 0779, Pub. Chap. 598. The resulting new House district map is referred to herein as

the Enacted House Map and has been included in the Appendix for ease of reference at Tab 1.[7]

The House Ethics counsel, Doug Himes, evaluated this plan, and all submitted plans, and provided

---

[1] *See* Website of the Tennessee General Assembly setting forth legislative history of SB 0779 (https://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=SB0779) and SB 0780 (https://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=SB0780). All website URL's cited in this Memorandum were last accessed on March 10, 2022. The Court may take judicial notice of the legislative history referenced herein under Rule 201 of the Tennessee Rules of Evidence. TENN. R. EVID. 201; *Counts v. Bryan*, 182 S.W.3d 288, 291-93 (Tenn. Ct. App. 2005).

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *See* Letter dated April 26, 2021 from House Ethics Counsel, Doug Himes, to the Honorable Cameron Sexton, Speaker of the House, communicating the U.S. Census Bureau's reporting of the total Tennessee population, Website of the Tennessee General Assembly (https://capitol.tn.gov/Archives/house/112GA/redistricting/Documents/Population_letter.pdf); a copy of this letter is included in the Appendix for ease of reference at Tab 4.

[6] *Id.*

[7] The Enacted House Map can also be viewed on the Website of the General Assembly at the following URL:
https://www.capitol.tn.gov/Archives/House/112GA/Redistricting/Plans/House_as_passed%2001 2422.png.

the legislators with a one-page summary evaluation for each plan. Per Mr. Himes's written evaluation, the Enacted House Map includes a range of districts whose populations deviate from the ideal district population in a range from +5.09% (+3,552 people) to -4.82% (-3,361 people), with a total variance of 9.90%.[8]

The Enacted House Map divides 30 counties, such that portions of these 30 counties share a House district with another county or counties.[9] The following are the 30 counties divided in the Enacted House Map: Anderson, Bradley, Carroll, Carter, Claiborne, Dickson, Fentress, Gibson, Hamblen, Hardeman, Hardin, Hawkins, Haywood, Henderson, Henry, Jefferson, Lawrence, Lincoln, Loudon, Madison, Maury, Monroe, Obion, Putnam, Roane, Sevier, Sullivan, Sumner, Williamson, and Wilson.[10]

During the legislative process, Representative Bob Freeman (D-Nashville) proposed an alternative redistricting plan on behalf of the House Democratic Caucus that divided seven fewer counties, and that achieved a lower total population variance than the Enacted House Map.[11] This alternate proposal is referred to herein as the Democratic Caucus Plan and has been included in the Appendix for ease of reference at Tab 2.[12]

---

[8] *See* Doug Himes evaluation of the Enacted House Map, included at page 1 of the following document, which is posted on the Tennessee General Assembly's website at: https://capitol.tn.gov/Archives/House/112GA/redistricting/Documents/additional%20december%20evaluations.pdf. A copy of this evaluation is included in the Appendix at Tab 3. This evaluation document is referred to herein as the "Himes Evaluation."

[9] *Id.*

[10] *See* Enacted House Map, included in the Appendix as Tab 1, *see also* text of SB 779, viewable on the Website of the Tennessee General Assembly at the following URL: https://www.capitol.tn.gov/Bills/112/Amend/SA0466.pdf.

[11] *See* Himes Evaluation, page 2, included in the Appendix as Tab 3; *see also* Affidavit of Bob Freeman at ¶ 10.

[12] The Democratic Caucus Plan can also be viewed at the following website: https://davesredistricting.org/maps#viewmap::706539fb-f439-4d8c-9df8-7a48c6473a30. As noted in Representative Freeman's filed affidavit, Rep. Freeman submitted the Democratic Caucus Plan using a mapping tool called Dave's Redistricting, and the URL included in this footnote links

4

As noted in Mr. Himes's evaluation, the Democratic Caucus Plan included districts with populations that deviated from the ideal equal-population target in a range from +4.98% (+3,552) to -4.74% (-3,311), comprising a total deviation of 9.72%.[13] The Democratic Caucus Plan achieved this lower total deviation while also dividing only the following 23 counties: Anderson, Bedford, Bradley, Carroll, Carter, Dickson, Fentress, Hawkins, Jefferson, Lauderdale, Loudon, Madison, Maury, Monroe, Montgomery, Putnam, Sevier, Shelby, Sullivan, Sumner, Warren, Williamson, and Wilson.[14] Thus, the Democratic Caucus Plan divided seven fewer counties than the Enacted House Map while also achieving a lower total population deviation than the Enacted House Map.[15] And, both the Enacted House Map and the Democratic Caucus Plan contained 13 majority-minority districts.[16]

Representative Freeman presented the Democratic Caucus Plan to the House Select Committee on Redistricting on December 17, 2021.[17] During that meeting, attorney Doug Himes, acting as counsel to the Select Committee, presented his evaluation of the Democratic Caucus Plan to the Select Committee.[18] Mr. Himes's evaluation of the Democratic Caucus Plan included his belief that the Democratic Caucus Plan violated the Tennessee Constitution. Specifically, Mr. Himes's evaluation stated, "The split of Shelby County appears to violate Article II, Section 5 of the Constitution of Tennessee as interpreted by *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836

---

to the exact proposal Rep. Freeman submitted to the legislature and that Attorney Himes evaluated. *See* Freeman Affidavit at ¶¶ 13-17.

[13] Himes Evaluation, page 2, included in the Appendix at Tab 3.

[14] *Id.*; *see also* map of Democratic Caucus Plan, located in the Appendix at Tab 2.

[15] Himes Evaluation, included in the Appendix at Tab 3.

[16] *Id.*

[17] *See* Transcript of the December 17, 2021, meeting of the House Select Committee on Redistricting, filed as Exhibit A to the Affidavit of Scott P. Tift (hereinafter, "Select Committee Transcript"); *see also* Freeman Affidavit at ¶ 18.

[18] *See* Select Committee Transcript, at Exhibit A to Tift Affidavit.

5

(Tenn. 1983)."[19] This opinion directly concerned the fact that the Democratic Caucus Plan includes one district where a portion of Shelby County is paired with a neighboring county to create one house district.[20] This was the only criticism of the Democratic Caucus Plan including in Mr. Himes's evaluation of that Plan.[21]

At the conclusion of the Select Committee's meeting, the Committee approved the majority caucus's proposed House redistricting plan.[22] The Select Committee did not vote on the Democratic Caucus Plan or any plan other than the plan presented by the majority caucus.[23]

On January 12, 2022, Representative Freeman presented the Democratic Caucus Plan to the House Public Service Subcommittee.[24] At this meeting, the Democratic Caucus Plan was formally introduced in House Bill 1583, sponsored by Representative Karen Camper and co-sponsored by Representative Freeman.[25] The House Public Service Subcommittee rejected House Bill 1583, and thereby rejected the Democratic Caucus Plan, by voice vote.[26]

**B.        The Reapportionment of the Tennessee Senate**

In the decade since the last decennial apportionment, Davidson County has been represented by four Senators.[27] Three of these senatorial districts are wholly within Davidson

---

[19]        *See* Himes Evaluation, page 2, included in the Appendix at Tab 3.
[20]        *See* map of Democratic Caucus Plan, located in the Appendix at Tab 2.
[21]        *See* Himes Evaluation, page 2, included in the Appendix at Tab 3.
[22]        *See* Select Committee Transcript, at Exhibit A to Tift Affidavit.
[23]        *Id.*
[24]        *See* Transcript of January 12, 2022, meeting of the House Public Service Subcommittee, filed as Exhibit B to the Affidavit of Scott P. Tift (hereinafter, "Public Service Subcommittee Transcript"); *see also* Freeman Affidavit at ¶¶ 28-29.
[25]        *Id.*
[26]        *See* Public Service Subcommittee Transcript, at Exhibit B to Tift Affidavit.
[27]        *See* Website of the Tennessee General Assembly, map of Middle Tennessee's current senatorial districts: https://www.capitol.tn.gov/districtmaps/Senatemiddle.html

County, and one district contains a portion of Davidson County, as well as Sumner and Trousdale Counties.[28]  These four senatorial districts are numbered 18, 19, 20, and 21.[29]

SB 0780 creates four senatorial districts within Davidson County.[30] Three of these districts are also wholly within Davidson County, and one district includes a portion of Davidson County as well as all of Wilson County.[31] SB 0780 numbers these four senatorial districts 17, 19, 20, and 21.[32]

On January 20, 2022, during the session in which the Senate ultimately approved SB 0780, Senator Jeff Yarbro proposed an amendment to SB 0780.[33]  The redistricting plan set forth in Senate Amendment 0467 ("the SA 0467 Plan") would have replaced the Senate redistricting plan that the Senate ultimately enacted with a redistricting plan that also included four senatorial districts, including three districts wholly within Davidson County and one district paring a portion of Davidson County with a portion of Rutherford County.[34] The SA 0467 Plan would have numbered these four senatorial districts 18, 19, 20, and 21.[35]

In addition to numbering Davidson County's senatorial districts consecutively, the SA 0467 Plan also divided fewer counties than the enacted plan and did not pair any incumbents in the same senatorial district.[36] The SA 0467 Plan divided eight counties, such that portions of just

---

[28]     *Id.*

[29]     *Id.*

[30]     The legislative districts enacted by SB 0780 are depicted on the General Assembly's website at the following URL: https://wapp.capitol.tn.gov/Apps/fml2022/search.aspx, and those districts are also set forth within the legislative text of SB 0780, viewable at the following link: https://www.capitol.tn.gov/Bills/112/Amend/SA0464.pdf.

[31]     *Id.*

[32]     *Id.*

[33]     *See* Senate Amendment 0467, viewable on the website of the Tennessee General Assembly at the following URL:
https://www.capitol.tn.gov/Bills/112/Amend/SA0467.pdf

[34]     *Id.*

[35]     *Id.*

[36]     Affidavit of Senator Jeff Yarbro at ¶¶ 12-14.

eight counties share a senatorial district with another county or counties, whereas the enacted map divides nine counties.[37] The SA 0467 Plan also would have contained district-to-district population deviations well below a total deviation of 10%, in a range from +2.76% to -4.94% as compared to the ideal district population, and a total deviation of 7.70%.[38]

The Senate tabled SA 0567 by a vote of 26-5.[39]

### C.      The Plaintiffs

Plaintiff Moore is a resident of Davidson County, Tennessee, and Plaintiff Moore is registered to vote in Davidson County, Tennessee.[40]

Plaintiff Turner is a resident of Shelby County, Tennessee, and Plaintiff Turner is registered to vote in Shelby County, Tennessee.[41]

Plaintiff Wygant is a resident of Gibson County, Tennessee, and Plaintiff Wygant is registered to vote in Gibson County, Tennessee.[42]

### III.     THE REDISTRICTING PLANS ENACTED BY THE LEGISLATURE VIOLATE THE TENNESSEE CONSTITUTION AND SHOULD BE ENJOINED.

#### A. Temporary Injunction Standard

A temporary injunction is available in Tennessee state courts "if it is clearly shown […] that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that

---

[37]     *Compare* SA 0467 (https://www.capitol.tn.gov/Bills/112/Amend/SA0467.pdf with SB 0780, as amended (https://www.capitol.tn.gov/Bills/112/Amend/SA0464.pdf).

[38]     *See* Affidavit of Senator Jeff Yarbro at ¶ 15.

[39]     *See* Website of the Tennessee General Assembly, reflecting vote totals on SB 0780, including the vote total concerning tabling Senator Yarbro's proposed Amendment 2, referred to herein as SA 0467, at the following URL: https://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=SB0780 (at "Votes" tab).

[40]     *See* Sworn Verification of Akilah Moore, First Amended Verified Complaint.

[41]     *See* Sworn Verification of Telise Turner, First Amended Verified Complaint.

[42]     *See* Sworn Verification of Gary Wygant, First Amended Verified Complaint.

8

the acts or omissions of the adverse party will tend to render such final judgment ineffectual." *Gentry v. McCain*, 329 S.W.3d 786, 792–93 (Tenn. Ct. App. 2010) (quoting Tenn. R. Civ. P. 65.04) (emphasis added).

An application for a temporary injunction typically turns on the analysis of four factors: (1) the likelihood the movant will prevail on the underlying merits of her claim; (2) the threat of irreparable harm facing the movant should her application for temporary relief pending final adjudication be denied; (3) the balance of this harm against whatever burden the temporary injunction would impose on the party enjoined; and (4) considerations of public interest. *Id.* at 793 (quoting Robert Banks Jr. and June F. Entman, Tennessee Civil Procedure §4-3(l) (1999)). While the Tennessee Supreme Court has never formally adopted this four-part balancing test, the state Court of Appeals consistently relies on it. 1 MB Tennessee Civil Procedure §4-3 (2019).

**B. Plaintiffs are likely to succeed on the underlying merits of their claims.**

The General Assembly adopted a redistricting plan for the House of Representatives that divides more counties than necessary to achieve equality of population among House districts, and the General Assembly adopted a redistricting plan for the Senate that fails to number the four senatorial districts in Davidson County consecutively. Both acts violate the plain language of the Tennessee Constitution, and Plaintiffs are likely to succeed on the merits of both claims.

    1. **The enacted House of Representatives redistricting plan violates the Tennessee Constitution by dividing more counties than necessary to achieve equality of population among the legislative districts.**

       a) **Article II, Section 5 of the Tennessee Constitution requires reapportionment plans to cross as few county lines as possible.**

The Tennessee Constitution requires the General Assembly to apportion the House of Representatives into 99 districts. Tenn. Const. art. II, § 5. Both the Tennessee Constitution and the federal Constitution require "equality of population among districts, insofar as is practicable."

*State ex rel. Lockert v. Crowell*, 631 S.W.2d 702, 706–07 (Tenn. 1982) ("*Lockert I*") (citing U.S. Const amend. XIV; Tenn. Const art. II, §§ 4, 6). The Tennessee Constitution additionally constrains the General Assembly's apportionment of the House of Representatives by requiring that "no county shall be divided in forming such a district." Tenn. Const. art. II, § 5.

The Tennessee Supreme Court reconciles these two constitutional mandates by instructing the General Assembly to adopt reapportionment plans that "cross as few county lines as is necessary to comply" with the equal population requirement of the Fourteenth Amendment to the federal constitution. *Lockert I*, 631 S.W.2d at 715. Thus, during every decennial reapportionment, "the State's constitutional prohibition against crossing county lines must be enforced insofar as is possible and . . . any apportionment plan adopted must cross as few county lines as is necessary to comply with federal constitutional requirements." *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836, 838 (Tenn. 1983) ("*Lockert II*"); *see also Rural West Tenn. African-American Affairs Council, Inc. v. McWherter*, 836 F. Supp. 447, 450 (W.D. Tenn. 1993) (quoting same).

"The burden is on one attacking an act to establish its invalidity." *Lockert I*, 631 S.W.2d at 710 (quoting *Smith v. Craddick,* 471 S.W.2d 375, 378 (Tex. 1971)). *Lockert I* set forth a burden-shifting framework for cases attacking the validity of a redistricting act. The plaintiffs must first demonstrate that the redistricting act split counties, thereby violating the state constitutional prohibition against crossing county lines. *Id.* at 714. Once plaintiffs have done so, the burden shifts to the defendants "to show that the Legislature was justified in passing a reapportionment act which crossed county lines" by establishing that dividing counties was necessary to comply with federal constitutional requirements. *Id.*

10

### b) Plaintiffs have established a *prima facie* violation of Article II, Section 5 of the Tennessee Constitution.

Plaintiffs have established a *prima facie* violation of the Tennessee Constitution. Article II, Section 5 of the Tennessee Constitution provides: "[N]o county shall be divided in forming . . . a [House of Representatives] district." To establish a *prima facie* violation of that constitutional prohibition, Plaintiffs need only establish that the Enacted House Map created at least one district crossing county lines to pair a portion of one county with at least one adjacent county. *See Moore v. State of Tennessee*, 436 S.W.3d 775, 784–85 (Tenn. Ct. App. 2014) ("Consistent with *Lockert*, after Appellants demonstrated that the Act violated the Tennessee Constitution by crossing county lines, the burden shifted to Appellees to demonstrate that the divisions were excused by the requirements of equal representation." (internal quotations omitted) (quoting *Lockert I*, 631 S.W.2d at 710)). Here, it is clear that the Enacted House Map divides a number of counties – in fact, counsel for the Tennessee House of Representatives acknowledged that the map does so 30 times.[43] Accordingly, Plaintiffs have made a *prima facie* showing of a violation of Article II, Section 5 of the Tennessee Constitution.

### c) Defendants cannot show that the General Assembly was justified in passing the Enacted House Map.

Since Plaintiffs have established a *prima facie* violation of Article II, Section 5 of the Tennessee Constitution, the burden of proof shifts to the Defendants to establish that the General Assembly was "justified in passing a reapportionment act which crossed county lines," *Lockert I*, 631 S.W.2d at 714; that is, that the Enacted House Map's division of 30 counties was "necessary to comply with federal constitutional requirements." *Rural West Tenn. African-American Council*,

---

[43] *See* Himes Evaluation, at Appendix Tab 3.

11

836 F. Supp. at 451 (quoting *Lockert II*, 56 S.W.2d at 838). As set forth below, the legislative history alone prevents Defendants from making such a showing.

**(1) <u>The Enacted House Map divides more county lines than necessary to comply with requirements imposed by the federal constitution.</u>**

The 2020 census identified 6,910,840 people as the total population of Tennessee. If the state's total population were divided equally among the state's ninety-nine House districts, each House district would have contained 69,806 people. The United States Supreme Court and the Tennessee Supreme Court recognize, however, that rational state policy, such as maintaining the compactness and contiguity of districts and preserving the integrity of traditional county and city boundaries, can justify deviations from that precise district size in drawing legislative districts under the federal "one-person, one-vote" doctrine. *E.g.*, *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 258 (2016); *Lockert I*, 631 S.W.2d at 710.[44] Despite that flexibility, both courts have held that the General Assembly must make a good faith effort to minimize such deviations when drawing legislative districts. *Lockert I*, 631 S.W.2d at 707–08.

Article II, Section 5's prohibition on county divisions, being a constitutional restriction, is the foremost state policy that regularly justifies a map with a wider total population variance in Tennessee. Recognizing the tension between the federal constitution's one-person, one-vote doctrine and Article II, Section 5's prohibition on dividing counties across House districts, the Tennessee Supreme Court requires the General Assembly to adopt legislative maps that "cross as few county lines *as is necessary* to comply with the" one-person, one-vote doctrine under the

---

[44]      *See, e.g.*, *Moore*, 436 S.W.3d 775 (Tenn. Ct. App. 2014), *perm. app. denied* (Tenn. 2014) (upholding state senate reapportionment map based on 2010 decennial census with an overall deviation of 9.17%); *see also White v. Regester*, 412 U.S. 755 (1973) (holding Texas state legislative redistricting plan with total population variance of 9.9%, standing alone, did not violate one person, one vote standard); *Gaffney v. Cummings*, 412 U.S. 735 (1973) (upholding Connecticut reapportionment plans where maximum deviations among house districts totaled 7.83% and maximum deviations between Senate districts totaled 1.81%).

federal constitution. *Id.* at 715 (emphasis added). In other words, if two possible maps comply with the one-person, one-vote doctrine, the General Assembly is constitutionally required to adopt the map that better complies with the Tennessee Constitution's prohibition on county-splitting.

There are no safe harbors that protect redistricting plans from constitutional scrutiny, either based on the plan's total population variance or on the number of county divisions. *See Moore*, 436 S.W.3d at 786 ("There is no safe harbor."); *Rural West Tenn. African-American Council*, 836 F. Supp. at 450 (rejecting defendants' argument that the number of county splits approved by prior court decisions creates a safe harbor for future reapportionments). Indeed, the Tennessee Supreme Court has been clear that it would not "sanction a single county line violation not shown to be necessary to avoid a breach of federal constitutional requirements." *Lockert II*, 656 S.W.2d at 839.

Per the House Ethics Counsel's review of the Enacted House Map, the new house districts deviate from the equal-population ideal in a range from -4.82% to 5.09%, yielding a total population variance of 9.91%. The Enacted House Map divides 30 counties in creating its voting districts.

A competing redistricting map submitted by State Representative Bob Freeman to the House Select Committee on Redistricting and the House Public Service Subcommittee confirms it was unnecessary to divide 30 counties to comply with federal constitutional requirements. During the legislative reapportionment process, Rep. Freeman submitted an alternative House map to the House Select Committee on Redistricting on behalf of the House Democratic Caucus (the "Democratic Caucus Plan") in late 2021. Per the House Ethics Counsel's review of the Democratic Caucus Plan, the Plan divided only 23 counties—7 fewer than the Enacted House Map. The Democratic Caucus Plan also has a lower total population variance from the ideal population than

the Enacted House Map. Specifically, the Democratic Caucus Plan has a total population variance of 9.72%—less than the Enacted House Map's total population variance of 9.91%.[45]

The House Select Committee on Redistricting took no action on the Democratic Caucus Plan and adopted the redistricting plan proposed by the majority caucus by voice vote, before referring it to the House Public Service Subcommittee for further consideration. Rep. Freeman then presented the Democratic Caucus Plan to the House Public Service Subcommittee as an amendment to the redistricting legislation. The House Public Service Subcommittee rejected the proposed amendment by voice vote. The redistricting legislation proposed by the majority caucus then proceeded to the House floor, where it was considered and adopted.

In light of these facts, Defendants cannot establish that the map adopted by the General Assembly, which divided 30 counties, was necessary to comply with federal equal-protection constitutional requirements. Indeed, the indisputable evidence shows the Democratic Caucus Plan's alternate proposal simultaneously crossed fewer county lines than the Enacted House Map (23 versus 30) *and* achieved a narrower total population variance than the Enacted House Map (9.72% versus 9.91%). Put simply, the Democratic Caucus Plan confirms that the General Assembly could have easily adopted a map that both crossed substantially fewer than 30 county lines *and* hewed even closer to the requirements of the one-person, one-vote doctrine under the federal constitution.

Defendants may erroneously contend that Article II, Section 5 has been interpreted to allow House redistricting maps to cross up to 30 county lines. *See Lockert II*, 656 S.W.2d at 844 (holding based on "the proof in this record" House reapportionment following 1980 census would have "an

---

[45]   Notably, both the Enacted House Map and the Democratic Caucus Plan created 13 majority-minority districts. *See* Himes Evaluation. Because the two plans contain the same number of districts in which minority voters constitute a majority of the voting-age population, they would be equally compliant with Section 2 of the federal Voting Rights Act, 52 U.S.C. § 10301.

14

upper limit of dividing 30 counties"). The case law holds to the contrary. As noted above, there is no safe harbor permitting the General Assembly to cross a predetermined number of county lines with constitutional impunity. Each and every county division must be "shown to be necessary to avoid a breach of federal constitutional requirements." *Lockert II*, 656 S.W.2d at 839; *see also Rural West Tenn. African-American Council*, 836 F. Supp. at 450 ("[N]owhere in the *Lockert II* opinion does the court purport to establish an absolute numerical standard, applicable in all redistricting contexts."). In fact, technological advances now make it easier to draw redistricting maps that maximize compliance with federal and state requirements. *See Rural West Tenn. African-American Council*, 836 F. Supp. at 451. If Defendants cannot show the Enacted House Map crossed only as many county lines as necessary to comply with federal law and no more— and here they cannot—the redistricting plan violates Article II, Section 5 and must be set aside. *Lockert II*, 656 S.W.2d at 839.

Accordingly, there can be no dispute that the General Assembly violated Article II, Section 5 of the Tennessee Constitution by enacting SB 0779. Defendants cannot show that the seven additional county divisions in the Enacted House Map, as compared to the alternative Democratic Caucus Plan, were necessary to meet the mandates of equal protection, since the indisputable evidence establishes that the alternate map actually carries a *lower* total population variance (*i.e.*, is more compliant with the applicable requirements of the federal constitution) than the Enacted House Map. The alternative map makes clear that, in violation of clear Tennessee Supreme Court precedent, the General Assembly sanctioned not just one—but seven—county line violations that were not necessary. And while the General Assembly may not need to adopt the alternative Democratic Caucus Plan exactly as it was presented, it is definitive proof that the Enacted House

Map must be set aside, given the Legislature could have drawn a map that simultaneously crosses fewer county lines and provides for a lower total population variance between districts.

### (2) <u>The General Assembly did not identify any legitimate state interest in adopting the Enacted House Map.</u>

Moreover, the General Assembly did not articulate in the legislative record any other legitimate state interest that would justify adoption of the Enacted House Map, particularly to the exclusion of a known, alternative map that crosses fewer county lines, has a lower total population variance, and contains the same number of majority-minority districts. While a certain degree of population deviations is permissible to further legitimate state interests, *see Moore*, 436 S.W.3d at 783–84, a review of relevant legislative history confirms that the General Assembly did not articulate any such legitimate interest in favoring the Enacted House Map over alternative proposals. In fact, the House Select Committee on Redistricting *only* voted on the majority caucus's redistricting plan, which unnecessarily split 30 counties, and the House Public Service Subcommittee similarly rejected an amendment to substitute the Democratic Caucus Plan for the majority map.

This is not a proper result under the law. The General Assembly's only apparent justification for rejecting the Democratic Caucus Plan is that it divided one of Shelby County's fourteen proposed districts with a neighboring county. The General Assembly's legal counsel advised the House that "[t]he split of Shelby County appears to violate Article II, Section 5 of the Constitution of Tennessee as interpreted in *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836 (Tenn. 1983)."[46] In fact, neither the *Lockert* cases nor any subsequent case establishes a prohibition on dividing large counties. In fact, in *Lockert III*, the Tennessee Supreme Court expressly affirmed a legislative map that divided a portion of Shelby County based on the Legislature's good faith

---

[46]     *See* Himes Evaluation, at Appendix Tab 3.

attempt to comply with the federal constitutional requirement of population equality and the state constitutional prohibition against dividing county lines. *See State ex rel. Lockert v. Crowell*, 729 S.W.2d 88, 91 (Tenn. 1987) ("*Lockert III*"). Similarly, in *Lockert II*, the Tennessee Supreme Court expressly recognized that dividing large counties, when necessary, could assist in alleviating large population deviations that otherwise fail to comply with federal law. *See Lockert II*, 656 S.W.2d at 841 ("[O]nly one fractional segment of each [of Knox and Davidson] county need be detached and joined with other counties to reduce the over population deviation to limits acceptable under federal law."). Stated alternatively, the *Lockert* cases plainly contemplate that dividing a large county (or multiple large counties) is permissible to obtain a map with a lower overall population deviation. Thus, the fact that the Democratic Caucus Plan divides one large county is not disqualifying, especially when that division would have permitted the General Assembly to achieve lower overall population deviation and fewer county divisions across the state. Against this backdrop, there is no legitimate basis in the legislative record to permit the Legislature to favor the Enacted House Map over the Democratic Caucus Plan.

On this record, the General Assembly plainly lacked *any* legitimate state interests in adopting SB 0779 over alternative proposals—such as the Democratic Caucus Plan—that adhere more closely to federal and state constitutional requirements. Nor does the record demonstrate that any other legitimate state interests were even contemplated by the General Assembly in adopting its map. Accordingly, the House map enacted pursuant to SB 0779 cannot stand.

### d) The General Assembly must redraw the House map to comport with state and federal constitutional requirements.

As set forth above, the General Assembly adopted a House map that violates Tennessee's constitutional prohibition on unnecessarily dividing counties in drawing legislative districts. Plaintiffs have stated a *prima facie* case of this violation, and defendants cannot meet their burden

17

Case 3:26-cv-00603    Document 1-9    Filed 05/07/26    Page 18 of 26 PageID #: 193

to establish that the enacted map passes scrutiny given (i) feasible alternative maps—such as the Democratic Caucus Plan—that would result in lower population deviation, a lower number of county splits, and the same number of majority-minority districts, and (ii) the General Assembly's failure to articulate any legitimate state basis in favoring SB 0779 over such alternatives. Accordingly, this Court should issue an order requiring the General Assembly to produce a new House map that complies with state and federal constitutional requirements within 15 days pursuant to Tenn. Code Ann. § 20-18-105(a).

This is not an onerous task. For starters, the General Assembly has already considered the Democratic Caucus Plan, which meets constitutional requirements and advances recognized state interests as described above. However, should the General Assembly not be satisfied with the Democratic Caucus Plan, it has sufficient resources to timely produce new potential House legislative maps. As the District Court for the Western District of Tennessee noted in 1993, "'rapid advances in computer technology and education during the last two decades make it relatively simple to draw contiguous districts of equal population and at the same time to further whatever secondary goals the State has.' This is even more true today. Witnesses in this consolidated case testified to preparing state-wide plans in a matter of hours." *Rural West Tenn. African-American Council*, 836 F. Supp. at 451 (citing *Karcher v. Daggett*, 462 U.S. 725, 733 (1983)). Presumably, the technology available to the General Assembly has advanced even further over the past 30 years, and redrawing the House legislative maps to comply with constitutional principles can and should be accomplished in relatively short order.

Accordingly, the Court should not be "disturbed by the prospect of the State being subjected to pressure to obey both the U.S. Supreme Court directive to make an honest and good faith effort to construct districts . . . as nearly of equal population as practicable and its own highest

18

court's mandate to cross as few county lines as is necessary to comply with federal constitutional requirements. To the extent that this is a hardship, it is one imposed by the two documents defendants are sworn to uphold, the state and federal Constitutions." *Rural W. Tenn. African-Am. Affairs Council*, 863 F. Supp. at 451 (internal quotations and citations omitted). Should the General Assembly fail to meet the directive to enact a House map that complies with the federal and state constitutional requirements discussed in this Section, the Court should redraw, or adopt, a House legislative map that complies with these constitutional principles to apply to the 2022 legislative election cycle, as provided in Tenn. Code Ann. § 20-18-105(b).

**2. SB 0780 violates the Tennessee Constitution because it does not number Davidson County's senatorial districts consecutively.**

Article II, Section 3 of the Tennessee Constitution expressly and unambiguously requires that in "a county having more than one senatorial district, the districts *shall* be numbered consecutively." Tenn. Const. art. II, Sec. 3 (emphasis added). SB 0780, which numbers the Davidson County senatorial districts 17, 19, 20, and 21, violates this provision of the Tennessee Constitution.

Article II, Section 3 sets up a staggered election cycle such that even-numbered senatorial districts hold elections in presidential election years (*e.g.*, 2016, 2020, 2024) and odd-numbered senatorial districts hold elections in gubernatorial election years (*e.g.*, 2018, 2022, 2026).[47] This constitutional framework ensures that the citizens of the State of Tennessee and the citizens of Tennessee's larger-population counties benefit from the continuity of government inherent to a legislative body comprised of staggered-term legislators. *See, e.g., Legislature v. Reinecke*, 516 P.2d 6, 12 (Cal. 1973) ("The state may rationally consider stability and continuity in the Senate as a desirable goal which is reasonably promoted by providing for four-year staggered terms.");

---

[47] *See* Tenn. Const. art II, § 3.

*Denish v. Johnson*, 910 P.2d 914, 924 ("Staggered terms preserve continuity in the public entity by preventing the theoretical possibility of all appointees being replaced at once. This continuity ensures that there will be no erratic changes of the entity's policies." (concerning staggered terms on an appointed board of regents)) (citations omitted).

SB 0780 clearly violates Article II, Section 3 because it creates senatorial districts in Davidson County numbered 17, 19, 20, and 21; *i.e.*, districts that are ***not*** "numbered consecutively." In *Lockert I*, the Tennessee Supreme Court noted that in reviewing the "constitutionality of a state apportionment plan . . . [i]n a county having more than one senatorial district, *such districts shall be numbered consecutively." Lockert I*, 631 S.W.2d at 710-711 (emphasis added). The Court then ruled that "constitutional standards which *must* be dealt with in any plan include contiguity of territory and *consecutive numbering of districts*." *Id.* at 715 (emphasis added). In doing so, the Supreme Court reversed the Chancery Court's ruling that the misnumbering of senatorial districts can be "a necessary by-product of reapportionment and did not violate the Constitution." *Id.* at 704, 715. Because SB 0780 violates the clear, express, mandatory language of the Tennessee Constitution and the blackletter law on this issue from the Tennessee Supreme Court, SB 0780 should be enjoined, and the legislature should be given 15 days to remedy this constitutional defect.

There is, of course, an easy fix to this issue. As submitted during the debate on SB 0780, a map can easily be drawn that correctly numbers the Senate districts in Davidson County 18, 19, 20, and 21 and assures that Davidson County voters, like those in all other larger-population counties, gain the benefits of staggered representation in the Senate. Moreover, this map resolved the constitutional numbering issue while also dividing fewer counties than the map enacted by SB 0780 (eight divided counties rather than nine) and without disturbing the term of any sitting

20

member of the Senate.[48] As required by TENN. CODE ANN. § 20-18-105(a), the Court should immediately provide the General Assembly with 15 days during which to remedy this constitutional violation. If the General Assembly fails to produce a constitutional districting plan by the deadline, the Court should expeditiously impose an interim districting plan, which plan will apply only to the 2022 election cycle, as required by TENN. CODE ANN. § 20-18-105(b).

### C. Plaintiffs will suffer irreparable harm if the enacted maps are not enjoined.

Having established that Plaintiffs are likely to prevail on the merits of their claims, Plaintiffs must also show what irreparable harm they will face in the absence of a temporary injunction. A threatened injury is "irreparable" when it is not compensable by remedy at law. See *Cole v. Dych*, 535 S.W.2d 315, 322 (Tenn. 1976).

Federal authority holds that the abridgement of a constitutional right is irreparable harm *per se*. *See, e.g., Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) ("When constitutional rights are threatened or impaired, irreparable injury is presumed. A restriction on the fundamental right to vote therefore constitutes irreparable injury."). And such abridgement, "'even for a minimal period[] of time, unquestionably constitutes irreparable injury.'" *Tanco v. Haslam*, 7 F. Supp. 3d 759, 769–70 (M.D. Tenn.) (emphasis added) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), rev'd sub nom. *DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014), rev'd sub nom. *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). Accordingly, "a successful showing on the first factor [*i.e.*, likelihood of success] mandates a successful showing in the second factor—whether the plaintiff will suffer irreparable harm." *Bonnel v. Lorenzo*, 241 F.3d 800, 809 (6th Cir 2001) (emphasis added). (citing *Elrod*, 427 U.S. at 373).

---

[48] The Tennessee Constitution also prohibits the division of counties when creating senatorial districts, Tenn. Const. art. II, § 6, with the same analysis addressed herein concerning House of Representatives seats applying equally to senatorial seats. *See also* SA 0467; Affidavit of Senator Jeff Yarbro at ¶¶ 12-14.

21

Here, the candidate filing deadline for the August 4, 2022 primary elections falls on April 7, 2022. Absent prompt issuance of an injunction delaying the April 7, 2022 candidate qualifying deadline and providing the General Assembly with at least 15 days to remedy the identified constitutional defects, Plaintiffs' irreparable injury will be guaranteed because the 2022 election cycle will take place in earnest on the unconstitutional maps enacted by the General Assembly.

### D. The balance of harms favors injunctive relief.

The balance of harms strongly tips in favor of injunctive relief because there is currently enough time to remedy the constitutional defects that Plaintiffs allege before the voting process begins in late June of this year. The harm of not acting now, therefore, falls entirely on the Plaintiffs, who will be required to vote under unconstitutional maps throughout the 2022 election cycle if injunctive relief is not granted.

This year's primary elections will occur on August 4, 2022, and the State of Tennessee will be required to mail military absentee ballots to service members who have requested them on or before June 20, 2022. Should the Court determine that Plaintiffs' claims are likely to succeed on the merits and that a temporary injunction is warranted, TENN. CODE ANN. § 20-18-105 requires the Court to provide the General Assembly with a minimum of 15 days to remedy any identified constitutional defects. Applying this statutory minimum to a hypothetical schedule, the Court could issue a temporary injunction in late March 2022, following a hearing on Plaintiffs' Motion. Therein, the Court could move the April 7, 2022 candidate qualifying deadline by approximately six weeks, to May 20, 2022, and could provide the General Assembly until April 15, 2022 to remedy the identified constitutional defects. The Court would then have the benefit of several weeks during which to issue an interim redistricting plan if the Legislature fails to act. This process would avoid the anticipated violation of Plaintiffs' constitutional rights, would comply with TENN.

22

CODE ANN. § 20-18-105, and would ensure that any legislative candidate had at least a month before the mailing of military absentee ballots to be established as a qualifying candidate.

The State will suffer little to no harm from the imposition of a schedule similar to that set forth above, and any harm suffered by the State in the process would be administrative at most. At this point in time, therefore, the balance of the harms strongly supports injunctive relief.

### E. Injunctive relief is in the public interest.

Plaintiffs assert constitutional claims concerning their fundamental right to vote via elections organized under the strictures of the State's founding document. Injunctive relief is in the public interest to prevent the violation of these constitutional rights.

It is "always in the public interest to prevent the violation of a party's constitutional rights." *Jones v. Caruso*, 569 F.3d 258, 27 (6th Cir. 2009) (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)). Thus, because this action seeks to prevent the violation of Plaintiffs' constitutional rights, an injunction is justified in the public interest if the Court determines that Plaintiffs have a likelihood of success on the merits. *See Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014) ("[T]he determination of where the public interest lies [] is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights.") (quoting *Connection Distrib. Co.*, 154 F.3d at 288) (omissions in original).

## IV. CONCLUSION

This case involves the application of critical constitutional requirements to one of the fundamental elements of representative democracy—the crafting of legislative districts. Plaintiffs are likely to, and will, succeed on their claims on the merits as set forth herein. Therefore, to prevent the violation of Plaintiffs' constitutional rights, the Court should enjoin the State from

23

acting upon the enacted legislative maps, should provide the legislature with 15 days to remedy the identified constitutional defects, and should delay the April 7, 2022, candidate qualifying deadline sufficiently to allow for the Court to impose an interim redistricting plan if the legislature fails to act by the Court-imposed deadline.

Dated: March 11, 2022

Respectfully submitted,

/s/ Scott P. Tift
David W. Garrison (BPR # 024968)
Scott P. Tift (BPR # 027592)
Barrett Johnston Martin & Garrison, LLC
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2202
(615) 252-3798
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

John Spragens (BPR # 31445)
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
T: (615) 983-8900
F: (615) 682-8533
john@spragenslaw.com

*Counsel for Plaintiffs*

24

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing *Plaintiffs' Memorandum in Support of Motion for Temporary Injunction* has been served on the following counsel for the defendants via electronic and U.S. mail on this 11th day of March, 2022.

Alexander S. Rieger
Janet M. Kleinfelter
Pablo A. Varela
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202-0207
alex.rieger@ag.tn.gov
janet.kleinfelter@ag.tn.gov
pablo.varela@ag.tn.gov

/s/ Scott P Tift
Scott P. Tift