## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

VICKI HALE, EARLE FISHER, )
TELISE TURNER, HEDY WEINBERG, )
STEPHEN COHEN, CHARLES 'CHAZ' )
MCIVER MOLDER, CHANEY )
MOSLEY, JUSTIN PEARSON, and the )
TENNESSEE DEMOCRATIC PARTY, )
                              )
*Plaintiffs*,               )      **CASE NO. 3:26-cv-00603**
                              )
v.                                )
                              )
BILL LEE, Governor, )
TRE HARGETT, Secretary of State; )
MARK GOINS, Tennessee Coordinator )
of Elections; all in their official capacity )
only,                              )
                              )
*Defendants*.             )

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

### INTRODUCTION

Plaintiffs include Tennessee voters residing in current Congressional Districts 5 and 9; qualified candidates who have long been running for the United States House of Representatives in current Congressional Districts 5, 6, and 9; and the Tennessee Democratic Party, whose membership includes voters from across the State of Tennessee and overseas. Plaintiffs face an unprecedented attack on their right to vote and their right to associate under the First and Fourteenth Amendments to the United States Constitution. On May 7, 2026, Governor Bill Lee signed HB 7001, HB 7002, HB 7003 and HB 7005 (collectively, the "Act") into effect. The Act redraws Tennessee Congressional Districts 3-9 for the 2026 congressional elections and drastically

1

revises election deadlines, candidate qualifications, and voter notification requirements while the 2026 election cycle is already underway.[1]

This case is unique from other redistricting cases around the country because the State of Tennessee has moved the candidate qualifying date from March 10, 2026, to May 15, 2026, despite the fact that the Tennessee Supreme Court, just four years ago, rejected a May 5 qualifying deadline, stating that delaying the candidate qualifying deadline for the August elections "from April 7, 2022, to May 5, 2022, will have a significant detrimental impact on the work of our state and county election officials, risks voter confusion, and potentially compromises the integrity of our state's elections." *Moore v. Lee*, 644 S.W.3d 59, 65 (Tenn. 2022)

At the time, the Supreme Court was considering whether to stay a lower court injunction that had moved the candidate qualifying date from April 7 to May 5. In arguing that the candidate qualifying deadline should not be moved to May 5, the defendants there (who are also the defendants in this case) submitted affidavits from four elections officials who swore under oath that delaying the candidate qualifying deadline into May would "jeopardize" local election officials' "ability to complete [their] obligations timely and accurately, and would likely result in significant voter confusion."[2]

These administrators further swore that delaying the candidate qualifying deadline into May would prevent their offices from meeting their federal statutory deadline for mailing overseas absentee ballots to members of the military and other overseas citizens, as required by the Uniformed and Overseas Citizen Absentee Voting Act. *See* 52 U.S.C. 20310 ("UOCAVA"). Based

---

[1] See *Elections Calendar*, Tenn. Sec'y of State, https://sos.tn.gov/elections/calendar (last visited May 6, 2026) (candidate qualifying deadline March 10, 2026; withdrawal deadline March 17, 2026).

[2] Exhibit B to Complaint, Affidavit of Linda Phillips, at ¶ 27; nearly identical to Ex. C, Affidavit of Chris Davis, ¶ 26 and Ex. D, Affidavit of Tammy Smith, ¶ 23).

2

on these affidavits, counsel from the Office of the Attorney General and Reporter argued, on behalf of Governor Lee, Secretary of State Hargett, and Coordinator of Elections Goins that moving the candidate qualifying deadline to **May 5** would "wreak electoral chaos, risking voter disenfranchisement and compromising the integrity of the electoral process." In response, the Supreme Court of Tennessee stayed the trial court's order, which had moved the candidate qualifying deadline to May 5.[3]

Now, in 2026, the Act moves the qualifying deadline to May 15—well past April 7 and May 5. The Act's alteration of the mechanics of the August 6, 2026 election, as testified to by the administrators who will oversee this election, will wreak chaos on the electorate, cause significant voter confusion, impede the ability of the local election commissions to timely and accurately administer the August 6, 2026 election, and risk disenfranchising Plaintiffs and the many voters who comprise the membership of the Tennessee Democratic Party. The Act also removes the individual notice requirement for notifying voters by mail of their new Congressional Districts, which will lead to additional voter confusion and potential disenfranchisement. In addition, the Act rips apart Plaintiffs' already-formed political associations, severely burdening their right to associate in advance of an election, causing irreparable harm to the Candidate Plaintiffs and the voters they seek to represent.

In this action, Plaintiffs do not challenge the contents of the Act's map or whether it was fairly and legally drawn. Rather, Plaintiffs urgently request that the Court enter a temporary restraining order ("TRO") and a preliminary injunction to enjoin the implementation and enforcement of the Act for the 2026 election cycle.

---

[3] Exhibit G to Complaint.

**I.    The Enactment of the Act**

On May, 1, 2026, Governor Bill Lee issued a proclamation[4] calling the One Hundred Fourteenth General Assembly of the State of Tennessee to convene in an extraordinary session ("special session") beginning May 5, 2026. The purpose of the special session was to pass legislation altering the composition of Tennessee's nine congressional districts and to make statutory changes "necessary to effectuate change to the composition of Tennessee's congressional districts and to facilitate 2026 congressional elections."

On May 7, 2026, the Tennessee General Assembly reapportioned seven of Tennessee's nine congressional districts and altered the electoral rules and regulations that apply to the 2026 election by enacting House Bills 7001, 7002, 7003, and 7005 ("the Act").[5] Governor Lee signed the Act on May 7, 2026. By its express terms, the Act went into effect immediately upon its enactment.

**II.    The Act's Revisions to the 2026 Election Cycle**

In addition to redrawing Tennessee's congressional districts, the Act amends existing requirements regarding election deadlines, candidate qualifications, and voter notice requirements.

---

[4] Exhibit K to Complaint.
[5] Exhibit M to Complaint.

### A. Redrawing of Tennessee Congressional Districts

2022 Map[6]



2026 Map[7]



The Act's 2026 map drastically changes Congressional Districts 4, 5, 7, 8 and 9. Most notably, the formerly compact District 9 is now split amongst Districts 5, 8, and 9.

A congressional candidate who qualified to run in District 9 before the Act, for example, would have been campaigning (since March 10, 2026 or earlier) in two counties—Tipton and

---

[6] *U.S. Congress Districts*, Tenn. Comptroller of the Treasury, https://comptroller.tn.gov/maps/u-s--congress-districts.html (last visited May 6, 2026).

[7] Marianna Bacallao *Tennessee GOP Unveils New Maps Fracturing Memphis and Nashville Area*, WPLN News, https://wpln.org/post/tennessee-gop-unveils-new-maps-fracturing-memphis-and-nashville/ (last visited May 6, 2026).

5

Shelby. Now, a candidate in District 9 will campaign in an area that stretches across fifteen counties—Shelby, Fayette, Hardeman, McNairy, Hardin, Wayne, Lawrence, Giles, Lincoln, Moore, Bedford, Marshall, Maury, Williamson, and Rutherford. Likewise, before the Act, voters organizing, donating, and volunteering for a candidate in District 9 would only perform those activities in two counties. Now, voters from fifteen counties find themselves pushed together only days before the new candidate qualifying deadline.

Similarly, a congressional candidate in former District 5 would have campaigned in six counties in the center of the state—Lewis, Maury, Marshall, Williamson, Davidson, and Wilson. Now, under the Act's map, candidates for District 5 will campaign in counties that stretch to the Kentucky and Mississippi borders—Shelby, Tipton, Lauderdale, Dyer, Lake, Obion, Weakley, Henry, Benton, Stewart, Houston, Humphreys, Montgomery, Hickman, Lewis, Maury, and Williamson. Voters organizing, donating, and volunteering for a candidate in District 5 now must coordinate with voters in these new, far-flung counties.

**B. Revisions to the 2026 Election Calendar and Candidate Qualification**

The Act also changes the August 6, 2026 election calendar and the qualification requirements for candidates. Before the Act, the first day to pick up petitions to qualify as a candidate in the August 6, 2026 election cycle was January 9, 2026. [8] The qualifying deadline was noon on March 10, 2026.[9] Tenn. Code Ann. §2-5-101 (2). Candidates were required to submit a nominating petition that included twenty-five (25) signatures of "registered voters who are eligible

---

[8] See *Elections Calendar*, Tenn. Sec'y of State, https://sos.tn.gov/elections/calendar (last visited May 6, 2026).
[9] *Id.*

to vote to fill the office." Tenn. Code Ann. §2-5-101 (b)(1). The withdrawal deadline was noon on March 17, 2026.[10] Tenn. Code Ann. §2-5-204(b)(1).

Before the Act, the executive committee of a political party could file a determination, if any, that the candidate was not qualified as a bona fide member of the party on March, 17, 2026. Tenn. Code Ann. §2-5-204(2)(A). Candidates could appeal this finding to the coordinator of elections within two (2) days. Tenn. Code Ann. §2-5-204(2)(B). The coordinator of elections then had seven (7) days from the original withdrawal deadline to issue a determination. *Id*. That deadline was March 24, 2026.

Lastly, before the Act, candidates had to meet the residency requirements for state senators and representatives in the Tennessee Constitution. Tenn. Code Ann. §2-13-209. Under Art. II, Secs. 9 and 10, a representative or senator must be a citizen of Tennessee for at least three years and a resident of the county or district they represent for at least one year before the election. Tenn. Const. art. II, §§ 9, 10.

The Act extends these deadlines and changes the terms of candidate qualification. Now, candidates who qualified before the Act can either (a) stay in the district in which they qualified, which requires no notice; (b) provide written, notarized notice to the coordinator of elections that they are running in a different district by May 15, 2026; or (c) or provide written, notarized notice to the coordinator of elections that they are withdrawing by May 15, 2026.[11]

The Act also creates a new "special qualifying period" that allows for anyone to submit a nominating petition that contains twenty-five (25) "signatures from registered voters residing anywhere within any county that lies wholly or partially within the congressional district."[12] Note:

---

[10] *Id.*
[11] Exhibit M to Complaint, HB 7001.
[12] *Id.*

the signers do not have to be eligible to vote to fill the office—they do not have to reside in the district at all.  Neither do the candidates. Under the Act, the statutory residency requirements for candidates "d[o] not apply to the 2026 primary election."[13]

Nominating petitions in the special qualifying period must be submitted by May 15, 2026. (*Id*. at HB 7001.) A candidate who qualifies during this period is not permitted to withdraw nor can they appeal any decision by the executive committee of a political party that they are not qualified.[14]

## C. Revisions to Statutory Notice Requirements

The Act sweeps away important notice requirements for voters. Before the Act, "Immediately after any alteration of precinct boundaries or change of district," county election commissions where required to (1) "publish the changed boundaries in a newspaper of general circulation in the county" and (2) "mail to each active voter whose polling place is changed a notice of the voter's new polling place and precinct number." Tenn. Code Ann. § 2-3-105.

Now, "each county election commission in which all or any portion of a redrawn congressional district is located shall publish notice on the county election commission's official website, if one exists." [15] Publishing on the county election commission website, if one exists, "satisfies all notice requirements" under Title 2, "including arising from the redrawn congressional districts."[16]

---

[13] *Id*.
[14] *Id*.
[15] *Id*.
[16] *Id*.

**D. Repeal of Statutory Ban on Mid-Decade Reapportionment**

Lastly, the Act repeals Tennessee's statutory ban on mid-decade reapportionment—a law passed in 1972.[17] *See* Tenn. Code. Ann. §2-6-102 ("The general assembly shall establish the composition of districts for the election of members of the house of representatives in congress after each enumeration and apportionment of representation by the congress of the United States. **The districts may not be changed between apportionments**." (emphasis added.)

**III. The Supreme Court determined in 2022 that moving the candidate qualifying deadline to May 5 would have a significant detrimental impact on the work of our state and county election officials, would risk voter confusion, and would potentially compromise the integrity of our state's elections.**

In 2022, three voters filed a lawsuit in Tennessee state court challenging the General Assembly's reapportionment of the Tennessee House of Representatives and the Tennessee Senate under two provisions of the Tennessee Constitution. The case was initially titled *Moore v. Lee* and ultimately titled *Wygant v. Lee*, Davidson County Chancery Court, Case Number 22-0287-IV. This memorandum refers to the case as *Wygant*.

In *Wygant*, the plaintiffs sought an injunction requiring the General Assembly to remedy alleged constitutional deficiencies in the apportionments of both houses of the legislature and proposed that the April 7, 2022, candidate qualifying deadline be moved to May 20, 2022, to allow time to remedy the constitutional deficiencies. The trial court issued an injunction requiring the legislature to remedy a constitutional deficiency in the State Senate map (specifically in middle Tennessee) and extended the candidate qualifying deadline to May 5, 2022.

In the wake of the trial court's injunction order, Defendants sought a stay of the injunction, based on previously submitted affidavits from four election administrators who attested in March

---

[17] Exhibit M to Complaint, HB 7002.

9

2022 in great detail to the many reasons that delaying the candidate qualifying deadline would jeopardize the administration of the August 2022 elections. Based on these declarations, Defendants argued that delaying the candidate qualifying deadline to May 5 would "wreak electoral chaos, risking voter disenfranchisement and compromising the integrity of the electoral process."[18]

On April 13, 2022, in reliance on these affidavits and on Defendants' argument, the Tennessee Supreme Court stayed the trial court's injunction. In doing so, the Court noted as follows: "Put simply, it is clear from these affidavits that a delay in the Senatorial candidate filing deadline from April 7, 2022, to May 5, 2022, will have a significant detrimental impact on the work of our state and county election officials, risks voter confusion, and potentially compromises the integrity of our state's elections." *Moore v. Lee*, 644 S.W.3d 59, 65 (Tenn. 2022).[19]

**IV.    Voter Plaintiffs and Candidate Plaintiffs have engaged in campaign efforts for many months based on the 2022 Congressional Map.**

Voter Plaintiffs live in Maury, Shelby and Davidson Counties. They are all registered voters and are politically active. For the past few months, they have supported congressional candidates in their pre-Act congressional districts in various ways, including but not limited to making monetary donations, volunteering, talking to other voters, hosting and attending community events, and hosting and attending fundraisers.[20]

As of filing, most of the Voter Plaintiffs are unsure in which congressional district they now reside.[21] They do not know who their congressional candidates will be and whether the

---

[18] Exhibit F to Complaint.
[19] Exhibit G to Complaint.
[20] Plaintiffs attach at <u>Exhibit N</u>, the Declaration of Earle Fisher; <u>Exhibit O</u>, the Declaration of Telise Turner; <u>Exhibit P</u>, the Declaration of Hedy Weinberg; and <u>Exhibit Q</u>, the Declaration of Vicki Hale to the Motion for Temporary Restraining Order.
[21] Exhibit N at ¶ 7; Exhibit O at ¶ 8; Exhibit P at ¶ 11; Exhibit Q at ¶ 9.

candidates will be the same candidates that they previously supported.[22] They do not know who the other voters in their new districts are and what issues concern them most.[23] For Plaintiffs Fisher and Turner, organizing in their former district simply meant connecting with other voters in Tipton and Shelby County. Now, not only are they unsure whether their neighbors in Shelby County are in the same district—they will now be organizing with voters hours away in central-state counties like Lincoln and Williamson.  They have mere days in which to recreate their efforts.

Candidate Plaintiffs are qualified candidates in pre-Act Congressional Districts 5, 6, and 9.[24] All of the Candidate Plaintiffs have been campaigning for months in preparation for the August 6, 2026 primary election.[25] Their campaign efforts include but are not limited to: timely filing a petition; conducting extensive voter outreach through door-to-door canvassing, phones call, texts, mailers, digital media, and paid media; attending community events, neighborhood and civic meetings, fundraisers, faith-community meetings, and in-person meet-and-greets; raising funds for their campaigns; developing campaign infrastructure like hiring staff and consultants, recruiting volunteers; obtaining endorsements from leaders within the pre-Act district; purchasing voter data analysis, media buys, and campaign material; and developing policy platforms specifically tailored to their pre-Act districts.[26]

All of this activity was conducted on the assumption that the 2022 congressional district map would govern the 2026 election—as guaranteed by state law. Tenn. Code. Ann. §2-6-102.

---

[22] *Id.*
[23] Exhibit N at ¶¶ 6-7; Exhibit O at ¶ 7; Exhibit P at ¶ 13; Exhibit Q at ¶ 8
[24] Plaintiffs attach at Exhibit R, the Declaration of Steve Cohen; Exhibit S, the Declaration of Charles "Chaz" Molder; Exhibit T, the Declaration of Chaney Mosley; and Exhibit U, the Declaration of Justin Pearson to the Motion for Temporary Restraining Order.
[25] Exhibit R at ¶ 2; Exhibit S at ¶ 2; Exhibit T at ¶2; Exhibit U at ¶ 2
[26] Exhibit R at ¶¶ 4-6; Exhibit S at ¶¶ 4-6; Exhibit T at ¶¶ 4-6; Exhibit U at ¶¶ 4-6.

11

**LEGAL STANDARD**

The same legal standard governs both the issuance of preliminary injunctions and temporary restraining orders. *Michigan State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 942 (E.D. Mich. 2016) (citing *Sandison v. Michigan High School Athletic Assoc.,* 64 F.3d 1026, 1030 (6th Cir.1995)). Although "[t]he standard for issuing a temporary restraining order is logically the same as for a preliminary injunction," the "emphasis [is] on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div*., 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016).

A district court must balance four factors in determining whether to grant a temporary restraining order or preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020) (internal quotation omitted). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Id.*

**ARGUMENT**

**I.     Plaintiffs are Substantially Likely to Succeed on the Merits of Their Claims**

   **A. Plaintiffs are substantially likely to succeed on their claim that the Act severely burdens their right to vote.**

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted). Burdens on the fundamental right to vote are evaluated under the *Anderson-Burdick* framework. Under *Anderson-Burdick*, the level of scrutiny "depends upon the extent to which a challenged regulation

12

burdens First and Fourteenth Amendment rights." *Daunt v. Benson*, 999 F.3d 299, 310 (6th Cir. 2021) (citing *Burdick*, 504 U.S. at 434).

If the challenged regulations burden voting rights "incidentally," or impose only "reasonable, nondiscriminatory restrictions," they receive rational basis review. *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). If they severely burden voting rights, then the regulations will only be upheld if they are "narrowly drawn to advance a state interest of compelling importance." *Burdick,* 504 U.S. at 434; *see also Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) ("[S]trict scrutiny applies when a state's restriction imposes 'severe' burdens." (citation omitted)). Here, the Act imposes drastic last-minute changes to the August 6, 2026 election cycle that severely burden Plaintiffs' right to vote. Strict scrutiny applies.

Last-minute changes to election rules can "result in voter confusion and consequent incentive to remain away from polls." *Purcell*, 549 U.S. at 4-5; *see also Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 30 (2020) (Gorsuch, J., concurring) ("Last-minute changes to longstanding election rules risk other problems too, inviting confusion and chaos and eroding public confidence in electoral outcomes."). "As an election draws closer, that risk will increase." *Id*. Indeed, the concern over voter confusion "is why administrators should plan and implement significant changes to registration processes well ahead of an election—not just before a deadline." *NAACP v. Lee*, 105 F.4th 888, 900 (6th Cir. 2024).

The Act drastically changes the August 6, 2026 election cycle and pushes the candidate qualifying deadline to May 15, 2026. In 2022, the Assistant Coordinator of Elections for the State of Tennessee swore under oath that a candidate qualifying deadline **later than April 7** would make

13

it "very difficult to have everything timely and accurately ready for the August election and early voting."[27]

The Shelby County Administrator of Elections, Linda Phillips, detailed in her affidavit the many time-consuming tasks her office must perform leading up to an August election.[28] Ms. Phillips also summarized the applicable statutory deadlines with which her office must comply and the points at which her office has to wait for another entity or entities to complete a required task before her office can proceed. Ms. Phillips also addressed the difficulty of programming over 1,000 voting machines on a compressed election schedule, and Ms. Phillips details the many other tasks her office is required to perform in the months and weeks leading up to an election.[29]

Finally, concerning the Shelby County Election Commission office's ability to comply with the law, concerning voter confusion, and concerning voter disenfranchisement, Ms. Phillips attested:

> There is always some degree of confusion among voters during redistricting years when their polling places change and changing the district maps at this time is likely to cause additional confusion requiring our Office to send additional notices (and incurring additional costs) to affected voters of a change to their polling place.[30]

Given all of the tasks that her office must perform in advance of an election, Ms. Phillps concluded:

> Based on my experience and that of my staff, if the qualifying deadline for the August Primary and General election were delayed to May 20, 2022, our Office would not be able to meet the federally mandated deadline to mail UOCAVA ballots to overseas and military voters by June 20, 2022, potentially disenfranchising those voters. It would also shorten the time for programming and public testing of the early and election day voting machines and increase the costs for additional technicians. Finally, in addition to incurring additional mailing costs, changing the State House and Senate district maps would also jeopardize our

---

[27] Exhibit A to Complaint at ¶ 21.
[28] Exhibit B to Complaint at ¶ 6-9.
[29] *Id.* at ¶ ¶ 17-24.
[30] *Id*. ¶ 26.

Office's ability to complete its obligations timely and accurately, and would likely result in significant voter confusion.[31]

Governor Lee, Secretary of State Hargett, and Coordinator of Elections Goins relied on this declaration and similar declarations from the Knox County Administrator of Elections, Chris Davis, and from the Wilson County Administrator of Elections, Tammy Smith. Those election officials expressed similar concerns to Ms. Phillips.[32] The Tennessee Supreme Court credited these affidavits from Tennessee election officers and, based on the representations made on behalf of Governor Lee, Secretary of State Hargett, and Coordinator of Elections Goins, the Tennessee Supreme Court stayed the trial court's injunction that imposed a May 5 deadline.[33]

If the state and local election officials' sworn statements are not sufficiently compelling—consider the actual outcomes of federal redistricting in 2022. A 2022 report issued by Defendant Mark Goins details how the Davidson County Election Commission "misassigned" voters to the incorrect congressional district in the wake of Tennessee's 2022 redistricting.[34] There, the Davidson County Election Commission began applying changes to the congressional districts in January of 2022 but did not discover errors until early voting for the November election was underway. In all, over 3,000 voters were "misassigned" to an incorrect state or federal congressional district.[35] The Davidson County Election Commission could not correct all "misassigned" voters before they case their vote, meaning that hundreds, if not thousands of Davidson County residents were unable to effectively vote in the November 2022 election. As Defendant Goins summarized, "[P]lacing 489,944 voters in the correct congressional, legislative,

---

[31] *Id.* ¶ 27.
[32] Exhibits C and D to Complaint.
[33] Exhibit G to Complaint.
[34] Exhibit J to Complaint.
[35] *Id.*

and metro council district is a complex process."[36]  Here, state and local election officials will be expected to place *millions* of Tennessee voters in the correct congressional district in a matter of weeks—early voting is expected to begin on July 17, 2026.

Perhaps most alarming: the Act removes crucial notice requirements, leaving voters in the dark about the Act's "changes to districts, offices to be elected, or qualifying deadlines arising from the redrawn congressional districts."[37]

Under the Act, voters living in changed districts will not receive any notice in the mail if their polling place or precinct has changed. Tenn. Code Ann. §2-3-105. Voters will only be able to find information about the district changes on the county election commission website—*if it exists*. Voters living in counties where the election commission has no official website may be left to search the internet or the Secretary of States' website. Crucially, voters will not be given individual notice of how the changes specifically affect them. Ostensibly, these notice requirements were hastily removed because there simply will not be enough time for state and local election officials to prepare for the election and provide previously required notice.

Even "heroic efforts by . . . state and local authorities in the next few weeks . . . likely would not be enough to avoid chaos and confusion." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (staying an injunction against Alabama's congressional map seven weeks before primary election early voting began). When a state's voting system results in long waits, improperly programed voting machines, improperly trained poll workers, incorrect voter instructions, misdirected voters, and improperly printed ballots, that "system deprives its citizens of the right to vote or severely burdens the exercise of that right."  *League of Women Voters of*

---

[36] *Id.*
[37] Exhibit M to the Complaint, HB 7001.

16

*Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008). All of these outcomes are exceedingly likely here based on Tennessee election officials' sworn statements and track record of disenfranchising voters in the wake of redistricting. While the confusion from last-minute changes has rarely come from the State itself, the principle stands: chaos and confusion severely burden the right to vote.

The State cannot supply a compelling interest that justifies drastic, last-minute changes to an election cycle that is already under way. *Burdick,* 504 U.S. at 434. On May 7, 2026, the Act's sponsor, Senator John Stevens, stated that the purpose of the Act was to "maximiz[e] our partisan advantage" and "to support the National Republican Party maintaining the majority in the United States Congress."[38]

Overt partisan gamesmanship to support a national party is not a compelling state interest. "Precisely what constitutes a 'compelling interest' is not easily defined. Attempts at definition generally use alternative, equally superlative language: 'interest[ ] of the highest order,' 'overriding state interest,' 'unusually important interest.'" *Republican Party of Minnesota v. White*, 416 F.3d 738, 749 (8th Cir. 2005) (internal citations omitted). Partisan gerrymandering, while a non-justiciable practice, "leads to results that reasonably seem unjust." *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019). Some call it a practice that "debase[s] and dishonor[s] our democracy." *Rucho*, 588 U.S. at 722 (Kagan, J., dissenting).

At base, partisan gamesmanship is not an "interest of the highest order" for the State when it comes to elections—integrity of the election and avoiding confusion should take rank. *See NAACP v. Lee*, 105 F.4th at 901 ("Tennessee also has a compelling interest in preserving the integrity of its election process."); *see also Lichtenstein v. Hargett*, 83 F.4th 575, 600 (6th Cir.

---

[38] Floor Testimony on the Act, 114th Gen. Assemb. (Tenn. May 7, 2026) (statement of Republican Senator John Stevens at 2:06:49-2:08:00, available at Senate Session - 2nd Extraordinary Session - 3rd Extraordinary Day.

2023)("Tennessee's […] concern with avoiding voter confusion qualifies as a substantial interest."). Even if partisan map drawing is a valid state interest, it does not justify the Act's sweeping changes that severely burden Plaintiffs' right to vote. *See Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 185 (1979) ("even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty"). Plaintiffs are substantially likely to succeed on this claim.

**B. Plaintiffs are substantially likely to succeed on their claim that the Act severely burdens their right to association.**

"[F]reedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460, 78 (1958). The right of association encompasses the right of citizens to organize collectively for political purposes and to advance their political beliefs through group activity. *NAACP v. Button*, 371 U.S. 415, 430 (1963); *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960) ("freedom of association for the purpose of advancing ideas and airing grievances is protected by the Due Process Clause of the Fourteenth Amendment from invasion by the States."). Both voters and candidates suffer violation of their right to associate when a law burdens candidates' ability to run. *Anderson*, 460 U.S. at 786 ("The rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.").

Cumbersome state regulations that disrupt the "opportunity to organize" burden both the right to vote and the right to associate. *Williams v. Rhodes*, 393 U.S. 23, 32 (1968) (recognizing network of Ohio laws that functionally prevented effective organizing by third party burdened the right to associate). Burdens on the right to associate in this context are analyzed under the

18

*Anderson-Burdick* framework. *Burdick*, 504 U.S. at 434. Here, the burden imposed by the Act is severe.

Prior to the Act's enactment, Voter Plaintiffs and Candidate Plaintiffs engaged in associational conduct: political organizing, volunteering, speaking, campaigning, and donating in support of a political candidate and the views which that candidate represents.[39] Candidate Plaintiffs knocked on doors, made phone calls and text messages, attended community forums, neighborhood meetings, civic association gatherings, and faith community events, and held in-person meet-and-greets across their respective districts.[40] Every voter list, walk packet, phone bank script and targeting model was generated using the precinct and block boundaries of the 2022 congressional district map.[41]

Candidate Plaintiffs raised significant funds from contributors who supported their campaigns specifically because they were running in contributors' district.[42] Many other donors, both inside and outside Tennessee, contributed because of the Candidate Plaintiffs' stated intention and ability to represent the particular community interest reflected in the existing district.[43] Likewise, Candidate Plaintiffs expended campaign resources on paid media, direct mail, digital advertising—all targeting voters in their former districts.[44]

Plaintiffs created these associational bonds (both voter-to-voter and voter-to-candidate) within their previous districts, relying on Tennessee's existing congressional district map and the

---

[39] *See generally* Exhibits N-U to TRO.
[40] Exhibit R at ¶ ¶ 4-6; Exhibit S at ¶¶4-6; Exhibit T at ¶¶ 4-6; Exhibit U at ¶¶ 4-6.
[41] Exhibit R at ¶ 4; Exhibit S at ¶ 4; Exhibit T at ¶ 4; Exhibit U at ¶4.
[42] Exhibit R at ¶ 5; Exhibit S at ¶4; Exhibit T at ¶ 5; Exhibit U at ¶ 5.
[43] *Id.*
[44] Exhibit R at ¶ 8; Exhibit S; Exhibit U at ¶ 8.

existing schedules for redrawing districts and conducting federal Congressional elections under state law.

The Act takes a wrecking ball to these efforts. The Act leaves Plaintiffs mere weeks before the August 6, 2026 primary to reorganize their entire campaign operations, rebuild donor networks, re-recruit volunteers, and re-establish political associations in redrawn districts. "Departures from the preordained rules cause [candidates] particularized and concrete harm." *Bost v. Illinois State Bd. of Elections*, 146 S. Ct. 513, 520–21 (2026) (finding candidate had standing to challenge state's method of counting votes). "Each runner in a 100-meter dash, for example, would suffer if the race were unexpectedly extended to 105 meters" because they "would be deprived of the chance to compete for the prize that the rules define." *Id*.

Candidate Plaintiffs, and the voters that support them, have already begun their 100-meter dash. They met the qualifying deadline by March 10, 2026 to run. But Defendants now change the rules mid-race. New runners can enter the race—even if they do not reside in the district and their nominating petition is not signed by people that can vote for them. The Act will certainly cause Plaintiffs to "expend additional resources" and, more importantly, deprive Plaintiffs "of a fair process and an accurate result." *Bost*, 146 S.Ct. at 519-20.

Defendants can advance no compelling reason to so severely burden Plaintiffs' right to associate. As detailed above, overt partisan gamesmanship is not a compelling state interest— certainly not at the cost of severely burdening Plaintiffs' right to associate. Plaintiffs are substantially likely to succeed on their claim that the Act burdens their right to associate.

## II.     <u>Plaintiffs Will Suffer Irreparable Harm</u>

Any loss of constitutional rights is presumed an irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The right to vote is a fundamental right and is the gateway to the preservation of

other rights. *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). "A restriction on the fundamental right to vote therefore constitutes irreparable injury." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *cf. Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016) ("[Voting] isn't golf: there are no mulligans."). Likewise, "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. State of Ala. ex rel. Patterson,* 357 U.S. 449, 460, 78 (1958).

Deprivation of either of these rights constitutes an irreparable harm. As detailed above, the Act severely burdens Plaintiffs' rights to vote and associate in the 2026 election.

### III.  Injunctive Relief Will Not Cause Substantial Harm to Others

Injunctive relief will ameliorate—not cause—harm by halting the Act's last-minute changes to the 2026 election cycle and preserving the status quo. *ABX Air*, 219 F. Supp. at 670; *cf. Fla. Democratic Party*, 215 F. Supp. 3d at 1255. ("Temporary restraining orders have the effect of merely preserving the status quo rather than granting most or all of the substantive relief requested by a plaintiff in a complaint") (internal citation omitted). Defendants, therefore, will not be harmed. Any arguments by Defendants that judicial intervention is not warranted under *Purcell v. Gonzalez*, 549 U.S. 1 (2006) fail.

### A.  *Purcell* is not implicated when States disrupt elections; even so, its rationale to maintain the status quo in advance of an election supports Plaintiffs.

The *Purcell* principle instructs federal courts not to disrupt state election rules close to an election. *See NAACP v. Lee*, 105 F.4th 888, 890 (6th Cir. 2024) (discussing and applying *Purcell v. Gonzalez*, 549 U.S. 1 (2006)). The reasoning is simple: "When an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880-81 (2022) (Kavanaugh, J., concurring). Last-minute changes on the eve of an election can confuse voters,

21

burden election administrators, and undermine public confidence in electoral outcomes. *Democratic Nat'l Comm. V. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). Thus, *Purcell* cautions against *judicial* interference. Where the state itself is the source of disruption, though, a different calculus should apply.

Here, maintaining the status quo—and preventing voter confusion and disenfranchisement—*warrants* judicial intervention. The Act creates its own emergency by enacting a mid-decade congressional district map in May 2026. In *NAACP v. Lee*, the Sixth Circuit stayed a lower court's injunction under *Purcell* where the lower court's injunction regarding voter registration was issued June 5 and the voter registration deadline was July 2. *NAACP v. Lee*, 105 F.4th at 898; *cf. Purcell* (staying injunction about a month before election). If four weeks before the relevant deadline was "too close" to change the election rules, nearly two months *after* the deadline is surely "too close." *Id.* ("other cases have stayed injunctions issued many months before" election day). The rationale behind *Purcell* (keeping election rules "clear and settled") weighs strongly in Plaintiffs' favor. *Merrill*, 142 S. Ct. at 880-81. Tennessee should not be able to insulate unconstitutional conduct from judicial review by deliberately timing illegal conduct close to an election.

Justice Gorsuch encouraged judicial deference to state legislatures under *Purcell* because legislatures are subject to the democratic process and therefore "slow to respond" and "tepid when they do." *Democratic Nat'l Comm. V. Wisconsin State Legislature*, 141 S. Ct. 28, 29–30 (2020) (Gorsuch, J., concurring). For these reasons, legislatures serve "as a means of ensuring that any changes to the status quo will not be made hastily, without careful deliberation, extensive consultation, and social consensus." *Id.* In passing the Act in a matter of two days, Tennessee was neither "slow to respond" nor "tepid." *Id.* Tennessee passed the Act with little to no

22

deliberation, consultation or social consensus. Rigorous judicial review of a state's unconstitutional conduct is therefore warranted rather than the deferential *Purcell* standard.

**B. The merits favor Plaintiffs, Plaintiffs will suffer irreparable harm, and implementation of pre-Act election calendar is feasible.**

Even if *Purcell* concerns exist, the Plaintiffs can overcome these concerns. *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). As Justice Kavanaugh posited in his concurrence in *Merrill*, "an injunction can be issued close to an election if the plaintiff establishes: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.*

First, the merits are clearcut in favor of the Plaintiffs. Total upheaval of an election cycle that is already underway severely burdens Plaintiffs' right to vote and right to associate. This case does not present complicated questions of law or fact regarding racial gerrymandering—or other legal infirmities—in a congressional district map. Again, Plaintiffs do not challenge the Act's map—only that the Act disrupts the August 6, 2026 election cycle by pushing deadlines, rewriting the rules of notice and qualification, and redrawing districts. As these same defendants noted in 2022, "changing the rules on the eve of an election would wreak chaos upon the electoral process and would unnecessarily risk voter confusion and disenfranchisement of Tennessee's military and overseas voters, causing irreparable harm to the [the State of Tennessee] and to the public interest." (Exhibit E to the Complaint, at 2.)

Second, as argued above, Plaintiffs will suffer irreparable harm if the Act is not enjoined. Plaintiffs and voters like them could be disenfranchised by the Act's last-minute, confusing changes to the August 6, 2026 election. To add to the confusion, the Act nearly completely does

23

away with previously required notice requirements. Moreover, the harm to voters is nearly certain given the state and local election officials' statements in *Moore v. Lee*, 644 S.W.3d 59, 65 (Tenn. 2022) and the demonstrated record of "misassigning" voters when redistricting in 2022. The election cycle is only more rushed now.

Third, Plaintiffs were exceedingly diligent in bringing suit. Plaintiffs filed their Complaint on the same day the Act was passed and sought to enjoin it immediately before Defendants could make significant changes to the August 6, 2026 election cycle. On May 7, 2026, counsel for Plaintiffs gave counsel for Defendants pre-suit notice.

Lastly, the "changes" ordered by an injunction would not be changes at all. Defendants would merely revert back to the status quo: a map and schedule in place since 2022 and candidates who have qualified months ago. For these reasons, judicial intervention is warranted and *Purcell* is not an obstacle.

## IV.     Public Interest Is Served by Injunctive Relief

As the Sixth Circuit has made clear, "it is always in the public interest to prevent violation of a party's constitutional rights." *Am. C.L. Union of Ky. v. McCreary Cnty*., 354 F.3d 438, 445 (6th Cir. 2003) (alteration in original) (internal quotation marks omitted). "While states have a strong interest in their ability to enforce state election law requirements, the public has a strong interest in exercising the 'fundamental political right' to vote." *Obama for Am. v. Husted,* 697 F.3d 423, 436–37 (6th Cir. 2012) (cleaned up); *cf. Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016) (granting TRO)("Ensuring that [voters] can exercise their constitutional right to vote [] promotes the public interest.") The public interest in the fundamental right to vote "is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Id*. The public interest therefore favors an injunction.

**CONCLUSION**

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The public's confidence in the outcome of the August 6, 2026 election is essential to preserving democracy in Tennessee. For the foregoing reasons, a temporary restraining order enjoining enforcement of the Act should be granted.

Dated: May 8, 2026               Respectfully submitted,

/s/ David W. Garrison
**DAVID W. GARRISON (No. 24968)**
**SCOTT P. TIFT (No. 27592)**
**JOSHUA A. FRANK (No. 33294)**
BARRETT JOHNSTON MARTIN & GARRISON, PLLC
200 31st Ave North
Nashville, TN 37203
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
dgarrison@barrettjohnston.com
stift@barrettjohnston.com
jfrank@barrettjohnston.com

**John Spragens (No. 31445)**
Spragens Law PLC
915 Rep. John Lewis Way S., Suite 100
Nashville, TN 37203
Telephone: (615) 983-8900
Facsimile: (615) 682-8533
john@spragenslaw.com

*Attorneys for Plaintiffs*

25

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this *Plaintiffs' Memorandum of Law in Support of Plaintiffs' Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction* was filed electronically with the Clerk's office by using the CM/ECF system on May 8, 2026. Plaintiffs will serve a copy of this filing upon to the following counsel by electronic mail as instructed by the Office of the Tennessee Attorney General and Reporter on May 8, 2026.

Zachary L Barker
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202-0207
Phone: (615) 532-4098
Zachary.Barker@ag.tn.gov

Taylor A.R. Meehan*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Arlington, VA 22209
taylor@consovoymccarthy.com

/s/ David W. Garrison
DAVID W. GARRISON
**BARRETT JOHNSTON**
**MARTIN & GARRISON, PLLC**

26