**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| VICKI HALE, EARLE FISHER, TELISE TURNER, HEDY WEINBERG, STEVEN COHEN, CHARLES 'CHAZ' MCIVER MOLDER, CHANEY MOSLEY, JUSTIN PEARSON, and the TENNESSEE DEMO-CRATIC PARTY, | ) ) ) ) ) ) ) | No. 3:26-cv-00603<br>CHIEF JUDGE CAMPBELL |
|     *Plaintiffs,* | ) ) | |
| v. | ) | |
| BILL LEE, Governor, TRE HARGETT, Secretary of State; MARK GOINS, Tennessee Coordinator of Elections; all in their official capacity only, | ) ) ) ) ) ) | |
|     *Defendants.* | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR A TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

ARGUMENT ..................................................................................................................... 6

    I.      Plaintiffs are not likely to succeed on the merits. ...................................... 6

       A.   Plaintiffs are unlikely to establish standing. ............................................ 6

       B.   Plaintiffs are unlikely to succeed on the merits of Count I. ................................. 10

       C.   Plaintiffs are unlikely to succeed on the merits of Count II. ............................... 18

    II.     *Purcell* precludes Plaintiffs' extraordinary request for preliminary relief. ........ 20

    III.   Plaintiffs will not suffer irreparable harm absent an injunction. ........................ 23

    IV.   The balance of harms and public interest demands denial of Plaintiffs' requested relief. ............................................................................................................. 24

CONCLUSION ................................................................................................................. 26

**INTRODUCTION**[1]

Plaintiffs come to this Court with a solution in search of a problem. They ask to stop ongoing, orderly election preparations on the theory that chaos, confusion, and disenfranchisement will ensue if those election preparations are allowed to continue. Dkt. 1, Compl. ¶79. But it's Plaintiffs' request for extraordinary preliminary relief—not the State's process—that would sow chaos. The State has appropriated more than $3.1 million for election officials to implement recently enacted changes to Tennessee's congressional districts before the 2026 primary elections in August. *See* Decl. of Andrew Dodd ¶¶4, 7, 13 (attached as Ex. 1). State officials are already working to meet those deadlines with that substantial additional funding. *Id.* So are the counties. *Id.* ¶18; *see* Decl. of Will Burns ¶¶3-9 (attached as Ex. 3). Right here in Davidson County, the Elections Administrator told the *Tennessean* that he is "100% confident" about his office's ability to implement the recently enacted changes.[2]

Plaintiffs cannot conflate those ongoing preparations with materially different circumstances in 2022. Presently, state and local officials are working to implement *the*

---

[1] Federal law requires a three-judge court to preside over challenges to "the constitutionality of the apportionment of congressional districts." 28 U.S.C. §2284(a). That includes this constitutional challenge to the use of the 2026 congressional districts, unless the Court deems Plaintiffs' action "wholly insubstantial and frivolous." *Shapiro v. McManus*, 577 U.S. 39, 45-46 (2015) (quotations omitted); *see* Dkt. 37.

[2] *See* Evan Mealins, *Nashville Elections Chief Confident Office Can Make Changes By Primary*, Tennessean (May 8, 2026) (attached as Ex. 2).

1

*State's* newly enacted congressional districts with substantial funding for overtime, additional staff, and whatever other resources officials might need. Dodd Decl. ¶¶4-7. In 2022, state officials faced *court-imposed* changes to the state senate map with three times as many districts, three times as many elections, different candidate qualifying deadlines, different ballots, and without millions in available funding. *Id*. ¶¶8-13. There is no present state of "chaos," *contra* Compl. ¶79, only hardworking state officials effectuating the State's newly enacted laws, Dodd Decl. ¶¶14-16, 18.

It is Plaintiffs' request for preliminary relief that, if granted, will risk chaos and errors. A court order stopping the State's elections preparations mid-stream will "caus[e] much confusion and upset[] the delicate federal-state balance in elections." *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025) (per curiam). There is no constitutional basis for that disruption. Their theories of harm are predicated on Tennessee's *relaxed* candidate qualifying requirements, allowing candidates to choose their districts for their campaigns. Binding precedent dooms their claims.

At bottom, this suit is an invitation to play politics, not law. Even though Supreme Court and Sixth Circuit precedent forecloses their claims, Plaintiffs ask for an order to reinstate the "existing Congressional District map"—by which they mean the now-repealed 2022 districts. Compl. ¶84. The operative law in Tennessee is the 2026 Plan. The State is actively preparing for forthcoming elections consistent with that current law, not a repealed one. Plaintiffs' request for extraordinary relief should be denied.

2

BACKGROUND

On April 29, 2026, the Supreme Court decided *Louisiana v. Callais*, 608 U.S. \_\_\_, 2026 WL 1153054 (2026). The Court held that Louisiana's existing redistricting plan was racially gerrymandered and clarified that States need not put racial considerations before nonracial considerations when they draw congressional districts. Among those nonracial considerations, a State may advance its "political goals" in redistricting. *Id.* at *13 (slip op. at 24-25). Likewise, in *Alexander v. South Carolina Conference of the NAACP*, 602 U.S. 1, 20-21 (2024), the Supreme Court confirmed that a State may prioritize nonracial considerations in redistricting without being faulted for racially gerrymandering.

With those clarifications, Tennessee convened a special session to redraw its nine congressional districts. The special session began on May 5, 2026, three months before Tennessee's primary elections on August 6, 2026. That special session repealed a statute prohibiting mid-decade redistricting, 2026 Tenn. Pub. Ch. 1, 2d Extra. Sess. §1, and replaced the existing congressional districts with redrawn districts more favorable to Republican candidates, 2026 Tenn. Pub. Ch. 3, 2d Extra. Sess. §1. The Legislature made its nonracial considerations open and obvious: "Tennessee is a conservative state," the "congressional representation in Washington should reflect that," and the "map ensures that" it does.[3] The Legislature also took the opportunity to redraw districts without using any

---

[3] Statement of Sen. John Stevens, Senate Judiciary Comm. Tr. 6:24-7:1 (May 6, 2026) (attached as Ex. 4); *see also id.* at 60:14-66:13, 66:23-67:1 (Sen. Stevens) (noting redistricting by the Democratic Party in New York and California); *id.* at 66:23-67:1 (observing "who's

3

racial data.[4] That was a conscious choice to "reduc[e] the risk of future legal challenges" and "protect[] the state from costly litigation."[5]

The Legislature also revised candidate qualification requirements and deadlines. 2026 Tenn. Pub. Ch. 2, 2d Extra. Sess. §1-2. The changes to candidate qualifying relax the requirements in the following ways: Any candidates who have already qualified remain qualified. *Id.* Any such candidate may choose whether she wants to run in the district where she already qualified or in a different district, or she may withdraw. *Id.; see* Dodd Decl. ¶4.[6] Candidate qualifying is also reopened for a brief period to allow any new candidate to qualify. 2026 Tenn. Pub. Ch. 2, 2d Extra. Sess. §1; *see* Dodd Decl. ¶19. But those changes avoid timing concerns by ending candidate qualifying on May 15, followed by the parties' certification by May 17, so that counties can begin preparing ballots as early

_____

going to control the House of Representatives" was up for grabs and stating "[w]e want Republicans to maintain control of the House of Representatives"); *id.* at 70:7-11, 71:8-11, 72:3-8 (Sen. Stevens) ("We are attempting to maximize the chances that the congressional delegation of Tennessee will maintain a Republican majority in the United States House of Representatives. That's our intent.").

[4] Statement of Speaker Cameron Sexton, House Cong. Redistricting Comm. Tr. 68:1-3 (May 6, 2026) (Ex. 5) ("[T]he map that was generated was based on population and politics[.] [N]o racial data was used, and no incumbents were paired together."); *id.* at 80:15-18 (Speaker Sexton) (similar).

[5] Ex. 4, Statement of Sen. John Stevens, Senate Judiciary Comm. Tr. 69:12-14; *see also id.* at 68:19-22 (Sen. Stevens) (similar).

[6] Sixteen candidates now reside beyond the district boundaries where they qualified. Dodd Decl. ¶17. Those candidates are Republicans, Independents, and Democrats who initially qualified in CD-4, CD-5, CD-6, CD-8, and CD-9. *See id*. The relaxed qualification requirements allow these candidates to choose to continue their campaigns in the district where they qualified or in the district where they now reside, or to withdraw. 2026 Tenn. Pub. Ch. 2, 2d Extra. Sess. §1.

4

as May 18. *See* Dodd Decl. ¶9. Those ballots, moreover, are anticipated to have fewer candidates than the 2022 elections. *Id.* ¶10.

To implement these changes, the State appropriated $3.1 million for state and local election officials. 2026 Tenn. Pub. Ch. 4, 2d Extra. Sess. §2. The additional funding will pay for overtime and additional staff, expedited services from vendors, and notices to voters and other miscellaneous items, including training, signage, and voter education. Dodd Decl. ¶13.

With that substantial funding, state and local election officials have already begun implementing the 2026 Plan and preparing for the 2026 primary elections. *Id.* ¶¶13-16, 18. Immediately upon the enactment of the 2026 Plan, the Division of Elections made information about the 2026 districts available on its website. *Id.* ¶15. Contrary to Plaintiffs' claim (at 16) that voters have been left "in the dark," a "voter look-up" function went live last Thursday, May 7, 2026, and allows any voter to identify his or her 2026 congressional district by typing in his or her address. *Id.*[7] Counties are also making preparations to notify voters. *See* Burns Decl. ¶5. For candidates, the Division overnighted letters to already-qualified candidates, advised them of the revised congressional districts, and advised them that they remained qualified to run in their existing district or a district of their choosing. Dodd Decl. ¶16. Additionally, the Division is in close coordination with local

---

[7] *2026 Congressional Redistricting Revised District Boundaries*, Tennessee Secretary of State (last updated May 12, 2026), https://sos.tn.gov/announcements/2026-congressional-redistricting.

5

elections officials. Before the 2026 Plan even passed, the Division sent a memorandum asking counties to begin planning for changes to districts. *Id.* ¶14. And as soon as the Governor signed the 2026 Plan, the Division sent another memorandum to county election commissions that outlined next steps to implement the 2026 Plan and advised them of the amended candidate qualifying information. *Id.*¶15. Since last week, counties have already worked substantial overtime and made substantial progress toward implementing the 2026 Plan. *Id.* ¶18.

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020). To do so, a plaintiff must establish that (1) "he is likely to succeed on the merits," (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Id.* at 535-36; *EOG Res. v. Lucky Land Mgmt.*, 134 F.4th 868, 885 (6th Cir. 2025) (holding that all four factors are "prerequisite[s]"). Plaintiffs have not cleared any one of those hurdles.

## I. Plaintiffs are not likely to succeed on the merits.

### A. Plaintiffs are unlikely to establish standing.

Plaintiffs' alleged harm is too speculative for standing. Standing requirements "prevent the judicial process from being used to usurp the powers of the political

6

branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Plaintiffs' "injury must be 'concrete, particularized, and actual or imminent'" for standing, not merely a "'*possible future injury*.'" *Id.* at 409. "At the preliminary injunction stage, … the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing," that is, actual or imminent injury, causation, and redressability. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted).

**1.** With respect to Count I, Plaintiffs make no "clear showing" that there will be "chaos" or "confusion" or "disenfranchisement," *contra* Dkt. 12, Memo. in Support of PI at 13-17. Plaintiffs' declarations do not suggest they are confused, only that they disapprove of the Legislature's recently enacted laws. *See, e.g.*, Dkt. 11-3, Weinberg Decl. ¶11 ("I am very disturbed that this week the Tennessee [Legislature] has approved new geographic boundaries … ."); Dkt. 11-8, Pearson Decl. ¶9 (critiquing provision "allowing new candidates … to now join the race"); *see Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013) (observing that standing must be based "on an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor"). Nor are statements that declarants are "concerned" there might be election issues sufficient to make a clear showing of imminent and non-speculative harm. *See* Dkt. 28, Byrd Decl. ¶10; Dkt. 29, Perkins Decl. ¶4. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

Nor can Plaintiffs make that "clear showing," *Murthy*, 603 U.S. at 58 (citation omitted), with assertions that the present circumstances can be equated to the "federal redistricting in 2022." *Contra* Dkt. 12 at 14-15. Despite manifold factual distinctions between 2022 and today, Dodd Decl. ¶¶7-13, Plaintiffs contend what happened in 2022 can predict the future. Dkt. 12 at 14-15. But "the past" cannot "in itself show a present case or controversy," *Murthy*, 603 U.S. at 59 (quotation omitted), especially not with all the material differences between present-day circumstances and 2022. *See Anderson v. Raffensperger*, 497 F. Supp. 3d 1300, 1309 (N.D. Ga. 2020) (concluding earlier elections "reveal little about elections today"); *see also Sumpter v. Wayne County*, 868 F.3d 473, 491 (6th Cir. 2017) (finding allegations of imminent injury "further diminished" by defendants' changed policy).

The attached declaration from the Division of Elections details those differences and undermines any possible claim of an imminent injury. Presently, state and local officials have $3.1 million allocated for overtime and additional staff to implement new district lines. Dodd Decl. ¶¶7, 13. No such funding was available in 2022, which created the "risk of incomplete or inaccurate work." *Id.* Nor was the congressional plan even at issue in 2022. *Id.* ¶11. The 2022 litigation was about the State Senate plan with 33 senate districts, as compared to Tennessee's newly enacted congressional plan, which has only 9 congressional districts, requires no changes for 53 counties, and only substitutes district numbers in the remaining 32 counties. *Id.* The qualifying timeline is also different. Presently, "counties could potentially begin preparing their ballots and Division review could

8

begin as soon as May 18," which is earlier than the contemplated timeline in the 2022 litigation. *Id.* ¶9. And those forthcoming ballots are also far simpler than those required in 2022 because there are fewer candidates. *Id.* ¶10.

With election preparations already underway, and with the assistance of "significant funds to meet those deadlines," Dodd Decl. ¶7, Plaintiffs' predicted harm "is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *Clapper*, 568 U.S. at 401 (citation omitted). Their concerns "of *possible* future injury are not sufficient." *Id.* at 409 (quotation omitted).

**2.** For Count II, Plaintiffs' standing arguments are similarly speculative without any cognizable harm. *See, e.g.*, *Gill v. Whitford*, 585 U.S. 48, 54 (2018) (remanding for plaintiffs to "attempt to demonstrate standing"). Plaintiffs contend voters and candidates have already developed associational bonds with each other through fundraising, get-out-the vote efforts, and campaigning, and that the 2026 Plan breaks those associational bonds. Dkt. 12 at 19. But allegations that new district lines cause a party to have "difficulty raising money, attracting candidates, and mobilizing voters," or make "fundraising, attracting volunteers, [and] campaigning" more difficult are not cognizable First Amendment injuries. *Rucho v. Common Cause*, 588 U.S. 684, 713-14 (2019). Federal courts are not the appropriate tribunals to adjudicate those nebulous harms. *See id.* at 714 ("How much of a decline in voter engagement is enough to constitute a First Amendment burden?"). And

regardless, Tennessee's newly enacted qualification requirements allow candidates to choose their district. 2026 Tenn. Pub. Ch. 2, 2d Extra. Sess. §1.

*Bost v. Illinois State Board of Elections*, 607 U.S. 71 (2026), is inapposite. *Contra* Dkt. 12 at 20. *Bost* held that candidates have standing to challenge a state law permitting election officials to count mail-in ballots received after election day because—for purposes of a justiciable preemption claim—they had "an obvious personal stake in how the result is determined and regarded." *Bost*, 607 U.S. at 77-79. Unlike *Bost*, Plaintiffs assert a generalized grievance about the 2026 Plan's lines and then fault *relaxed* qualifying requirements allowing candidates to choose their district. *But see Gill*, 585 U.S. at 66. These assertions of harm are simply the "general legal, moral, ideological, or policy objection to a particular government action" that standing rules are designed to screen out. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); *cf. Green Party of Tenn. v. Hargett*, 700 F.3d 816, 829 (6th Cir. 2012) (holding that plaintiffs were not injured by a requirement that did not "affect [their] ability to get on the ballot").

### B.    Plaintiffs are unlikely to succeed on the merits of Count I.

Plaintiffs claim the 2026 Plan and relaxed qualifying deadlines violate the First and Fourteenth Amendment under the *Anderson-Burdick* test. Dkt. 12 at 12-18. Where it applies, *Anderson-Burdick* requires "balanc[ing] an election law's burdens on voters' rights against the state's interests in the law as a threshold inquiry to determine the level of scrutiny that courts should apply to the law." *Lichtenstein v. Hargett*, 83 F.4th 575, 589 (6th

10

Cir. 2023). No *Anderson-Burdick* balancing applies here. And even if it did, Plaintiffs' speculation about possible election administration issues does not warrant the extraordinary remedy of a preliminary injunction.

**1.** *Anderson-Burdick* does not apply "to all election-related challenges." *Lichtenstein*, 83 F.4th at 593. It covers only "three types of claims." *Id.* at 590. **First,** it applies to "ballot-access claims" for laws limiting "candidates who could appear on a ballot." *Id.* (emphasis omitted). **Second,** it applies to "political-party associational claims" for laws like open primary requirements. *Id.* at 590-91. **Third,** it applies "to claims that election laws violate a voter's right to vote," such as challenges to laws requiring photo ID. *Id.* at 591.

Count I does not fit within any one of these groups. *Id.* For starters, *Anderson-Burdick* cannot apply to Plaintiffs' complaints about the 2026 Plan itself, *contra* Dkt. 12 at 14-16. Plaintiffs cannot point to any case where *Anderson-Burdick* applied to redistricting. *See Jackson v. Tarrant County*, 158 F.4th 571, 593 (5th Cir. 2025) ("[W]e are aware of no cases applying *Anderson-Burdick* to redistricting decisions."). This Court would thus have to "expand *Anderson-Burdick*'s balancing test into uncharted territory" if applied here. *Lichtenstein*, 83 F.4th at 591. That forecloses preliminary relief: challengers "seek[ing] to extend the constitution['s] guarantees to new territory" cannot make "a showing of a likelihood of success on the merits." *L.W. v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023).

Nor does *Anderson-Burdick* apply to Plaintiffs' complaints about the State's *relaxed* qualifying deadlines for candidates. *See* Dkt. 12 at 13-14. While *Anderson-Burdick* applies

to laws "limiting a candidate's ability to get on the ballot," *Lichtenstein*, 83 F.4th at 590, Tennessee's recently enacted law does not limit opportunities for candidates. It expands those opportunities. Plaintiffs cannot possibly assert that the law, relaxing qualification requirements, impedes candidates getting on the ballot. A candidate who has already qualified remains qualified; that candidate may choose his or her district; and any new prospective candidates can qualify now too. Dodd Decl. ¶4.[8]

**2.** To shoehorn their claim into *Anderson-Burdick*, Plaintiffs attempt to style it as a "right to vote" claim based on speculation about "chaos" and "confusion" and "disenfranchisement" in forthcoming elections. Dkt. 12 at 12-18. That, too, stretches *Anderson-Burdick* beyond its reach. A "right to vote" claim for *Anderson-Burdick* ordinarily involves laws that "mak[e] it too difficult to cast a ballot," such as photo ID laws, or "rules governing absentee[]ballot[s]" and "early voting." *Lichtenstein*, 83 F.4th at 591-92. In other words, the laws *themselves* are challenged as "election regulation[s]" that make it harder to vote. *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626 (6th Cir. 2016).

But here, Plaintiffs contend the newly enacted laws will create downstream election administration issues that they speculate may burden the right to vote. Dkt. 12 at 12-

---

[8] Plaintiffs also fault (at 16) changes to notice requirements. But voters can already find their districts by typing in their address on the Secretary of State's website. *See* Dodd Decl. ¶15. Applying *Anderson-Burdick* to police the sufficiency of a State's already-sufficient notice requirements would again require extending the doctrine to new territory. *See Lichtenstein*, 83 F.4th at 590-94. *But see Skrmetti*, 83 F.4th at 471.

17. But the "Constitution contains no universal 'cost-benefit balancing' provision" for anything that could affect voting. *Lichtenstein*, 83 F.4th at 593. That theory of potential downstream harm would expand *Anderson-Burdick* "to all election-related challenges" when the Sixth Circuit has been careful not to do so. *Id.* There is no logical endpoint. A plaintiff could challenge any election law even if it did not directly regulate voting based on alleged (speculative) downstream harm. Extending the *Anderson-Burdick* test as Plaintiffs request would "conflict[] with both text and precedent." *Id.*

**3.** Even if *Anderson-Burdick* applied, the new law easily satisfies it. *Anderson-Burdick* allows courts, in limited contexts, "to balance an election law's burden on voters' rights against the state's interests in the law" to determine, "as a threshold inquiry," whether rational basis or some other level of scrutiny applies. *Lichtenstein*, 83 F.3d at 589. Minimal burdens "need only satisfy something approaching rational-basis review," while "severe burdens must satisfy something approaching strict scrutiny; and laws in between must satisfy a level of scrutiny commensurate with their burdens." *Id.*

**a.** At most, rational-basis review applies here because any burden on voting is minimal. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197-98 (2008) (plurality op.) (finding minimal burden); *Kowall v. Benson*, 18 F.4th 542, 547-48 (6th Cir. 2021). Contrary to Plaintiffs' forecasting of chaos and confusion, state and local officials are

working overtime with substantial funding to implement the 2026 Plan for primary elections, which remain nearly three months away. *See* Dodd Dec. ¶¶14-16, 18; Burns Decl. ¶¶7-8.[9]

Plaintiffs exaggerate the burden by conflating the present election preparation efforts with 2022 litigation. *See* Dkt. 12 at 13-16. The present-day changes to the State's 9 congressional districts are materially distinguishable from that earlier litigation involving 33 senate districts redrawn after the 2020 census. Dodd Decl. ¶11. The maps themselves are different—with three times as many districts and corresponding elections at issue in 2022. *Id.* The election deadlines are different—on an earlier timeline than the proposed adjustments to candidate qualifying in 2022. *Id.* ¶9. The ballots are different—with far fewer candidates on the ballot than in 2022. *Id.* ¶10. And, as for "the most significant

---

[9] Plaintiffs submitted supplemental declarations from one Davidson County Election Commissioner, Dkt. 28, and one Montgomery County Election Commissioner, Dkt. 29. These declarations posit that it is "unclear how the Commission is going to be able to comply with the new map" and "ballot permutations by the statutory deadline." Dkt. 29, Perkins Decl. ¶4; *see also* Dkt. 28, Byrd. Decl. ¶5. County election commissions are multi-member bodies. Tenn. Code Ann. §2-12-103(a). The views of two commissioners from two counties are not a basis for enjoining ongoing election preparations across the State. As for Davidson County, the Commission Chairman (and former Coordinator of Elections for the entire State) avers that the county will be able to create all ballots, handle split precincts, timely notify voters with new voter registration cards by the first week of July, and otherwise complete all required preparations. Burns Decl. ¶¶3-9. As for Montgomery County, Plaintiffs' declarant also signed an open letter last week stating she "oppose[d] the corrupt redrawing of our Congressional district." Charles Uffelman, *Open Letter* (May 5, 2026), *available at* https://clarksvillenow.com/local/local-elected-officials-candidates-sign-letter-opposing-gerrymandering-effort-opinion/.

difference" according to the Division of Elections, the funding is different. *Id.* ¶13. Presently, the State is providing more than $3.1 million in funding to state and local officials charged with implementing any changes to districts. *Id.* The lack of funding in 2022 was what risked "incomplete and inaccurate work." *Id.*

Plaintiffs' allegations fail to account for these material distinctions. Those distinctions further confirm that any burden on voters on election day is speculative at best—and certainly not above the "minimal" threshold. *See, e.g.*, *Husted*, 834 F.3d at 632 (holding "'the character and magnitude of the asserted injury'" "result[ed] only in a minimal burden" on right to vote and thus a standard "akin to rational basis" review applied (citation omitted)); *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 338 (6th Cir. 2016) (treating the burden as "minimal" based on "the expansive ability of the plaintiffs to exercise their associational and expressive rights in other ways").

If the burden is only minimal, rational-basis review applies, asking "whether the limits are rationally related to a legitimate government interest." *Kowall*, 18 F.4th at 548.[10] Plaintiffs cannot prevail under that deferential standard. The State's policy changes are "presumed constitutional, and the burden is on plaintiffs to negate 'every conceivable basis which might support it.'" *In re City of Detroit*, 841 F.3d 684, 701 (6th Cir. 2016). The

---

[10] Similarly, if the Court concludes that *Anderson-Burdick* doesn't apply at all, then rational-basis review applies, and Defendants satisfy that standard for the same reasons. *See Kowall*, 18 F.4th at 546-48.

State has a constitutional "prerogative to prescribe the 'Times, Place, and Manner of holding Elections for Senators and Representatives.'" *Husted*, 834 F.3d at 626 (quoting U.S. Const. art. I, §4, cl.1). And "[f]ederal law … generally defers to the states' authority to regulate the right to vote." *Id.* Consistent with those background principles, the State may advance its stated goals in redistricting—both political goals and the mitigation of future litigation risk by redistricting without racial data. *Supra* pp.3-4; *see Alexander*, 602 U.S. at 6 ("[A] legislature may pursue partisan ends …."); *see also Callais*, 2026 WL 1153054, at *13 (slip op. at 24-26) (concluding states may prioritize political goals but face legal liability if allowing race to predominate).

**b.** Even if intermediate scrutiny applied, Plaintiffs cannot prevail. Intermediate scrutiny under *Anderson-Burdick* is "a 'flexible' analysis, 'weighing the burden on the plaintiffs against the state's asserted interests and chosen means of pursuing it." *Husted*, 834 F.3d at 627 (citation omitted). The purported burden is small for the reasons already stated. *Supra* I.B.3.a. And Plaintiffs' speculation about chaos and confusion is unfounded. *Id.* The same day the law was enacted, the Division of Elections updated the "voter lookup" function for voters to identify their districts, and election preparations are proceeding apace. Dodd Decl. ¶¶7, 14-16, 18; *see also* Burns Decl. ¶¶5-7 (noting Davidson County affected voters will be notified with new voter registration cards and on the county website and explaining how funding assistance allowed the county to create a "special redistricting team" to implement changes).

As for the interests justifying the law under that "flexible" scrutiny, *Husted*, 834 F.3d at 627, the State may redraw districts not only to obtain a partisan advantage but also to avoid the litigation risks of the old map. Two weeks ago, the Supreme Court affirmed Louisiana unconstitutionally elevated race above other nonracial considerations, such as politics. *Callais*, 2026 WL 1153054 at *4, *13 (slip op. at 3, 24-25). So while Plaintiffs complain of a "last-minute change[]," Dkt. 12 at 17, the State moved quickly after *Callais* clarified the State could lawfully prioritize the policy goal of sending a "conservative" delegation to Washington. *Supra* pp.3-4. And the State's decision to redistrict on the heels of *Callais* and thereby "[a]void[] the expense of litigation is a legitimate government interest." *Neinast v. Bd. of Trs. of Columbus Metro. Libr.*, 346 F.3d 585, 594 (6th Cir. 2003). To accommodate the new timeline, moreover, the State allowed already-qualified candidates to pick their districts and allows new candidates to qualify too. 2026 Tenn. Pub. Ch. 2, 2d Extra. Sess. §1. The State's "chosen means of pursuing" its interests, then, satisfy *Anderson-Burdick*'s intermediate scrutiny.[11]

In short, *Anderson-Burdick* does not apply to Count I. Even if it did, it does not compel the extraordinary remedy of a preliminary injunction.

---

[11] Applying strict scrutiny would be error. *See, e.g.*, *Thompson v. DeWine*, 959 F.3d 804, 811 (6th Cir. 2020) (per curiam) (staying injunction after district court's application of strict scrutiny instead of intermediate scrutiny).

### C.    Plaintiffs are unlikely to succeed on the merits of Count II.

Supreme Court and Sixth Circuit precedents foreclose Count II, making Plaintiffs' odds of success on the merits near zero. Plaintiffs contend that before the 2026 redistricting, they "engaged in associational conduct," such as "political organizing, volunteering, speaking, campaigning, and donating." Dkt. 12 at 19. In so doing, Plaintiffs claim they "created … associational bonds … within their previous districts, relying on Tennessee's existing congressional district map." *Id.* Invoking *Anderson-Burdick*, Plaintiffs argue the 2026 redistricting will "severely burden Plaintiffs' right to associate." *Id.* at 20.[12]

*Anderson-Burdick* is inapplicable. As with Count I, *Anderson-Burdick* does not apply to allegations of associational harm arising from the redrawing of district lines or relaxed qualifying deadlines. *See Jackson*, 158 F.4th at 593; *see also Lichtenstein*, 83 F.4th at 593-94.

Supreme Court precedent, moreover, forecloses Plaintiffs' associational claim. For decades, the Supreme Court contemplated a constitutional right for voters and candidates to associate in their preferred districts with their preferred candidates. *See Gill*, 585 U.S. at 60-70. Then came *Rucho v. Common Cause*. Plaintiffs there contended that new district plans violated their "First Amendment right to association." 588 U.S. at 713. They

---

[12] Plaintiffs filed a supplemental brief contending that some Candidate Plaintiffs' addresses were targeted by the redistricting changes, not as a separate count but seemingly to shore up their current allegations. *See* Dkt. 24 at 6-8. Described in the Division's attached declaration, more than a dozen candidates identifying as Republicans, Democrats, or Independents now reside in a different district than where they qualified—not just Candidate Plaintiffs. *See* Dodd Decl. ¶17. But the law allows the candidates to choose their district. 2026 Tenn. Pub. Ch. 2, 2d Extra. Sess. §1.

contended they "face[d] difficulty raising money, attracting candidates, and mobilizing voters to support the political causes and issues such Plaintiffs sought to advance." *Id.* (quotations omitted). The Supreme Court was unequivocal in response: "[T]here are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue. The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district." *Id.* at 713-14.

Here too, nothing in the 2026 Plan nor the accompanying changes to election deadlines stop Plaintiffs from associating with whomever they wish. Plaintiffs can still "knock[] on doors, ma[ke] phone calls and text messages, attend[] community forums, neighborhood meetings, civic association gatherings, and faith community events." *Contra* Dkt. 12 at 19. And nothing stops a voter from supporting her preferred candidates. *See Rucho*, 588 U.S. at 713-14.

Likewise, the Sixth Circuit has long rejected alleged harms like Plaintiffs' alleged associational harm. In the Sixth Circuit, a law affecting a candidate's campaign for office imposes no First Amendment burden because there is "no fundamental right to run for elective office," let alone in a congressional district drawn to the candidate's liking. *Zielasko v. Ohio*, 873 F.2d 957, 961 (6th Cir. 1989); *see also Kowall*, 18 F.4th at 547 ("[C]andidates do not have a fundamental right to run for office.").[13] Likewise, the new law does

---

[13] For this reason and others, Plaintiffs' supplemental brief and declarations faulting the 2026 Plan because (some) Candidate Plaintiffs were moved from CD-9 to CD-5, or *vice versa*, are not evidence of any constitutional infirmity. *See* Dkt. 24 at 6-7; Dkt. 26 at 1-2;

"not 'impose constitutionally suspect burdens on [voters'] right to associate or to choose among candidates' … because no one is guaranteed the right to vote for a specific individual." *Zielasko*, 873 F.2d at 961 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). "In the absence of any fundamental right," even if *Anderson-Burdick* applied, only "a rational basis level of scrutiny" applies. *Id.* And Plaintiffs lose under that deferential standard. *Supra* I.B.3.a.

**2.** Plaintiffs' claims are also vastly overstated. As *Rucho* observed, district lines do not restrict "speech, association, or any other First Amendment activities." 588 U.S. at 713. As for Tennessee's *relaxed* candidate qualifying requirements allowing candidates to choose their districts, they are the opposite of a law "*limiting* a political party's ability" to associate. *Lichtenstein*, 83 F.4th at 591 (emphasis added). Plaintiffs cannot establish a "likelihood of success on the merits." *Glowco*, 958 F.3d at 539 (cleaned up). And that's "fatal" to their motion. *Id.*

## II.    *Purcell* **precludes Plaintiffs' extraordinary request for preliminary relief.**

Plaintiffs ask for a temporary restraining order or preliminary injunction with the effect of stopping ongoing preparations mid-stream. *Purcell v. Gonzalez*, 549 U.S. 1 (2006)

---

Dkt. 27 at 3-4. The redistricting affected candidates of all parties. Dodd Decl. ¶17 (identifying 16 candidates of varying parties affected by redistricting lines). And the relaxed candidate qualifying provisions allow Plaintiffs to run in either CD-9 or CD-5. *See* 2026 Tenn. Pub. Ch. 2, 2d Extra. Sess. §1.

(per curiam), precludes that relief. Just as the Supreme Court stayed and summarily reversed a federal court that stopped ongoing elections preparations after mid-decade redistricting in Texas, it would be error to stop Tennessee's. *See Abbott*, 146 S. Ct. at 419; *Abbott v. LULAC*, ___ S. Ct. ___, 2026 WL 1127246 (Apr. 27, 2026) (Mem.).

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424-25 (2020) (per curiam); *see Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Mem.) (Kavanaugh, J., concurring) ("[F]ederal appellate courts should stay injunctions when, as here, lower federal courts contravene th[e] [*Purcell*] principle."). As early as *Reynolds v. Sims*, the Supreme Court has emphasized federal courts must stay their hand even in the face of constitutional claims. 377 U.S. 533, 585 (1964). "*Sims* has been the guidon to a number of courts that have refrained from enjoining impending elections," *Chisom v. Roemer*, 853 F.2d 1186, 1190 (5th Cir. 1988), even for "undisputed" constitutional violations," *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (per curiam).

*Purcell* squarely applies to the present circumstances in Tennessee. *Contra* Dkt. 12 at 21-23. Implementation of the 2026 Plan is ongoing, and candidate qualifying is underway, ending this Friday, for the State's August primaries. Dodd Decl. ¶¶13-16, 18. The Supreme Court has stayed preliminary injunctions under *Purcell* on similar (or earlier)

timelines. *See Abbott*, 146 S. Ct. at 419; *Merrill*, 142 S. Ct. at 879; *see also Ardoin v. Robinson*, 142 S. Ct. 2892, 2892-93 (2022) (Mem.); *Robinson v. Callais*, 144 S. Ct. 1171 (2024) (Mem.).

Plaintiffs claim that *Purcell* does not apply when "States disrupt elections." Dkt. 12 at 21. That argument cannot be squared with the Supreme Court's recent stay involving Texas's mid-decade congressional redistricting. *See Abbott*, 146 S. Ct. at 419. As exemplified by the *Abbott* stay, the *Purcell* doctrine limits the *judicial* power, not the State's prerogative to determine the time, place, and manner of holding congressional elections. *Id.*; *contra* Dkt. 12 at 22. Plaintiffs get that principle exactly backwards. "To reason that *Purcell* somehow constrains a state legislature's power to set rules would 'turn *Purcell* on its head.'" *OPAWL-Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 775, n.1 (6th Cir. 2024) (quoting *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Mem.) (Kavanaugh, J., concurring in denial of application to vacate stay)). *Purcell* "constrains the equitable powers of the federal courts, not the sovereign powers of state legislatures." *Id.* While policymakers might debate the wisdom of a State's decision "to toy with its election laws close to a State's elections," it is "quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election." *Merrill*, 142 S. Ct. at 880-81 (Kavanaugh, J., concurring). *Purcell* precludes the latter, not the former, as Plaintiffs' own cited authority confirms. *See, e.g.*, *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 890 (6th Cir. 2024) (per curiam) (staying *court*'s injunction, concluding it came too close to election day).

Plaintiffs' *Purcell* arguments also confuse the status quo. The 2026 Plan, as well as the changes to candidate qualifying requirements, including suspension of the residency requirement, are now the *status quo*. Detailed in the attached declarations, state and local officials are already implementing the 2026 Plan. Dodd Decl. ¶¶13-16, 18. Likewise, already-qualified candidates and new candidates will submit their paperwork by Friday so that ballots can be prepared as early as Monday. *Id.* ¶¶4, 9. And the 2026 Plan has been live on the Secretary of State's website for voters to use the "voter look-up" function since last week. *Id.* ¶15. Any court order will derail that status quo and interrupt ongoing election preparations mid-stream. *Purcell* precludes that disruption. *See, e.g., Abbott*, 146 S. Ct. at 418 (issuing stay over arguments that earlier enacted districts were the status quo); *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).

## III. Plaintiffs will not suffer irreparable harm absent an injunction.

Plaintiffs have not established irreparable harm. While they speculate the 2026 Plan will cause downstream election administration issues, voter confusion, or possible disenfranchisement, Dkt. 12 at 23-24, that speculation is unfounded and cannot establish irreparable harm. *See Memphis A. Philip Randolph Inst. v. Hargett,* 978 F.3d 378, 391 (6th Cir. 2020) (irreparable harm requires "both certain and immediate" injury, not "speculative or theoretical" (citation omitted)). For all the reasons already explained, Plaintiffs cannot substantiate their speculation. *Supra* I.B.3.a. They cannot conflate the present circumstances, including the $3.1 million provisioned for state and local officials, with 2022

litigation. Dodd Decl. ¶¶7-13; Burns Decl. ¶¶5-7. Primary elections are months away. Tennessee holds one of the latest primary elections in the country, August 6. Early voting doesn't begin until July 17. And while candidates now have additional days to qualify, qualifying ends promptly to allow ballots to be prepared as soon as May 18. Dodd Decl. ¶9. And more than a month remains before the federal deadline for military and overseas citizen ballots. *See* 52 U.S.C. §20302(a)(8); Tenn. Code Ann. §2-6-503(a). All told, the State has the time and resources to implement the 2026 Plan; if officials may continue that important work, Plaintiffs won't suffer irreparable harm.

## IV. The balance of harms and public interest demands denial of Plaintiffs' requested relief.

Because Defendants are government officials, the balance-of-equities and public-interest factors "merge." *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (citation omitted). It is "in the public interest" to enforce the State's democratically enacted laws, *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020), and "[a]ny time" such a law is enjoined, the State "suffers a form of irreparable injury," *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 787 (M.D. Tenn. 2020) (cleaned up).

**A.** Any balancing of the harms compels the denial of Plaintiffs' requested relief. If an injunction is entered, "Tennessee will suffer irreparable harm from its inability to enforce the will of its legislature." *L.W. v. Skrmetti*, 73 F.4th 408, 421 (6th Cir. 2023) (granting stay pending appeal). That is doubly true in the election context. The "inability" to conduct elections under a "duly enacted" redistricting plan "clearly inflicts irreparable

24

harm" on the State and the members of the public it represents. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). If, after the 2026 election, the Court's "judgment is ultimately reversed, the State cannot run the election over again, this time applying" its congressional map. *Veasey v. Perry*, 769 F.3d 890, 896 (5th Cir. 2014). "[T]he State has a significant interest in ensuring the proper and consistent running of its election machinery, and this interest is severely hampered by [an] injunction." *Id.* Unsurprisingly, the Supreme Court regularly stays injunctions against redistricting plans to preserve the status quo until appellate review concludes, *Abbott*, 146 S. Ct. at 419, even in circumstances where appellate review came out in Plaintiffs' favor, *see*, *e.g.*, *Robinson*, 144 S. Ct. at 1171; *Merrill*, 142 S. Ct. at 879.

**B.** Finally, the public interest likewise compels the denial of Plaintiffs' request for extraordinary relief. Redistricting "is a legislative task" that "courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539-40 (1978) (White, J.) (collecting cases); *accord Wygant v. Lee*, ___ S.W.3d ___, 2025 WL 3537313, at *25 (Tenn. Dec. 10, 2025). The 2026 Plan and the associated changes to the State's election laws, all enacted by the General Assembly, are themselves "a declaration of public interest." *Virginian Ry. Co. v. System Fed'n No. 40*, 300 U.S. 515, 552 (1937); *see Berman v. Parker*, 348 U.S. 26, 32 (1954) ("when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive"). That legislative action is entitled the presumption of good faith. *See, e.g.*, *Alexander*, 602 U.S. at 6, 10-11; *cf. Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 487-

88 (1955). That presumption is a factor "to be considered in favor of applicants in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers).

## CONCLUSION

For all these reasons, the Court should deny Plaintiffs' motion for a temporary restraining order and preliminary injunction.

Dated: May 13, 2026

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ *Zachary L. Barker*
ZACHARY L. BARKER (BRP #035933)
*Senior Assistant Attorney General*

ANDREW DENNING (BPR #042208)
*Assistant Attorney General*
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 532-7400
Zachary.barker@ag.tn.gov
Andrew.denning@ag.tn.gov
(615) 532-4098

TAYLOR A.R. MEEHAN (PHV pending)
BRYAN K. WEIR (PHV pending)
OLIVIA C. ROGERS (PHV pending)
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
taylor@consovoymccarthy.com
bryan@consovoymccarthy.com
orogers@consovoymccarthy.com

*Counsel for Defendants*