| | | |
|---|---|---|
| VICKI HALE, EARLE FISHER, TELISE TURNER, HEDY WEINBERG, STEPHEN COHEN, CHARLES 'CHAZ' MCIVOR MULDER, CHANEY MOSLEY, JUSTIN PEARSON, and THE TENNESSEE DEMOCRATIC PARTY, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | NO. 3:26-cv-00603 |
| v. | ) ) | JUDGE CAMPBELL MAGISTRATE JUDGE FRENSLEY |
| BILL LEE, Tennessee Governor, TRE HARGETT, Tennessee Secretary of State, MARK GOINS, Tennessee Coordinator of Elections; all in their official capacity only, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM</u>

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

On May 7, 2026, the State of Tennessee enacted Tennessee House Bills 7001, 7002, 7003, and 7005 (the "Act"),[1] which redraws most of the Congressional districts in Tennessee, and revises election deadlines, candidate qualifications, and voter notice requirements. The Act took immediate effect and therefore applies to the primary and general elections to be held in August and November 2026, respectively.

Plaintiffs are voters Vicki Hale, Earle Fisher, Telise Turner, and Hedy Weinburg (the "Voter Plaintiffs"), candidates for the United States House of Representatives Stephen Cohen, Chaz Molder, Chaney Mosley, and Justin Pearson (the "Candidate Plaintiffs"), and the Tennessee

---

[1] The Act is filed in the record at Doc. No. 23-13.

Democratic Party. They challenge the constitutionality of the implementation and enforcement of the Act during the 2026 election cycle, arguing that immediate implementation of the law will unlawfully burden their rights to vote, free speech, and association. Plaintiffs bring official capacity claims against: Defendants Bill Lee, Governor of Tennessee; Tre Hargett, Tennessee Secretary of State; and Mark Goins, Tennessee Coordinator of Elections. In Count I, Plaintiffs claim the Act's alteration of Tennessee's congressional districts and the August 2026 election calendar and rules poses a concrete risk of disenfranchising Plaintiffs and severely burdens their right to vote in violation of the First and Fourteenth Amendments. (Compl., ¶¶ 75-79).[2] In Count II, Plaintiffs claim the Act severely burdens their right to associate in violation of the First and Fourteenth Amendments by breaking their already-formed associational bonds for the upcoming election. (Compl., ¶¶ 81-86).

In the Complaint and in their Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiffs ask the Court to enjoin the implementation and enforcement of the Act during the 2026 election cycle. (*See* Compl., Doc. No. 23; Motion, Doc. No. 11). They initially requested a hearing on the motion for temporary restraining order and the Court set a hearing. (*See* Motion, Doc. No. 11). However, during a status conference, the parties stated that they did not intend to present live testimony at the hearing, and Plaintiffs subsequently withdrew their request for a hearing and requested the Court issue a ruling on the motion for temporary restraining order based on the submissions by the parties. (*See* Doc. No. 32). Plaintiffs also filed a motion for an expedited ruling on the motion for temporary restraining order before the revised candidate notification deadline of 12:00 p.m. on Friday, May 15, 2026. (Doc. No. 33). Defendants responded in

---

[2]      All references to the Complaint are to the Amended Complaint (Doc. No. 23). Plaintiffs state that the only change from the original complaint is the correction of a spelling error in the name of one of the plaintiffs. (*See* Doc. No. 6).

opposition to the motion for expedited ruling and to the motion for temporary restraining order and preliminary injunction. (Doc. Nos. 35, 40). Plaintiffs replied. (Doc. Nos. 36, 41).

On May 14, 2026, the Court denied Plaintiffs' motion for temporary restraining order and stated that the reasons for the denial would be set forth in a forthcoming memorandum. (Doc. No. 42). The reasons are set forth herein.

## I.   BACKGROUND

After three days of an "extraordinary session" on May 5, 6, and 7, 2026, Tennessee enacted the challenged Act on May 7, 2026.[3] The Act redraws most of the nine congressional districts in Tennessee. Of note, it splits former District 9, which comprises most of Shelby County, into Districts 5, 8, and 9, and substantially redraws District 5.

The Act changed the candidate qualifying deadline for the August 2026 congressional primary from March 10, 2026, to May 15, 2026, and creates a new "special qualifying period" that allows anyone to submit a nominating petition containing 25 signatures from registered voters residing anywhere within any county that lies partially within the newly drawn congressional district. The Act also eliminates the requirement that candidates be a resident of the county represented for one year immediately preceding the election. HB 7001, Amendment No. 1, § 2-16-207 (amending Tenn. Code Ann. § 2-13-209 so that it "does not apply to the 2026 primary

---

[3]     On May 1, 2026, Governor Bill Lee issued a proclamation calling the One Hundred Fourteenth General Assembly of the State of Tennessee to meet and convene in extraordinary session beginning May 5, 2026, to "consider and act upon legislation relative to: (1) the composition of Tennessee's congressional districts; (2) making statutory changes that are necessary to effectuate change to the composition of Tennessee's congressional districts and to facilitate 2026 congressional elections; (3) making appropriations sufficient to provide funding for any legislation that received final passage during the extraordinary session or other appropriations sufficient to facilitate 2026 congressional elections; and (4) making appropriations sufficient to pay the expenses of the extraordinary session, including the expenses of carrying out any actions taken pursuant to this proclamation." Proclamation by the Governor, State of Tennessee, May 1, 2026 (filed at Doc. No. 23-11).

election for office of United States representative") (*See* Doc. No. 23-13 at PageID# 722-23). In other words, under the Act, neither the 2026 candidates nor those who sign the petition during the special qualifying period need to be registered voters within the district. In line with the compressed timeline, candidates who qualify during the special qualifying period are not permitted to withdraw or to appeal any decision by the executive committee of a political party that they are not qualified.

The Act provides that candidates who qualified before the Act have three choices: (1) stay in the district in which they qualified; (2) provide written notice to the coordinator of elections that they are running in a different district; or (3) provide written notice to the coordinator of elections that they are withdrawing. The deadline to provide written notice of a change of district or withdrawal was May 15, 2026.

To implement the necessary changes, the State appropriated $3,154,700.00 to reimburse counties for expenses incurred by county election commissions for the 2026 congressional elections. HB 7005, Amendment No. 1, Section 2 (Doc. No. 23-13 at PageID# 725); (*see also*, Dodd Decl., Doc. No. 41-1, ¶ 13). The funding may be used to pay overtime or hire additional staff, to pay vendors for services performed on an expedited bases, to mail notices to voters, to pay for additional training, signage, voter education, etc. (Dodd Decl., Doc. No. 41-1, ¶ 13). Although the funding may be used to mail notice to voters, such notice is not required. The Act provides that notice is satisfied by publication on the county election commission's official website "if one exists." HB 7001, Amendment No. 1, § 2-16-203(b) (Doc. No. 23-13 at PageID# 720).

## II. APPLICATION OF 28 U.S.C. § 2284

Under 28 U.S.C. § 2284, "[a] district court of three judges shall be convened … when an action is filed challenging the constitutionality of the apportionment of congressional districts …" 22 U.S.C. § 2284(a). In the Complaint, Plaintiffs contend that a three-judge-panel is not required because they are challenging the timing of the reapportionment of congressional districts and seek to enjoin the Act for the 2026 election cycle; they do not challenge the apportionment decisions codified in the Act. (Compl., ¶ 15).

The Court requested the parties filed briefs addressing whether a three-judge panel is required under the statute. (Doc. No. 20). Defendants argue the statute applies because, although Plaintiffs' claims are not the paradigmatic racial gerrymandering or malapportionment claims, they nevertheless challenge the "constitutionality of the apportionment of congressional districts." (Doc. No. 37). Indeed, the harm sought to be remedied is the Act's apportionment of congressional districts. In response, Plaintiffs state that, while application of the statute is a "close call," they do not oppose Defendants' position that Section 2284 applies. (Doc. No. 38).

Pursuant to Section 2284, "[u]pon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge." 28 U.S.C. § 2284(b)(1). Even when three judges are required under the statute, "[a] single judge may … may grant a temporary restraining order on a specific finding, based on evidence submitted, that specified irreparable damage will result if the order is not granted, which order, unless previously revoked by the district judge, shall remain in force only until the hearing and determination by the district court of three judges of an application for a preliminary injunction." 28 U.S.C. § 2284(b)(3).

Having no basis from which to conclude that three judges are not required, the Court will notify the chief judge of the circuit that this case requires three judges. The Court will proceed to consider Plaintiffs' motion for temporary restraining order. The application for preliminary injunction will be heard and decided by the panel.

### III.     LEGAL STANDARD

The same legal standard governs both the issuance of preliminary injunctions and temporary restraining orders. *Mich. State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 942 (E.D. Mich. 2016) (citing *Sandison v. Mich. High Sch. Athletic Assoc.*, 64 F.3d 1026, 1030 (6th Cir. 1995)).

"To secure a preliminary injunction, a plaintiff must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *EOG Resources, Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (citing *Winter v. Nat. Rs. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Because a preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right,' the plaintiff must make a 'clear showing' that these factors favor him." *Id.* (quoting *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346-46 (2024)).

### IV.     ANALYSIS

#### A.  Likelihood of Success

Plaintiffs assert two claims. Count I alleges that the timing of the reapportionment and changes to election deadlines, candidate qualifications, and voter notice severely burden their right to vote in violation of the First and Fourteenth Amendments. Plaintiffs point to statements by state and county election officials in 2022 in support of a motion to stay court-ordered redistricting. At

6

that time, election officials stated that they would be unable to timely and accurately implement changes necessitated by redistricting on a less compressed timeline than that imposed by the Act and expressed concerns about "significant voter confusion." (Doc. No. 12 at 14-15 (citing Declaration of Linda Phillips, Administrator of Elections for Shelby County, March 21, 2022, Doc. No. 1-2)).[4] Those election administrators also swore that delaying the candidate qualifying deadline to May would prevent their offices from meeting the federal statutory deadline for mailing overseas absentee ballots to members of the military. (*Id.*).

Plaintiffs also submit declarations from Kenneth Byrd and Tiffany Perkins, current commissioners on the Davidson County and Montgomery County Election Commissions, respectively. (Doc. Nos. 28, 29). These commissioners express concern that their county election commissions cannot meet the new deadlines without voter confusion and errors. (*Id.*). Plaintiffs argue that voter confusion is even more likely here because the Act removes notice requirements, leaving voters "in the dark" about election changes.

Defendants respond that the changes mandated by the Act, at most impose a minimal burden on voting and that Plaintiffs' comparison to election preparation in 2022 is misplaced. Defendants argue that difference in shortened deadlines, simpler ballots, and expanded resources differentiate election preparation efforts for the 2026 election from that of 2022. They submit declarations from Andrew Dodd, Assistant Coordinator of Elections, and Will Burns, Chairman of the Davidson County Election Commission, both of whom state that their respective agencies have begun preparation for the election under the deadlines and districts imposed by the Act. (Doc. Nos. 40-1, 40-3). Dodd acknowledges that "the revised congressional districts and special

---

4       In 2022, election officials from Knox and Wilson Counties expressed similar concerns. (*See* Doc. Nos. 1-3 (Decl. of Chris Davis, Knox County Administrator of Elections), 1-4 (Declaration of Tammy Smith, Wilson County Administrator of Elections)).

qualifying period will make it more difficult for [the agency's] staff and for the county election commissions to meet deadlines to prepare for the August 6 elections." (Dodd. Decl., Doc. No. 40-1, ¶ 7). He notes, however, that the State has appropriated over $3 million to assist county election officials in meeting deadlines and performing their duties. (*Id.*, ¶¶ 7, 13). Contrary to the opinion stated by Commissioner Byrd, Chairman Burns states that, with the additional funds appropriated, he is confident the Davidson County Election Commission will be able to meet election deadlines. (Burns Decl., Doc. No. 40-3, ¶ 7).

Historically, Courts apply the *Anderson-Burdick* balancing test to associational and voting-rights claims. *Lichtenstein v. Hargett*, 83 F.4th 575, 590 (6th Cir. 2023). Under *Anderson-Burdick*, the level of scrutiny "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Daunt v. Benson*, 999 F.3d 299, 310 (6th Cir. 2021) (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "Laws that impose minimal burdens need only satisfy something approaching rational-basis review; laws that impose severe burdens must satisfy something approaching strict scrutiny; and laws in between must satisfy a level of scrutiny commensurate with their burdens." *Lichtenstein*, 83 F.4th at 589 (citing *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626-27 (6th Cir. 2016)).

The parties dispute whether the *Anderson-Burdick* test applies here. (*See* Pl. Mem., Doc. No. 12 at 12-13; Defs. Resp., Doc. No. 40 at 10-13). Plaintiffs argue the test applies because the Act infringes on voting and association rights. Defendants characterize Plaintiffs' claims as a challenge to redistricting and argue that *Anderson-Burdick*, therefore does not apply. (Doc. No. 40 at 11 (citing *Jackson v. Tarrant Cty.*, 158 F.4th 571, 593 (5th Cir. 2025) ("[W]e are aware of no cases applying *Anderson-Burdick* to redistricting decisions."))).

For purposes of the instant motion, the Court need not decide whether *Anderson-Burdick* applies to the claims raised in this case. Plaintiffs have not shown that that the compressed timeline to prepare for the election will severely burden the right to vote, particularly given that the State has allocated significant resources to enable election officials to prepare which differentiates the Act from the court-imposed districting changes in 2022 for which funding was not available.

Even if the burden on the right to vote falls somewhere in between "minimally burdensome" and "severe restrictions," Plaintiffs have not clearly shown they are entitled to relief. For "[r]egulations falling somewhere in between—i.e., regulations that impose a more-than-minimal but less-than-severe burden," the Court applies a "flexible" analysis, "weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016). At this juncture, Plaintiffs have not shown that the potential burden on the right to vote based on anticipated voter confusion (which may prove to be unfounded) outweighs the State's asserted interest in redrawing districts to obtain a partisan advantage and to avoid litigation risks of the old map.[5]

In Count II, Plaintiffs claim the Act infringes their right to association because, for months, voters and candidates formed associational bonds with voters in districts as previously constituted under the 2022 congressional map. Now, with only three months until the August 2026 primary election, "the Act takes a wrecking ball to these efforts." (Doc. No. 12 at 18-20). Plaintiffs

---

[5]      On April 29, 2026, the Supreme Court decided *Louisiana v. Callais*, 608 U.S. ___, 2026 WL 1153054 (2026). The Court held that Louisiana's congressional map, which included majority-minority districts, impermissibly used race as a predominant factor. The Court also emphasized that a State may advance its "political goals" in redistricting. *Id.* at *13 (slip op. at 24-25). Members of the Legislature openly expressed that the purpose of the redistricting was partisan. (*See* Statement of Sen. John Stevens, Senate Judiciary Comm. Tr. 6:24-7:1; 70:7-10 (May 6, 2026) (Doc. No. 40-4) ("Tennessee is a conservative state." "We are attempting to maximize the chances that the congressional delegation of Tennessee will maintain a Republican majority in the United States House of Representatives.").

complain that the Act unfairly changes the rules in the middle of the election period causing them to "expend additional resources" and depriving them "of a fair process and an accurate result." (*Id.* at 20). Plaintiffs cite the analogy used by the Supreme Court in *Bost v. Illinois State Board of Elections*, 607 U.S. 71 (2026). That case considered whether a candidate had standing to challenge election rules. In explaining why he did, the Supreme Court explained, "Candidates [] are not 'mere bystanders' in their own elections. They have an obvious personal stake in how the result is determined and regarded. Departures from the preordained rules cause them particularized and concrete harm." *Id.* at 520 (internal citations omitted). The court analogized an election to 100-meter dash. *Id.* "Each runner in a 100-meter dash … would suffer if the race were unexpectedly extended to 105 meters. Whether a particular runner expects to finish strong or fall off the pace in the final five meters, all would be deprived of the chance to compete for the prize that the rules define. The fastest to run 105 meters has not won the 100-meter dash." *Id.* at 520-21 (internal citations omitted).

Defendants argue that the Supreme Court decision in *Rucho v. Common Cause*, 588 U.S. 684, 713 (2019), forecloses Plaintiffs' associational claim. (Doc. No. 40 at 18). In *Rucho*, the plaintiffs complained that partisan redistricting burdened fundraising, attracting candidates, and mobilizing voters. *Id.* The Supreme Court noted that the districting plans themselves did not restrict speech or association and found that there was no objective standard by which a court could separate constitutional from unconstitutional partisan gerrymandering. *Id.* at 14 ("The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district."). Plaintiffs respond that *Rucho* is distinguishable because it did not involve a challenge to redistricting in the midst of the election cycle – *i.e.*, months *after* the candidate qualifying deadline for the impending election. *Rucho*, 588 U.S. at 691.

The parties disagree on whether *Anderson-Burdick* applies to Plaintiffs' associational claim. Plaintiffs argue it applies, that the burden on their associational rights is severe and that "partisan gamesmanship" is not a compelling state interest. Defendants argue *Anderson-Burdick* does not apply to allegations of associational harm arising from the redrawing of district lines or relaxed qualifying deadlines. (Doc. No. 40 at 18 (citing *Jackson*, 158 F.4th at 593; *Lichtenstein*, 83 F.4th at 593-94)).[6] Here, however, Plaintiffs' claim is not strictly a challenge to the new district boundaries themselves, but to the redistricting in the middle of the race, akin to a declaration that the 100 meter dash for which the candidates qualified and registered will instead be a steeplechase.

The Court finds Plaintiffs may ultimately be able to succeed on this claim, but cannot find at this juncture a substantial likelihood of success on this theory.

**B. Irreparable Harm**

Plaintiffs contend they will suffer irreparable harm absent an injunction because the loss of constitutional rights – here, restriction on the right to vote and to associate for the advancement of political beliefs – is presumed to be an irreparable injury. Defendants argue Plaintiffs cannot show irreparable harm because any assertion that the Act will cause voter confusion or disenfranchisement is unfounded speculation. Defendants argue the State has allowed sufficient time and provided sufficient funding for election preparation to make the potential for voter confusion or disenfranchisement far from certain.

---

[6] The Complaint and initial briefing on the motion for temporary restraining order and preliminary injunction focus on the timing of the Act, but Plaintiffs' supplement to the motion (Doc. No. 24) and reply to Defendants' opposition (Doc. No. 41) raise issues with the new district lines themselves. In those filings, Plaintiffs assert that the newly drawn 2026 Map targeted Candidate Plaintiffs Cohen, Pearson, and Molder and was "drawn to protect Republican incumbent Representatives and to exclude the only Democratic incumbent Representative and other top performing Democratic candidates." (Doc. No. 24 at 6-7; Doc. No. 41 at 3, n.3).

11

Defendants do not speak to the likelihood of harm to voters and candidates related to the associational claim. Plaintiffs submitted declarations from voters and candidates that demonstrate the likelihood of associational harm. (*See* Doc. Nos. 11-3, 11-4, 11-5, 11-6, 11-7, 11-8).

**C. Balance of Equities, the Public Interest, and *Purcell***

When defendants are government officials, the balance-of-equities and public interest factors merge. *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020). Accordingly, the Court considers them together. Plaintiffs argue injunctive relief will preserve the status quo – *i.e.*, the status before the Tennessee Legislature passed the Act and that it is always in the public interest to prevent violation of a party's constitutional rights, especially the right to vote. (Doc. No. 12 at 24-25). Defendants argue the Act is the status quo, that it is in the public interest to enforce the state's democratically enacted laws, and that the legislative action is entitled to the presumption of good faith. (Doc. No. 40 at 24-25).

Both parties raise the *Purcell* principle which instructs federal courts not to alter state election rules "on the eve of an election." *See NAACP v. Lee*, 105 F.4th 888, 890 (6th Cir. 2024) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). In *Purcell*, a lower court issued an injunction against a law requiring voter identification a month before an election. *Id*. The Supreme Court dissolved the injunction without any opinion about the likelihood of success "because of the need for 'clear guidance' to election officials and the risk of 'voter confusion' from the judiciary's last-minute election changes." *Id*. Neither Supreme Court nor the Sixth Circuit has provided a categorical answer to what constitutes a last-minute election change, or in other words, "How close is too close?" *Id*. However, the Sixth Circuit has noted that the Supreme Court has stayed injunctions issued anywhere from a month to several months before an election, and appears to presume that an injunction within this timeframe would "fall within *Purcell*." *Id*. at 897. The Sixth

Circuit has not, however, suggested that an injunction affecting an election rule is foreclosed by *Purcell* merely because it would fall within weeks or months of an election. Instead, the *Purcell* principle is considered within the balance of the equities. *Id*. at 896. Sometimes, "the equities underlying *Purcell* can justify a stay *by themselves*." *Id*. (citing *Crookston v. Johnson*, 841 F.3d 396, 399 (6th Cir. 2016)). To determine whether *Purcell* "alone" warrants a stay, the Sixth Circuit has found timing of the request for relief, risk of confusion, and relative burdens, to be relevant considerations.

Here, Plaintiffs sought expedited relief the day after the Act became law. Nothing about the timing of Plaintiffs' motion is a basis to deny relief. The potential for confusion, perhaps inevitable in this type of litigation, is a more pressing concern that is magnified given the already compressed timeframe between the Act and the primary election. Mindful of this Court's role the litigation of this matter and that the motion for preliminary injunction will ultimately be decided by a three-judge panel under 28 U.S.C. § 2284, the likelihood of confusion resulting from a stream of Court decisions, which may or may not reach the same conclusions, is too significant to disregard. This is particularly true where the likelihood of success on the merits is far from certain. *See Purcell*, 549 U.S. at 4-5 ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.").

The relative burdens of an injunction cut both ways. Plaintiffs argue that the State's burden is minimal because an injunction would merely restore the pre-Act boundaries and deadlines and cease rather than perpetuate election upheaval. To be sure, the burden on the State is less than it would be if, for example, Plaintiffs sought to enjoin long-standing congressional maps. But the burden on the State is not inconsequential. The State began planning for the necessary election changes before the Act was passed and upon the Act's passage, the Division of Elections

13

immediately began implementing measures. (*See* Goins Memo (May 4, 2026), Doc. No. 23-12; Dodd Decl., Doc. No. 40-1). Moreover, it is universally recognized that a State is burdened whenever a court enjoins one of its election laws. *See NAACP v. Lee*, 105 F.4th at 900 (collecting cases).

The burdens on voters with regard to voter confusion are less certain. Information regarding the new districts is available on the Division of Election website with a voter-look-up feature that allows voters to look up their address to determine which district they are in. (*See* Dodd Decl., Doc. No. 40-1, ¶ 15).[7] The burdens to the association rights of voters and candidates that arise by virtue of the changes to district boundaries during the election cycle after the original deadline for candidate qualification is undeniable, particularly as to those voters who formed associative bonds with candidates who are no longer in their district and vice versa.

On balance, given the timing of the legislation vis-a-vis the election, Plaintiffs' immediate request for relief, and the relative burdens, it does not appear to the Court that this is a case where the *Purcell* principle *alone* warrants denial of an injunction. The Court does, however, give strong weight to the likelihood of voter confusion in the face of ongoing litigation close to an election regardless of the outcome of that litigation. This consideration counsels strongly against the issuance of an injunction.

---

[7] https://sos.tn.gov/announcements/2026-congressional-redistricting (last visited May 21, 2026).

## V.    CONCLUSION

Considering the relevant factors, the Court is not persuaded that a temporary restraining order should issue. Accordingly, the motion for temporary restraining order is **DENIED**.

The Order reflecting this decision has been entered. (*See* Doc. No. 42).

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

15